UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

HYUK KEE YOO, a/k/a "KEITH YOO,"       :
                                       :
            Petitioner,                :
                                       :     Case No.  7:21-cv-06184-CS
        vs.                            :
                                       :
UNITED STATES OF AMERICA               :
                                       :
            Respondent.                :

---------------------------------------------------------x


<u>MEMORANDUM IN SUPPORT OF THE PETITION OF YOO HYUK KEE ("KEITH YOO")
FOR A WRIT OF HABEAS CORPUS</u>


Paul Shechtman
BRACEWELL LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020
212-508-6107
paul.shechtman@bracewell.com


Shawn Naunton
ZUCKERMAN SPAEDER LLP
485 Madison Avenue
10th Floor
New York, NY 10022
646-746-8655
snaunton@zuckerman.com

Attorneys for Defendant Keith Yoo

August 16, 2021

<u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ................................................................................................1

MAGISTRATE JUDGE MCCARTHY'S DECISION ........................................4

STANDARD OF REVIEW ..................................................................................5

ARGUMENT ........................................................................................................5

POINT ONE:  THE CHARGES AGAINST KEITH YOO ARE TIME-BARRED......................5

    A.    The Statute of Limitations Issue is for the Court to Decide ...................................6

        1.    The Language of the Treaty.....................................................7

        2.    History of the Treaty .............................................................10

    B.    The Statute of Limitations is Five Years ..............................................15

    C.    The Korean Arrest Warrant Did Not Toll the Statute of Limitations...................16

    D.    Keith Yoo Did Not Flee from Justice ..................................................18

    E.    The Accomplice Toll Does Not Revive the Case ..................................19

POINT TWO: THERE IS NOT PROBABLE CAUSE THAT
KEITH YOO COMMITTED EMBEZZLEMENT CRIMES...............................21

    A.    Legal Principles ................................................................................21

    B.    Korean Summaries and Yoo's Transcripts ...........................................23

    C.    The Seven Embezzlement Charges.......................................................23

        1.    Chonhaiji Trademark Agreement ..........................................23

            a.    Park's Statements..................................................24

            b.    Byeon Gi-Chun .....................................................27

        2.    Ahae Trademark Agreement....................................................28

a.      Park's Statement ................................................................29

b.      Lee Gang-se ...................................................................29

c.      Lee Seong-Hwan ..............................................................30

3.      Onnara Shopping Trademark Agreement ...................................30

4.      Semo Consulting Agreement ................................................33

a.      Kim Gyu-seok ...............................................................33

b.      Go Chang-hwan ..............................................................34

c.      Jo Seon-ae ..................................................................36

5.      Moreal Consulting Agreement...............................................39

a.      Ha Myeong-hwa ..............................................................39

b.      Park Hwa-sun ................................................................41

6.      Chonhaiji Consulting Agreement ...........................................42

7.      Chonhaiji Photography Purchases ..........................................45

CONCLUSION...............................................................................49

## TABLE OF AUTHORITIES

PAGE

CASES

Blaxland v. Commonwealth Dir. Of Pub. Pros., 323 F.3d 1198 (9th Cir. 2003)............................6

Caplan v. Vokes, 649 F.2d 1336 (9th Cir. 1981) ................................................. 14-15, 19

Citizens & S. Nat. Bank v. Bougar, 434 U.S. 35 (1977) .......................................................8

Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193 (2000) ......................................8

E. Airlines, Inc. v. Floyd, 499 U.S. 530 (1991) ........................................................ 10-11

Extradition of Sindona, 450 F. Supp. 672 (S.D.N.Y. 1978) ..................................................22

Farmers' & Merchants' Bank of Monroe N.C. v. Fed. Reserve Bank of Richmond,
    262 U.S. 649 (1923)..............................................................................8

Fernandez v. Phillips, 268 U.S. 311 (1925)...................................................................5

Freedman v. United States, 437 F. Supp. 1252 (N.D. Ga. 1977).............................................22

Gill v. Imundi, 747 F. Supp. 1028 (S.D.N.Y. 1990)........................................................23

Haynes v. United States, 891 F.2d 235 (9th Cir. 1989)......................................................8

In Matter of Extradition of Ernst, 1998 WL 395267 (S.D.N.Y.)..............................................22

In re Extradition of Ben-Dak, 2008 WL 1307816 (S.D.N.Y.)................................................22

In re Extradition of Gang-Choon Han, 2012 WL 33201 (C.D. Cal.) ..........................................16

In re Extradition of Khochinsky, 116 F. Supp. 3d 412 (S.D.N.Y. 2015) ....................................22

In re Extradition of Marzook, 924 F. Supp. 565 (S.D.N.Y. 1996) ..........................................26

In re Kaine, 55 U.S. 103 (1852).............................................................................15

Jhirad v. Ferrandina, 486 F.2d 442 (2d Cir. 1973) .........................................................18

Johnson v. Star Freight, LLC, 2018 WL 4520212 (N.D. Ga.)..................................................9

Johnson v. Wells Fargo Home Mortgage, Inc., 635 F.3d 401 (9th Cir. 2011) ...............................8

Lo Duca v. United States, 93 F.3d 1100 (2d Cir. 1996) ......................................................6

Marathon Oil Co. v. United States, 374 F.3d 1123 (Fed. Cir. 2004)................................8

Martinez v. United States, 828 F.3d 451 (6th Cir. 2016)...................................................17

Medellin v. Texas, 552 U.S. 491 (2008)................................................................................11

Patterson v. Wagner, 785 F.3d 1277 (9th Cir. 2015).........................................................7

Photopaint Technologies, LLC v. Smartlens Corp., 335 F.3d 152 (2d Cir. 2003) .........8

Sainez v. Venables, 588 F.3d 713 (9th Cir. 2009).............................................................17

Sandhu v. Burke, 2000 WL 191707 (S.D.N.Y.) .................................................................22

Shapiro v. Ferrandina, 478 F.2d 894 (2d Cir. 1973)........................................................15

Simmons v. Harleysville Ins. Co., 2021 WL 1947868 (S.D. Ga.).....................................9

Skaftouros v. United States, 667 F.3d 144 (2d Cir. 2011).................................................5

Sumitomo Shoji Am. v. Avagliano, 457 U.S. 176 (1982) ...............................................11

Theron v. United States, 832 F.2d 492 (9th Cir. 1987) ...................................................15

U.S. v. Pena-Bencosme, 2006 WL 3290361 (E.D.N.Y.).................................................22

United States v. Atl. Rsch. Corp., 551 U.S. 128 (2007) .................................................10

United States v. Howard, 489 F.3d 484 (2d Cir. 2007) ..................................................21

United States v. Marion, 404 U.S. 307 (1971)..................................................................15

United States v. Rogers, 461 U.S. 677 (1983) ...................................................................8

United States ex rel. Holzendorf v. Hay, 20 App. D.C. 576 (D.C. Cir. 1902) ...........8, 10

United States ex rel. Petrushansky v. Marasco, 325 F.2d 562 (2d Cir. 1963)..............22

Van Du Vo v. Benov, 447 F.3d 1235 (9th Cir. 2006)......................................................7

STATUTES AND RULES

18 U.S.C. §3184 .........................................................................................................6

18 U.S.C. §3282(a) ...................................................................................................16

18 U.S.C. §3290 .......................................................................................................18

28 U.S.C. §2241 ....................................................................................................1, 5

OTHER AUTHORITIES

B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995) ................................9

Korean Criminal Procedure Act Article 253(2) .........................................................19

May, Black's Law Dictionary (11th ed. 2019) .............................................................9

Resolution of Advice and Consent of 27 May 1987 to the U.S.-U.S.S.R. Treaty
    on the Elimination of Their Intermediate-Range and Shorter-Range Missiles
    (INF Treaty), 134 Cong. Rec. 12, 849 (1988) ...................................................14

Restatement (Third) of Foreign Relations Law §325 (1987)........................................11

Restatement (Third) of Foreign Relations Law §476 (1987)................................14, 19

S. EXEC. REP. No. 106-13 (1999)........................................................................ passim

This memorandum is respectfully submitted in support of the petition of Yoo Hyuk Kee ("Keith Yoo") for a writ of habeas corpus, seeking review and reversal of the decision of Magistrate Judge Judith C. McCarthy certifying his extraditability to South Korea on seven embezzlement charges. [1]  We argue below that extradition should be denied because (i) the embezzlement charges are time-barred and (ii) they are not supported by probable cause.

<u>INTRODUCTION</u>

On July 22, 2020, Keith Yoo was arrested at his home in Pound Ridge, New York, on a complaint seeking his extradition to South Korea to stand trial on seven embezzlement charges.  Almost a year later, on July 2, 2021, after extensive briefing and argument, Magistrate Judge McCarthy rejected Keith Yoo's challenges to extradition and certified his extraditability. On July 21, 2021, Keith Yoo filed a habeas corpus petition with this Court under 28 U.S.C. §2241; the petition seeks review of the Magistrate Judge's decision.

Keith Yoo is the son of Yoo Byeong-eun, a South Korean religious leader, businessman, inventor and photographer.  In 1962, at age 21, Yoo Byeong-eun converted to Christianity and became a key figure in the Evangelical Baptist Church of Korea, which now has more than 40,000 members worldwide.  Yoo Byeong-eun got his start in business in 1976, when he acquired a failing company.  He subsequently had interests in companies in an array of industries, including shipbuilding, electronics, toys, cosmetics, paint and health foods. (Throughout this brief, the businesses are referred to as "the affiliated companies.")  To this day, many church members are employed in those companies.  Yoo Byeong-eun was also an inventor, holding several patents.  Several of the affiliated companies manufacture and sell items that he

---

[1]      We follow the Korean convention of referring to individuals by their last name followed by their first name.

patented.  In 2009, Yoo Byeong-eun began photographing nature through the window of his studio south of Seoul.  His works were subsequently exhibited in numerous locations around the world, including Grand Central Station, the Louvre, and Versailles.

One of the affiliated companies was Chonghaejin Marine, which operated a ferry, the Sewol, between Incheon and Jeju.  On April 16, 2014, the ferry sank, resulting in 304 deaths, many of them students on a school trip.  Outrage followed the accident, and the Yoo family became pariahs.  Media coverage, some of it later retracted, proclaimed that the Yoo family controlled the operation of the ferry, which it did not.  On April 23, Korean investigators raided the offices of Chonghaejin Marine and some 20 other affiliated companies.  Yoo Byeong-eun became a fugitive, and a manhunt ensued.  A $500,000 reward was offered for his capture, and 6,000 police officers and army troops stormed a church complex searching for him.  On June 12, 2014, he was found dead in a plum orchard.

Yoo Byeong-eun's death did not slow the Korean government's investigations. Nine senior executives of the affiliated companies were indicted and convicted of embezzlement and/or breach of trust for allegedly depleting their companies of money to enrich the Yoo family. In May 2014, Korea requested the United States to extradite Keith Yoo to face trial as an accomplice to the alleged embezzlements.[2]  It was not until late 2019, however, after Korea made five supplemental submissions, that the Department of State authorized his arrest.  At his arraignment, he was denied bail and remains in custody.

---

[2]      Prosecuting the Yoo family has become a regular occurrence in Korea.  In June 2017, after a protracted proceeding, Yoo Somena, Yoo Byeong-eun's oldest daughter, was extradited from France to Korea on embezzlement charges.  She was convicted of breach of trust and sentenced to four years in prison.  The French government subsequently rejected Korea's effort to expand the charges against her.  Yoo Byeong-eun's wife, Kwon Yun-ja, was convicted of crimes, as were two of his brothers and older son.  In all, 44 members of the Evangelical Baptist Church were convicted of crimes in the aftermath of the ferry accident.

The Korean government's animus against the Yoo family cannot be overstated.  In a statement issued on May 27, 2014, Park Geun Hye, then Korea's President, announced that "[t]he family of Byeong Eun Yoo is the fundamental cause of this [ferry] disaster," and urged "the judicial authority to do their best to arrest them quickly, discover the truth, resolve suspicions, and punish them according to law."  Five days later, she sounded the same theme:  the Yoo family "must be arrested immediately to resume law and order."[3]

President Park was not the only Korean official to pronounce Yoo Byeong-eun and his family guilty before they were charged.  Prime Minister Jung Hong Won emphasized the "need to show that both oneself and one's family will be ruined if one causes an accident like this."  Legislation was introduced -- the "Yoo Byeong-eun Act" -- to seize the Yoo family's assets, and a leading legislator promised to take "an initiating role to figure out concealed property of voracious corporations, their families and related third parties."   The principal investigator promised to "arrest Mr. Byeong Eun Yoo [and to] make sure that he is sentenced to the maximum penalty allowed by law."  Reading these pronouncements recalls the Queen's statement in <u>Alice in Wonderland</u>, "sentence first - verdict afterward," for the guilt of the Yoo family was assumed.

Nor has the passage of time dulled the zeal of Korean authorities.  Although Keith Yoo is charged only with embezzlement, the second Korean extradition submission informed American authorities that they "need[ed] to know a few things in order to understand this case."  EX-YOO-S1-00020.[4]  Those things include this:

> First, YOO Byung Eyn, the father of [Keith Yoo], created a certain Christian group which is regarded as a heresy within Christian circles of Korea and has an absolute

---

[3]     The quotations in this paragraph and the next are taken from Korean newspaper articles.

[4]     The Korean submissions are contained in a binder with that name.  "EX-YOO-S1-00020" refers to Korea's first supplemental submission at page 20.

power over its followers as the cult leader.  After 2010, [Keith Yoo] succeeded his father for practical purposes and is currently leading the religious group.

Id.  Why our government needed to know that Keith Yoo was a supposed "cult leader" to determine whether his extradition should go forward was not explained.

The sixth Korean submission begins this way:

Tragedy struck the Republic of Korea on April 16, 2014, when 'Sewol Ferry' sank in the territorial waters of Korea, killing a total of 304 people, including students on a school trip.  The ferry at issue was registered with Chonghaejin Marine Co., Ltd. ("Chonghaejin"), which was run by YOO Byeong Eyn and his family including [Keith Yoo].  Chonghaejin purchased from a Japanese marine company this time-worn ferry, which had been already operated for 18 years at a low price and renovated the ferry inordinately in order to add more cabins for maximizing profits and overloaded cargo almost doubling the maximum capacity, resulting in this incident.

EX-YOO-S5-00003.  The submission goes on to "emphasize . . . that Yoo Byeong Eyn and his family's embezzlement of some huge amount of corporate funds left the [ferry] company financially unsound . . . [and] resulted in the loss of 304 innocent lives, including those of students."  EX-YOO-S5-00003-4.  Omitted from the submission is the fact that the Korean courts have determined that the "evidence is not sufficient to establish a significant causal relationship between [any] embezzlement offense as the cause of the . . . sinking accident."  See, e.g., Republic of Korea v. Yoo Dae-gyun, 2015 Ga Hap 561354 at 7 (available upon request).  Keith Yoo is not charged with embezzling from the ferry company, yet he has become a scapegoat for a tragedy.

Against this background, it should be clear that Keith Yoo would not receive a fair trial in Korea.  Thus, this habeas petition is of vital importance to him.

<u>MAGISTRATE JUDGE MCCARTHY'S DECISION</u>

On July 2, 2021, Magistrate Judge McCarthy denied Keith Yoo's motion to dismiss South Korea's request to certify Keith Yoo as extraditable, and issued a certification.  In an 80-page opinion, the Magistrate Judge held (i) that Korea had presented sufficient evidence to establish

probable cause for each of the seven embezzlement charges on which it sought extradition and (ii) that the court lacked authority to determine whether extradition on the charges was time-barred because, under the United States-South Korea Treaty, "that inquiry is a discretionary matter reserved for the Secretary of State."  Op. 1.  Having concluded that the limitations issue was for the Secretary of State, Magistrate Judge McCarthy declined to analyze the issue further.  Op. 79 ("[a] judicial opinion analyzing this question . . . would strip the Executive Branch of its exclusive authority to manage the United States' diplomatic relations with Korea").

## STANDARD OF REVIEW

Because extradition orders are regarded as preliminary determinations, and not final decisions, they are reviewed only by a petition for habeas corpus under 28 U.S.C. §2241.  See Skaftouros v. United States, 667 F.3d 144, 157 (2d Cir. 2011).  Habeas review is available to inquire "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and . . . whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."  Fernandez v. Phillips, 268 U.S. 311, 312 (1925).  A habeas court may also review a magistrate's determination that the statute of limitations does not bar extradition.  See Skaftouros, 667 F.3d at 161.  Factual findings are reviewed for clear error, and legal determinations de novo.  Id. at 157.

## ARGUMENT

### POINT ONE

### THE CHARGES AGAINST KEITH YOO ARE TIME-BARRED

As discussed below, extradition of Keith Yoo to South Korea to stand trial for crimes that, if they occurred, were completed by March 2014, more than six years ago, is barred

by the statute of limitations.[5]  To understand why that is so requires answering five distinct questions:  (i) is the statute of limitations issue for the court or the Secretary of State to decide?; (ii) what is the applicable limitations period?; (iii) did the issuance of an arrest warrant for Keith Yoo in Korea on May 8, 2014, suspend the running of the statute of limitations?; (iv) was the limitations period tolled by Keith Yoo's presence in the United States from April 7, 2014, to his arrest here in July 2020?; and (v) is there any other basis for a toll?  As noted above, Magistrate Judge McCarthy answered the first question in favor of the Secretary of State and therefore pretermitted analysis of the other four questions.  We address each of the questions in turn.

A.    The Statute of Limitations Issue is for the Court to Decide

Under the federal extradition statute, a country seeking a person's extradition from the United States must file a request with the Department of State.  If the request is determined to be within the scope of the relevant extradition treaty, a federal prosecutor is designated to file a complaint in district court seeking an arrest warrant for the person.  A federal judicial officer must then hold a hearing to determine whether to certify the person for extradition.  18 U.S.C. §3184; see also Lo Duca v. United States, 93 F.3d 1100, 1103 (2d Cir. 1996)("[t]he primary function of section 3184 is to interpose the judiciary between the executive and the individual").  The judge determines, inter alia, whether there is probable cause to sustain the charges.  Id.  If the judge certifies that the individual is extraditable, the Secretary of State must then exercise his discretion as to whether to authorize extradition.  See Blaxland v. Commonwealth Dir. Of Pub. Pros., 323 F.3d 1198, 1208 (9th Cir. 2003)("the executive branch's ultimate decision . . . may be based on a variety of grounds, ranging from individual circumstances to foreign policy concerns, to political

---

[5]      According to the Korean extradition papers, payments to Keith Yoo on the Semo consulting contract ended in March 2014; other payments ended then or earlier.

exigencies"). Thus, responsibility for extradition is divided between a judicial officer and the Secretary of State, with each having his or her role.

The threshold question here is whether the extradition Treaty between the United States and South Korea imposes a bar to extradition if the statute of limitations has expired. More precisely, is untimeliness a mandatory bar for the court to determine or a discretionary consideration for the Secretary of State? See Van Du Vo v. Benov, 447 F.3d 1235, 1247 (9th Cir. 2006)("discretionary decisions are within the province of the Secretary of State and not the extradition magistrate"). The answer to that question turns on the language of the United States-South Korea extradition Treaty and its history.

       1.    <u>The Language of the Treaty</u>

The timeliness issue is governed by Article 6 of the United States-South Korea Extradition Treaty, which provides:

> Extradition may be denied under this Treaty when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State. The period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations. Acts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested State, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive.

Extradition Treaty, U.S.-S. Kor., art. VI, June 9, 1998, T.I.A.S. No. 12, 962.

In 2015, the Ninth Circuit addressed this issue and concluded that the word "may" at the beginning of Article 6 indicates that untimeliness is "a discretionary factor for the Secretary of State to consider in deciding whether to grant extradition." Patterson v. Wagner, 785 F.3d 1277, 1281 (9th Cir. 2015). For the Ninth Circuit, the word "may" was talismanic. Its use meant that untimeliness was merely a factor for the executive branch to consider (among others) at the final

stage of the process.  In her decision, Magistrate Judge McCarthy relied on <u>Patterson</u>, but that reliance is misplaced, for the Ninth Circuit got it wrong.

As the Supreme Court has instructed, "the mere use of 'may' is not necessarily conclusive of [an] intent to provide for a permissive or discretionary authority."  <u>Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.</u>, 529 U.S. 193, 198 (2000).  Nor is <u>Cortez Byrd Chips</u> an outlier.  Numerous cases confirm that use of the word "may" is not controlling in deciding whether the authority conferred is mandatory or permissive.  <u>See, e.g.</u>, <u>United States v. Rogers</u>, 461 U.S. 677, 706 (1983)("[t]he word 'may' . . . usually implies some degree of discretion, [but] [t]his . . . principle . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute"); <u>Citizens & S. Nat. Bank v. Bougar</u>, 434 U.S. 35, 38 (1977)("[i]t is now settled that the statute's provision . . . despite the presence of what might be regarded as permissive language, is . . . mandatory"); <u>Farmers' & Merchants' Bank of Monroe N.C. v. Fed. Reserve Bank of Richmond</u>, 262 U.S. 649, 662-63 (1923)("the word 'may' is sometimes construed as 'shall' . . . where the context or the subject matter compels such construction"); <u>Johnson v. Wells Fargo Home Mortgage, Inc.</u>, 635 F.3d 401, 412 (9th Cir. 2011)(interpreting "may" in the Federal Arbitration Act as imposing a mandatory duty); <u>Marathon Oil Co. v. United States</u>, 374 F.3d 1123, 1138 (Fed. Cir. 2004)("the word 'may' in some contexts is not permissive but indeed is interpreted as restrictive in nature"); <u>Photopaint Technologies, LLC v. Smartlens Corp.</u>, 335 F.3d 152, 155-58 (2d Cir. 2003)(declining to afford "decisive effect" to the ordinary permissive meaning of "may" in venue statute); <u>Haynes v. United States</u>, 891 F.2d 235, 239 (9th Cir. 1989)("[t]he word 'may' usually implies some degree of discretion [but that] meaning may be defeated by a contrary legislative intent"); <u>United States ex rel. Holzendorf v. Hay</u>, 20 App. D.C. 576, 579 (D.C. Cir. 1902)("[w]hilst the signification of 'may' in the

construction of a statute is ordinarily permissive, it is quite true that it will be regarded as [meaning] 'must' and 'shall' when . . . the real intention of the legislature was to impose a duty and not to confer a discretionary power"); Simmons v. Harleysville Ins. Co., 2021 WL 1947868 at *4 (S.D. Ga.)("[t]he word 'may' has frequently been held to mean 'must'"); Johnson v. Star Freight, LLC, 2018 WL 4520212 at *3 (N.D. Ga.)("the term 'may' often indicates that a particular action is permissive, rather than mandatory, [b]ut this is not always the case").[6]

A careful reading of the Treaty demonstrates that the drafters did not use "may" consistently to identify those issues that were for the Secretary of State to consider in the exercise of his discretion.  Article 2(4) of the Treaty, for example, provides that "the executive authority of the Requested State may, in its discretion," grant extradition for offenses committed outside of the territory of the Requesting State in certain circumstances.  If "may" always means executive branch discretion, then the words "executive authority" and "in its discretion" would be surplusage.  The word "may" would be enough.  Similarly, Article 4(4) states that the "executive authority of the Requested State may refuse extradition" for certain military offenses.  Here, too, the words "executive authority" are surplusage if "may" always signals executive discretion. Article 3(1) provides that the Requested State "shall have the power to extradite such person [its own national] if, in its discretion, it be deemed proper to do so."  If "shall" always means that an issue is mandatory, then the words "in its discretion" would be contradictory.  Also noteworthy is Article 10(4), which states that a person who is provisionally arrested "may be discharged from custody" upon the expiration of two months from the date of the provisional arrest if the Requested

---

[6]     See also May, Black's Law Dictionary (11th ed. 2019)("[i]n dozens of cases, courts have held may to be synonymous with shall or must, usu[ally] in an effort to effectuate what is said to be legislative intent"); B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995)("[c]ourts in virtually every English-speaking jurisdiction have held . . . that shall means may in some contexts, and vice versa").

State has not received a fully documented extradition request.  Despite the use of the word "may," the provision seems directed to the court, and discharge is likely mandatory in such circumstances.[7] All of this shows that the Treaty is not a model of semantic precision.  Thus, reading the word "may" in Article 6 to allocate decision-making authority to the Secretary of State puts conclusive weight on a single word, which cannot support the weight.

In her decision, Magistrate Judge McCarthy brushed this argument aside on the ground that "a degree of surplusage" should be tolerated if the alternative is to "adopt a textually dubious construction that threatens to render the entire provision a nullity."  Op. 73-74, quoting United States v. Atl. Rsch. Corp., 551 U.S. 128, 137 (2007).  But our reading of Article 6 -- that it confers authority on the court to decide whether the statute of limitations has run -- does not render the provision a nullity; it merely delegates the timeliness issue to the court, where it resides under most treaties.  Relatedly, Magistrate Judge McCarthy found that if our argument was correct, it "would impermissibly render [the word 'may'] meaningless in a number of places in the Treaty." Op. 74, citing Art. 7(1), 12(1), 17(1).  But that, too, is not so.  Our argument is not that "may" always signals a mandatory matter, but rather that it can do so -- that, in some circumstances, "may" "will be regarded as . . . 'must' and 'shall,' when . . . the real intention of the [drafters] was to impose a duty and not to confer a discretionary power."  Holzendorf, 20 App. D.C. at 579.

2.    History of the Treaty

Words matter in treaty interpretation, but so does "the history of the treaty, the negotiations, and the practical construction adopted by the parties."  E. Airlines, Inc. v. Floyd, 499

---

[7]    Magistrate Judge McCarthy concluded that Article 10(4) was not directed to the Court because it was contingent on "the executive authority's non-receipt of a formal extradition request and supporting documentation."  Op. 74 n.47.  But that misses the point.  If the Requested State has not received a fully documented extradition request, the accused, it seems, must be released from custody, even though Article 10(4) begins with the word "may."

U.S. 530, 535 (1991); <u>see also</u> <u>Medellin v. Texas</u>, 552 U.S. 491, 507 (2008)("we have also considered as aids in interpretation the negotiation and drafting history of the treaty as well as the post-ratification understanding of signatory nations").  The views of both the Senate (two-thirds of whose members must ratify a treaty), and the Executive are to be taken into account.  <u>See</u> <u>Sumitomo Shoji Am. v. Avagliano</u>, 457 U.S. 176, 184-85 (1982); <u>see also</u> Restatement (Third) of Foreign Relations Law §325, Rpt. Note 5 (1987)("[a] court . . . is required to take into account . . . Committee reports, debates, and other indications of meaning that the legislative branch has attached to an agreement").  Put simply, analysis of the Treaty begins with its words, but does not end there.

Fairly read, the legislative history of the United States-South Korea Treaty compels the conclusion that untimeliness bars extradition -- <u>i.e.</u>, that the bar is mandatory -- and therefore the issue is for the court.  Indeed, the Senate Report could not be clearer on the point.  <u>First</u>, in summarizing the provisions of the Treaty, the Foreign Relations Committee wrote that the Treaty "<u>precludes</u> extradition of offenses barred by an applicable statute of limitations."  S. EXEC. REP. No. 106-13 at 5 (1999)(emphasis added).  The word "precludes" does not allow for discretion. <u>Second</u>, in its Technical Analysis section, which was "prepared by the Office of International Affairs, United States Department of Justice, and the Office of the Legal Adviser, United States Department of State, based upon the negotiating notes," the Report indicates that "Korea <u>insisted</u> on this provision [Article 6] because Korean law <u>demands</u> that extradition be denied if the statute of limitations would have expired in either Korea or in the Requesting State."  <u>Id.</u> at 8, 14 (emphasis added).  The words "insist" and "demand" bespeak lack of discretion.  <u>Third</u>, the sentence quoted above is footnoted (n. 22) to Korean law -- Section 7(1), Korea Extradition Law 1988.  That section states that generally "[n]o criminal shall be extradited . . . [w]here the

prescription of indictment or sentence against an extraditable crime is completed under the Acts of the Republic of Korea or the requesting state." Available at http://www.oecd.org/site/adboecdanti-corruptioninitiative/39361750.pdf. The use of the words "no" and "shall" in the Korean text underscores that Korea sought a lapse-of-time provision that had mandatory effect. Tellingly, nowhere in her opinion did Magistrate Judge McCarthy explain how "preclude," "insisted," "demands" and "[n]o criminal shall be extradited" can be reconciled with an interpretation that timeliness is a discretionary matter.[8]

One other piece of legislative history sheds light on this issue. During the Congressional hearing on the Treaty, Senator Grams questioned John Harris, the Acting Director of the Office of International Affairs, about the import of Article 6. The questions and answers went like this:

> Senator Grams: Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out.
>
> Now South Korea, unlike other treaty partners with similar commitments, also allows the time to continue running on the time limitation, even when charges are filed. Actions that would toll the statute of limitations, therefore, will apply under this treaty.
>
> So the question is are you confident that this article of the treaty adequately insures that fugitives cannot simply run out the clock by fleeing to Korea?
>
> Mr. Harris: Senator, this article of the treaty was the subject of considerable negotiation. As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language. Many of our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.

---

[8]    The Technical Analysis indicates that "[s]imilar provisions [to Article 6] are found in recent U.S. extradition treaties with Japan, France and Luxembourg." S. EXEC. REP. No. 106-13 at 14. Notably, the timeliness provisions in two of those three treaties -- those with France and Japan -- use "shall" and one -- that with Luxembourg -- uses "may." One would not call the three provisions "similar" to Article 6, if the choice between "may" or "shall," by itself, signified a radical difference in decision-making.

We have a few in which it was not possible to reach that resolution.  In this case, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply.  But, as you have indicated, the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.

So when the United States is making a request to Korea, there should be the ability to prevent a miscarriage of justice by the statute of limitations of Korea having expired before extradition can be accomplished.

S. EXEC. REP. No. 106-13 at 37 (emphasis added).  Plainly Senator Grams believed that Article 6 was a mandatory provision -- that extradition was "bar[red]" if the statute of limitations of the Requested State had run.

In his answer to Senator Grams, Mr. Harris made clear that if an accused fled from America to Korea, the statute of limitations would be tolled under the U.S. tolling provision for fugitivity, even if Korean law did not recognize such a toll.  It was that unusual provision (one prescribing that the tolling provisions of both countries be applied) that was the "subject of considerable negotiation" between the two countries.  What matters most here is that Mr. Harris said <u>nothing</u>, either directly or by implication, to contradict Senator Grams' statement that if the statute of limitations had run, then "the proposed treaty <u>bars</u> extradition."  If that statement was dead wrong, as the Ninth Circuit and Magistrate Judge McCarthy believed, surely Mr. Harris would have spoken up and corrected it.[9]

Magistrate Judge McCarthy found support for her interpretation in the State Department's submittal letter, which accompanied the Treaty when it was forwarded to the Senate. In particular, she relied on a sentence in the letter advising that "Article 6 <u>permits</u> extradition to be

---

[9]     Magistrate Judge McCarthy wrote that "Harris' answer communicates a far more nuanced reading" of Article 6 than Senator Grams'.  Op. 77.  That is true, but the nuance is the recognition that the tolling provisions of both countries, not just that of the Requested State, apply.  Mr. Harris did not utter the words "discretion" or "permissive" or "Executive Authority" or any other word that might signal (or imply) that the limitation issue was other than for the courts.

denied when the prosecution" is untimely, finding that the word "permits" signals discretion. Op. 77-78 (emphasis added). But "permits" means "authorizes." <u>See</u> Miriam-Webster's Collegiate Dictionary, Eleventh Edition 2020. Notably, some extradition treaties do not have a statute of limitation provision, so that a court may not consider timeliness in determining extraditability. <u>See</u> Restatement (Third) of Foreign Relations Law §476 comment e ("[i]f the treaty contains no reference to the effect of a lapse of time, neither state's statute of limitations will be applied"). By contrast, Article 6 speaks to the issue and <u>permits</u> (authorizes) a court to consider whether a prosecution is time-barred. "Permits" does not mean that timeliness is a discretionary matter for the Secretary of State to consider if he chooses.

This history matters greatly because, in approving the United States-South Korea Treaty, the Senate declared that the Treaty must be interpreted in accordance with "constitutionally based principles of treaty interpretation" as defined in two resolutions attached to two other treaties. S. EXEC. REP. No. 106-13 at 22-23. The key interpretive principle is that "the United States shall interpret [the] Treaty in accordance with the understanding of [it] shared by the Executive and the Senate at the time of Senate consent to ratification." <u>See</u> Resolution of Advice and Consent of 27 May 1987 to the U.S.-U.S.S.R. Treaty on the Elimination of Their Intermediate-Range and Shorter-Range Missiles (INF Treaty), 134 Cong. Rec. 12, 849 (1988). The Senate Report makes clear that the understanding of the Executive and the Senate was that untimeliness precludes extradition, and therefore the issue is for the court.

Magistrate Judge McCarthy wrote that a permissive reading of Article 6 "aligns with the well-settled principle that the extraditing court is not to engage in matters of foreign policy and other political questions." Op. 78. But, as previously noted, the majority of extradition statutes give the limitations issue to the court, and for good reason. In international as well as domestic

law, statutes of limitations "represent[] an important right of the accused."  Caplan v. Vokes, 649 F.2d 1336, 1341, n.7 (9th Cir. 1981).  They protect against the bringing of stale charges and "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced."  United States v. Marion, 404 U.S. 307, 322 (1971).  If untimeliness were for the Secretary of State, in his discretion, that important right would be diluted.  If political considerations favored extradition, a person could be sent abroad for trial on even the stalest of charges.  As the Supreme Court observed almost 170 years ago, "extradition without an unbiased hearing before an independent judiciary [is] highly dangerous to liberty, and ought never to be allowed in this country."  In re Kaine, 55 U.S. 103, 113 (1852). Leaving the untimeliness issue to executive discretion is dangerous to liberty.[10]

B.      The Statute of Limitations is Five Years

In its extradition request, Korea suggested that its statute of limitations governs and is as long as 15 years depending on the amount of money allegedly embezzled.  EX-YOO-S2-00042-43.  But the Treaty teaches otherwise.  It is the statute of limitations of the "Requested State" (here the United States) that governs.  See Article 6 ("[e]xtradition may be denied . . . when the prosecution . . . of the offense . . . would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State"); see also Theron v. United States, 832 F.2d 492, 499 (9th Cir. 1987)(the Treaty requires application of "the federal statute of limitations . . . even for [comparable] state offenses because the United States is undeniably the [contracting party]").  The applicable federal statute is 18 U.S.C. §3282, the general provision for non-capital offenses, and, under it, the limitations period is "within five years next

---

[10]      To borrow the words of Judge Friendly, written in a related context, determining if the statute of limitations has run is "a task particularly suited to the capacities of the judicial branch." Shapiro v. Ferrandina, 478 F.2d 894, 906-07 (2d Cir. 1973).

after [the] offense shall have been committed."[11]   According to the Korean submission, the embezzlement charges against Keith Yoo were committed between 2008 and March 2014.  See supra at  6 n.5.  Thus, the statute of limitations expired in March 2019 unless it was tolled.  Our government conceded this point below.

C.      The Korean Arrest Warrant Did Not Toll the Statute of Limitations

In its extradition request, Korea seemed to suggest that an arrest warrant issued for Keith Yoo in Korea on May 8, 2014, tolled the statute of limitations.  The Korean authorities wrote that "according to the Korean practice on investigation and indictment, a prosecutor does not indict a suspect without his custody," and therefore Keith Yoo was not indicted.  EX-YOO-00081 (emphasis added).[12]  But "practice" is not law, and, according to Korean law, only an indictment suspends the running of the statute.  Attached to this brief as Appendix A is an affidavit from Professor Sang Hoon Han of Yonsei University Law School, one of Korea's leading law schools, who has been teaching criminal law in Korea for 25 years.  Professor Han makes clear that "the issuance of a warrant for arrest or a warrant for detention will not suspend the statute of limitations" in Korea.  That interpretation, he writes, "is consistent with judicial precedent and academic consensus in Korea."  Han Aff. ¶ 7.

One American case reaches a contrary conclusion, but it should not be followed. In In re Extradition of Gang-Choon Han, 2012 WL 33201 at *12 (C.D. Cal.), the court found that

---

[11]      18 U.S.C. §3282(a) provides as follows:

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

[12]      Like most countries, South Korea does not employ a grand jury; an indictment there is what we would term a prosecutor's information here.

the issuance of an arrest warrant in Korea was "sufficient to start [sic] tolling the limitations period for . . . the offenses" on which Korea sought extradition.  It reached that conclusion without any citation to Korean law and solely in reliance on the Ninth Circuit's decision in Sainez v. Venables, 588 F.3d 713 (9th Cir. 2009).  The Han court's reliance on Sainez, however, was seriously misplaced.  Sainez involved an effort on the part of Mexico to extradite Aldo Crotte from the United States for a homicide offense.  The United States-Mexico Extradition Treaty includes a lapse-of-time provision, which bars extradition if the offense for which extradition is sought is time-barred according to the law of either country.  The applicable statute of limitations was determined to be five years, and the issue was whether the warrant for Crotte's arrest, issued within the five-year period, tolled the statute.  Finding that a Mexican arrest warrant was "the equivalent of a United States indictment," the court held that Crotte's extradition was not time-barred.  Id. at 717.

But Mexican law and Korean law are different.  Mexico "which models its legal system not on Blackstone's common law but on Napolean's civil law," "lacks the sort of indictment and information procedures that exist in the United States." Martinez v. United States, 828 F.3d 451, 456 (6th Cir. 2016).  Thus, if only an indictment or prosecutor's information stopped the clock, it could never be stopped.  As the Sixth Circuit put it:

> Does [the absence of an indictment procedure] mean that there is nothing Mexico can do . . . to prevent a 'lapse of time' from occurring?  No:  Because the issuance of an arrest warrant marks the end of the preliminary investigation and the beginning of the prosecution in Mexico, that event stops the . . . statute of limitations from running.  And because a Mexican court issued an arrest warrant within two months of Cruz Martinez's alleged offense, the five-year period does not bar his prosecution.

Id.  As Professor Han's affidavit shows, an arrest warrant in Korea does not mark the end of the preliminary investigation and the beginning of the prosecution.  That is the role of an indictment.

In sum, the issuance of an arrest warrant for Keith Yoo in Korea on May 8, 2014, did not toll the running of the statute under the Treaty.

D.    Keith Yoo Did Not Flee from Justice

The second sentence of Article 6 addresses the question whether the statute of limitations is tolled by fugitivity.  It provides that "[t]he period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations." (Emphasis added).  That is the United States standard, see 18 U.S.C. §3290, and the Treaty adopts it for fugitivity tolling.  See S. EXEC. REP. No. 106-13 at 14 ("[t]he second sentence of the paragraph adopts the U.S. standard, stating that the period during which the person for whom extradition is sought fled from justice does not count toward the running of the statute of limitations").[13]  Fleeing from justice has a settled meaning in U.S. law, and more than absence or staying away is required.  The phrase means "leaving the place of the alleged offense to avoid prosecution or arrest." Jhirad v. Ferrandina, 486 F.2d 442, 445 (2d Cir. 1973)(Jhirad I).

Under this standard, Keith Yoo did not flee from justice.  Keith Yoo came to this country in 1989 to attend high school and then went to the University of Michigan for college. After college, he obtained an H1-B visa and began working here.  In 2002, he married Betsy Nahm, and they lived together in an apartment in New York City.  In 2007, he obtained a green card, which he still holds.  That same year, after the birth of their second child, the Yoos moved to Pound Ridge in Westchester, where they have resided ever since.  Their children attend school there. When the ferry sank on April 16, 2014, Keith Yoo was home in Pound Ridge.[14]  On this record, a

---

[13]    18 U.S.C. §3290 provides as follows:  "No statute of limitations shall extend to any person fleeing from justice."

[14]    In 2014, the Korea Resolution and Collection Corporation sued Keith Yoo on two commercial loans on which his father had been a surety.  See KRCC v. Keith Yoo, 15-cv-156487

claim that Keith Yoo fled from justice -- that he left Korea to avoid prosecution -- cannot be sustained.  See Restatement (Third) of Foreign Relations Law §476 (1987) Rpt. Note 3 ("living and conducting business in a foreign state under one's own name belies an intent to avoid prosecution").  Simply stated, the delay here resulted from Korea's inability to persuade our government to go forward (it took six submissions); Keith Yoo "did not cause any delay by unacceptable conduct."  Caplan, 649 F.2d at 1341.

E.     The Accomplice Toll Does Not Revive the Case

In a ninth submission, Korea argued, for the first time, that the prosecution of Keith Yoo is timely because the statute of limitations was tolled under Article 253(2) of its Criminal Procedure Act during the prosecution of his alleged accomplices.[15]  Under the third sentence of Article 6, that provision, although unknown to U.S. law, is applicable in an extradition proceeding. The question, however, is the length of the toll.  To answer that question, Korea offered this chart:

| Accomplice | Date of Indictment | Date of Final Decision | Period of Suspension |
|---|---|---|---|
| GO Chang-hwan | May 28, 2014 | September 10, 2015 | 469 days |
| YOO Chong Somena | June 26, 2017 | August 30, 2018 | 429 days |
| LEE Jae-yeong | May 27, 2014 | November 13, 2014 | 169 days |
| BYEON Gi-chun | May 28, 2014 | September 10, 2015 | 469 days |

On that basis, Korea calculated that the limitation period for Keith Yoo was suspended for 899 days (470 days (from May 27, 2014 to September 10, 2015) + 429 days (from June 26, 2017 to August 30, 2018) with the overlapping period subtracted).

---

(Sup. Ct. N.Y. County).  Keith Yoo's address in Pound Ridge is disclosed in numerous publicly-filed documents in the case.

[15]     Article 253(2) reads as follows:

When a public prosecution is instituted against one of several accomplices referred to in the preceding paragraph, the running of the limitation period shall be suspended as to the other accomplices and shall begin to run again when a judgment on the case concerned becomes finally binding.

That calculation is wrong.  Attached is a second affidavit from Professor Sang Hoon Han, which explains that the statute of limitations is crime specific, and therefore one cannot add tolls across crimes.  <u>See</u> Appendix B, Han Aff. ¶ 5 ("because the statute of limitation period is calculated separately for each crime, the suspension of the statute of limitation pursuant to Section 253(2) only applies to the specific crime which an accomplice is being prosecuted for").  Yoo Chong Somena, for example, is an accomplice only with respect to the alleged embezzlement from Moreal Design, and the suspension period based on her prosecution cannot be used to toll the limitation periods for the alleged embezzlements from other companies, in which she had no role.[16] If the statute of limitations is determined count-by-count, the correct calculation, as of the filing of this brief, is this:

---

[16]     Professor Han gives this helpful example:

Assuming that a specific person commits Crime A with Accomplice 1 and Crime B with Accomplice 2, the limitation period for Crime A is suspended for the specific person during the trial period of Accomplice 1 but not suspended during the trial period of Accomplice 2.  This is because Accomplice 2 will not be recognized as an accomplice to the specific person in Crime A.  On the other hand, the limitation period for Crime B is only suspended for the specific person during the trial period of Accomplice 2 but not suspended during the trial period of Accomplice 1.  This is because Accomplice 1 will not be recognized as an accomplice to the specific person in Crime B.

Han Aff. ¶ 7.

| Count | Date of Last Payment | Alleged Accomplice | Period of Suspension | Time Elapsed[17] |
|---|---|---|---|---|
| Semo | 3/31/14 | Go Chang-hwan | 469 days | 6 yrs 34 days |
| Moreal | 12/31/13 | Yoo Chong Somena | 429 days | 6 yrs 164 days |
| Ahae | 12/31/13 | Lee Jae-yeong | 169 days | 7 yrs 59 days |
| Onnara | 12/31/11 | None | 0 | 9 yrs 59 days |
| Chonhaiji trademark | 6/30/10 | Byeon Gi-chun | 0 | 11 yrs 47 days |
| Chonhaiji consulting | 11/22/11 | Byeon Gi-chun | 0 | 9 yrs 267 days |
| Chonhaiji photograph | 12/24/13 | Byeon Gi-chun | 469 days | 6 yrs 131 days |

Thus, if the period of prosecution of the alleged accomplice is properly excluded, the five-year limitations period has run on each crime.

In sum, the answers to the five questions raised at the outset of this Point compel the conclusion that the charges against Keith Yoo are time-barred.

POINT TWO

THERE IS NOT PROBABLE CAUSE THAT KEITH YOO
COMMITTED EMBEZZLEMENT CRIMES

A.     Legal Principles

A central judicial function in an extradition proceeding is determining whether there is "probable cause" to support each of the charges for which extradition is sought.  Probable cause has its familiar meaning:  "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person . . . arrested." United States v. Howard, 489 F.3d 484, 491 (2d Cir. 2007).  Hearsay is admissible, but a court

---

[17]     Because Keith Yoo has yet to be indicted, the clock is still running.  Our calculation in the final column is done as follows:  Date of this brief - Date of Crime - Period of Suspension.  Korea treats Byeon Gi-chun as an accomplice for all three Chonhaiji embezzlement counts.  In fact, Byeon was prosecuted only for the alleged photography embezzlement, and therefore the limitations period is properly suspended only for that crime.

"must conduct an independent assessment of the evidence and closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause." U.S. v. Pena-Bencosme, 2006 WL 3290361 at *2 (E.D.N.Y.); see also Freedman v. United States, 437 F. Supp. 1252, 1265 (N.D. Ga. 1977)(the magistrate "should involve [herself] in a determination as to the reliability of the affidavits presented and not merely blindly believe such statements without regard to the underlying facts upon which the [affiant] believed the information was reliable").  The court is not a "rubber stamp."  In re Extradition of Khochinsky, 116 F. Supp. 3d 412, 419 (S.D.N.Y. 2015).

Not surprisingly, courts have denied extradition where the requesting country's submissions "were merely conclusory, or unsupported by underlying documentation, or otherwise unreliable." Pena-Bencosme, 2006 WL 3290361 at *7.  Statements that "do not disclose which factual allegations are based on [the witness'] personal knowledge, which are based on the personal knowledge of some other individual, and which are merely conjecture" are entitled to no weight. In re Extradition of Ben-Dak, 2008 WL 1307816 at *6 (S.D.N.Y.); see also In Matter of Extradition of Ernst, 1998 WL 395267 at *9 (S.D.N.Y.)("the materials submitted must set forth facts from which . . . the reliability of the source . . . can be inferred").  Moreover, although an extradition hearing is not a trial, the accused may submit "reasonably clear cut proof . . . [with a] reasonable chance of negating the government's showing of probable cause." Extradition of Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).[18]

---

[18]    Many cases observe that an accused may introduce "testimony which explains rather than contradicts the demanding country's proof." United States ex rel. Petrushansky v. Marasco, 325 F.2d 562, 567 (2d Cir. 1963).  At the same time, courts recognize that the line between the two -- explaining and contradicting -- is not easily drawn. Sandhu v. Burke, 2000 WL 191707 at *5 (S.D.N.Y.).  We discuss the distinction further below. See infra at 38.

On habeas review, the Magistrate Judge's finding of probable cause is entitled to deference.  See Gill v. Imundi, 747 F. Supp. 1028, 1043 (S.D.N.Y. 1990)("the writ does not issue if the magistrate relied on competent evidence sufficient to support the conclusion that a reasonable person would believe the petitioner[] guilty").

B.    Korean Summaries and Yoo's Transcripts

In support of extradition, Korea provided summaries of interview statements given by witnesses to Korean prosecutors in the aftermath of the ferry accident.  In her opinion, Magistrate Judge McCarthy wrote that "Korea was entitled to submit summaries . . . to the authorities [in] these [extradition] proceedings."  Op. 46.  We do not quarrel with that as a general proposition.  But we have been able to locate the actual interviews on which the Korean "summaries" are supposedly based.  (The transcripts were obtained from court files in Korea.) What we learned was that the summaries often grossly distort the witnesses' statements. Statements are attributed to witnesses that they never said.  Quotation marks do not mark quotations.  And exculpatory statements are omitted. [19]  In the discussion below, we rely exclusively on the witnesses' actual statements.

C.    The Seven Embezzlement Charges

1.    Chonhaiji Trademark Agreement

Magistrate Judge McCarthy found that there was probable cause to support Korea's allegation that in January 2008 Keith Yoo conspired with "CEO Byeon Gi-chun of Chonhaiji" to execute a sham trademark agreement pursuant to money funneled to Keith Yoo from the company.

---

[19]    Without any sense of embarrassment, in a submission to Magistrate Judge McCarthy, our government quoted Korea's explanation for its actions -- "[m]any of the witnesses' statements were very lengthy, so quotation marks were used to summarize and condense testimony." G. Mem. 13.  Of course, quotation marks are not used for that purpose anywhere in the world.

EX-YOO-00087.  As the Magistrate Judge saw it, the statements of Park Seung-il and Byeon Gi-chun were sufficient to support a reasonable belief that the agreement's "only purpose was to extract money from Chonhaiji for the Yoo family's benefit."  Op. 22.

Chonhaiji was a shipbuilding company founded by Keith Yoo's father.  In 2005 and 2006, a year before Byeon Gi-chun became a director of the company and five years before he became its CEO, Keith Yoo and his brother registered the Chonhaiji trademarks.  Thus, the allegation that Keith Yoo conspired with "CEO Byeon" to enter into a sham agreement in January 2008 is mistaken.  It could not be so.  Putting that point aside, the question here is this:  do the interview statements of Park and Byeon provide probable cause to believe that the Chonhaiji trademark agreement was a subterfuge to embezzle money from the company?

a.    Park's Statements

Park Seung-il ran the day-to-day operations of Key Solutions, Keith Yoo's company, and in that role was responsible for collecting trademark fees from Chonhaiji.  In his May 8, 2014 interview with Korean authorities, Park was asked these questions and gave these answers:

> Q:    [B]ased on the statements of officers and employees of the [affiliated companies] . . . you were responsible for illegally collecting and managing funds from affiliated companies under the pretext of trademark fees, consulting fees, etc., as well as being responsible for the overall management of the Yu family's finances.  Do you admit to this?
>
> A:    Yes, I admit to all of this.  However, <u>I didn't think that I was collecting money illegally</u>.
>
> Q:    While you claim that you didn't think you were collecting money illegally, you still collected large sums of money from affiliates every month under the pretext of trademark use fees, management consulting fees, etc. through illegal means.  What do you say to this?
>
> A:    . . . yes, looking back on it now I think I collected those funds illegally.

Ex. E at 9 (emphasis added).[20]  Thus, at the time he was collecting the trademark fees, Park believed that he was acting legally.

Park was also repeatedly asked whether he was responsible for collecting and managing money from the affiliates <u>for</u> trademark fees and consulting fees, and he answered the questions affirmatively.  Ex. E at 5, 10, 22.  The word "for" in the prior sentence is underlined for a reason.  The Korean word 명목으로 has two possible meanings:  (i) "for" or "as" or (ii) "under the pretext," depending on the context in which it is used.  The correct translation matters greatly because "for" is neutral ("I collected the fees for the trademark license") and "under the pretext" is pejorative ("I collected the fees under the pretext of a trademark license").  Not surprisingly, the Korean summaries translate 명목으로 to mean "under the pretext," so that Park's answers seem damning.  When the case was before Magistrate Judge McCarthy, we submitted affidavits from a former Korean judge and an experienced Korean translator explaining that "for," and not "under the pretext," was the proper translation.  <u>See</u> Appendix C.[21]  If 명목으로 is read to mean "for," then

---

[20]     "Ex. __" refers to the Korean interviews, which are collected in a binder with that label. We have also submitted three other binders that contain affidavits and documents which were offered below to undermine Korea's allegations.  Those binders are labelled "Semo Documents," "Moreal Documents" and "Other Companies' Documents" in accord with their contents.  As discussed <u>infra</u>, Magistrate Judge McCarthy refused to consider some of these materials on the ground that they were merely "contradictory."  Op. 44.

[21]     In her affidavit, Fran S. Yoon, a certified Korean/English interpreter with 20 years' experience, gave two examples of the use of 명목으로 taken from a Korean dictionary:

다른 사람들은 그들이 재난 구호금 <u>명목으로</u> 그 돈을 받을 자격 있다고 했다.
Others said they were entitled to the money <u>as</u> disaster relief.

그녀는 정치헌금이라는 <u>명목으로</u> 그에게 뇌물을 제공했다.
She offered him a bribe <u>under the pretext [excuse] of</u> giving a political donation.

Turning to Park's interview, Ms. Yoon addressed this question and answer, which the Korean government had translated this way:

Park's answers are not incriminating.  They merely describe his duties -- collecting money from the affiliates for trademark and consulting fees -- as Keith Yoo's assistant.[22]

Logic supports reading 명목으로 to mean "for," and not "under the pretext."  As noted above, when Park collected trademark fees from Chonhaiji, he did not believe that he was doing anything illegal.  Ex. E at 9.  Moreover, Park told Korean authorities that he "did not know the value of the trademark at all."  Id. at 19.  If Park didn't know the value of the trademark and didn't believe he was doing anything illegal, then he could not have thought that he was collecting funds "under the pretext" of a sham agreement.

Park was also asked this question and gave this answer:

Q:      [T]rademark fee of ultra-high 0.5 to 1% of sales paid.  All together, it seems that it was actually a way for the Yoo Byung-Eon family to take the funds of affiliates.  What do you think?

A:      Yes, it seems so.

---

Q.      I ask you again.  Do you admit that you collected money from affiliates including  Ahae Co., Ltd.  under the pretext of  trademark royalty and consulting fees and managed the funds?

A.      Yes, I admit that I collected and managed the funds.

Korea's translation suggests that Park was admitting wrongdoing.  But as Ms. Yoon explained in her affidavit, "nothing in the prosecutor's questions or Park's answers provides a basis for a negative connotation."  Appendix C, Yoon Aff. ¶ 11.  Thus, "for," and not "under the pretext," is the proper translation.  As Magistrate Judge McCarthy noted in her opinion, we had mistakenly translated 명목으로 as "under the pretext" in an early submission.  Op. 22.

[22]      Magistrate Judge McCarthy referred to the difference between "for" and "under the pretext" as a "de minimis semantic difference[]."  Op. 23, quoting In re Extradition of Marzook, 924 F. Supp. 565, 592 (S.D.N.Y. 1996).  That is not so.  The former makes an answer innocuous, and the latter renders it incriminating.

Id. at 21.  Suffice it to say "[y]es it seems so" in response to a leading question does little to advance Korea's cause.  It would not get a prosecutor a search warrant, and should not get Korea to probable cause.[23]

In sum, all that Park said that was adverse to Keith Yoo (other than "[y]es it seems so") is that he didn't think he was collecting money illegally at the time, but came to believe, under questioning by Korean prosecutors, that his conduct was illegal.  That is precious little.  If the trademark fee "scheme" was the brazen embezzlement that Korea posits, then Park could not have believed his conduct, which spanned 2 1/2 years, was lawful.

   b.   Byeon Gi-chun

That leaves Byeon Gi-chun, who became CEO of Chonhaiji in January 2011 after the last trademark payment was made.  In his interview with Korean authorities, Byeon acknowledged that when he joined Chonhaiji as a director in 2007, it was using the trademark and logo under an agreement that then CEO Shin Jae-Jik and Keith Yoo had negotiated.  Ex. H at 30. Byeon thought that the fee was "way too much" and "inappropriate" and that Shin "tolerated" it because the Yoo family had sought it.  Id. at 31-32.  Byeon was giving his opinion about a trademark licensing agreement that he had no role in establishing.

---

[23]    Magistrate Judge McCarthy also quoted this question and answer:

   Q:    [Y]ou were responsible for the overall management of the Yu family's slush fund.  What do you say to this?

   A:    Yes, I managed the money in accordance with the instructions of Yu family members Hyuk-kee Yu and Dae-kyun Yu.

Op. at 23, citing Ex. E at 25.  But interpreting this colloquy as incriminating confuses the question with the answer.

Byeon was then asked this question and gave this answer:

Q:      It does not seem necessary to have that trademark registered with the Korean Intellectual Property Office [and to have] Trademark fee of ultra-high 0.5 to 1% of sales paid.  It seems that it was actually a way for the Yoo Byung-Eon family to leak the funds of affiliates.  What do you think?

A:      Yes, it seems so.

Id. at 32-33.  Here, too, "[y]es it seems so" adds little to the probable cause calculus.

Adding Park ("I didn't think that I was collecting money illegally" and "Yes, it seems so") to Byeon ("Yes, it seems so") does not constitute probable cause.

2.      Ahae Trademark Agreement

The Korean submissions allege that, around January 2009, Keith Yoo conspired with the CEO of Ahae Co. to enter into a licensing agreement for a trademark that "had been used by [Ahae Co.] for about ten years."  EX-YOO-00100-01.  (Ahae Co. manufactures paint that is used for painting road lines and other purposes.)  Specifically, the submissions quote Lee Seong-hwan, the former CEO of Ahae Co., as telling Korean authorities that "[t]he company's employees got together to create the company name Ahae in 1998, but [Keith Yoo] ordered [Ahae Co.] to make royalty payments as he registered the trademark in 2009."  EX-YOO-S1-00030; EX-YOO-S4-00009.  Thus, the gist of the charge is that Ahae Co. was forced to make royalty payments in 2009 for use of a name that it had been using for a decade.

As Magistrate Judge McCarthy recognized, the relevant documents negate this allegation.  Op. 29-31.  On March 4, 1998, and October 15, 1998, Keith Yoo applied for three Ahae trademarks -- two of which were for logos.[24]  The trademarks were registered in Korea beginning in February 1999.  Semo Chemical changed its name to Ahae Co. in September 1998,

---

[24]      Ahae is the name that Keith Yoo's father used for his artistic endeavors.

after the trademark applications.  In May 2001, Ahae Co. entered into a contract with Keith Yoo permitting it to use the three Ahae trademarks.  Thus, there was not a ten-year period when the company used the Ahae name without making payments.

Although the documentary evidence tears the heart from Korea's allegations, Magistrate Judge McCarthy found probable cause in the interview statements of Park and two former Ahae CEOs -- Lee Gang-se and Lee Seong-hwan.  Op. 30.  Those statements, the Magistrate Judge found, "provided enough support . . . to satisfy the low threshold for probable cause." Id.  As discussed below, however, there is not enough here.

a.    <u>Park's Statement</u>

We have already discussed much of what Park said about the licensing fee agreements and need not repeat it.  <u>See</u> <u>supra</u> at 24-27.  Park was asked specifically about the Ahae agreement and said this:

> Q:    In this regard, Lee Sung-Hwan [former CEO of Ahae Co., Ltd.] said, "After being incorporated into the holding company, Yoo Hyuk-Ki said he would manage the Key Solution and provide management advice for Ahae when he requested payment.  He said that the consulting fee includes the trademark fee for 'Ahae' that he has registered with the Korean Intellectual Property Office.  So I pushed forward the contract, but only the contract for the use of trademark rights.  The consulting service was discussed only verbally.  The standard of 1.6% of sales was set by Yoo Hyuk-Ki.  Given the size of Ahae's sales, 1.6% is too much and I talked to Park Seung-Il that that was a bit high but didn't mention it directly to Yoo Hyuk-Ki."  What do you think about this?

> A:    That is correct.  I admit that.

Ex. E at 14.  Nothing in this colloquy indicates that the Ahae licensing agreement was a criminal scheme.

b.    <u>Lee Gang-se</u>

In his interview with Korean authorities, in which he acknowledged that he was "seeking favorable consideration from the court," Lee Gang-se said this:

-29-

Q: Leaving aside the fact that your company paid 1.6% of the company revenue as royalties, did your company actually use trademarks registered by YOO Hyuk Kee?

A: Yes.  As I have already said during the trial for embezzlement and breach of trust charges, our company did actually use YOO Hyuk Kee's trademarks.  I admit that paying him that much royalties was unnecessary.

Ex. I at KY-07.  Lee Gang-se's opinion that the royalty payments were too high provides little in the way of probable cause.

<blockquote>c. <u>Lee Seong-Hwan</u></blockquote>

Lee Seong-Hwan's testimony about the trademark fee was this:

Q: How come did you make the above contract?

A: After being incorporated to a holding company, Yoo Hyuk-Ki said that he would provide consulting for management advice on Ahae while operating Key Solution, and the consulting fee include[ed] the trademark fee for Ahae, which he had registered with the Korean Intellectual Property Office.  So I went on with the contract, and although only a contract for the trademark fee was signed, consulting cooperation was also discussed verbally.

Q: Who set the standard fee of 1.6% of sales?

A: It was decided by Yoo Hyuk-Ki.

Q: Based on Ahae's sales, 1.6% seems to be too much to me.  Did you ask for a lower price?

A: I talked to Park Seung-Il saying that it was too much, but I didn't mention that to Yoo Hyuk-Ki.

Ex. J at 18-19.  Paying "too much" for the use of a trademark does not prove an embezzlement crime.

Once again, putting the testimony of the witnesses together does not add up to probable cause.

<blockquote>3. <u>Onnara Shopping Trademark Agreement</u></blockquote>

The Korean submissions alleged that Keith Yoo conspired with the CEO of Onnara Shopping to enter into a trademark licensing agreement, even though the company name did not

have any "brand value" and was "quite replaceable." EX-YOO-00087. (Onnara sells milk and milk products from cows raised on a farm on Jeju Island in Korea.) In her opinion, Magistrate Judge McCarthy found that "Korea's submissions meet the minimal requirements of probable cause for this charge." Op. 35. The Magistrate Judge relied on the interview statements of Park and Kim Chun-gyun to reach that conclusion.

The frailty of Park's statements has been previously discussed. See supra at 24-27. So the question here is this: did Kim Chun-gyun provide meaningful evidence that the Onnara trademark agreement was a sham? In his interview with Korean authorities, Kim stated that "according to the instructions of Chairman Yoo Byung-Eon, each affiliate has to raise funds in one or another name and provides slush funds to the Yoo Byung-Eon family." Ex. D at 7. Tellingly, Kim Chun-gyun is an auditor, but he did not audit any of the five companies at issue in this case. See id. at 4 ("I was in charge of external audits for Dapanda Co., Ltd., Trigon Korea Co., Ltd., Cheonghaejin Shipping Co., Ltd. [which is different from Chonhaiji], and Egg & Seed Co., Ltd."). Indeed, Kim acknowledged that he had no personal knowledge as to the operations of those companies -- that the best that he could provide was guesswork:

> Q: Other than Semo Group affiliates (Dapanda Co., Ltd., etc.) you were in charge of accounting audit for, there are many affiliates of the Semo Group. Did all other affiliates send money to the Yoo Byung-Eon family in the same name of consulting and trademark fees and the purchase of photos of Chairman Yoo Byung-Eon?
>
> A: That part, I can't be sure of. I only guess it must have been the same for those companies, they must have been taken money from Yoo Byung-Eon family in the same way.

Id. at 13 (emphasis added). Indeed, Kim admitted that his "knowledge" as to other companies, including Onnara, came from conversations which he had with fellow church members "around

him." Id. at 5 ("[b]ecause there are many members of the congregation around me, I know a little about the bottom line").[25]

Surprisingly, Magistrate Judge McCarthy gave Kim's interview statements weight. As the Magistrate Judge correctly noted, hearsay can be considered in an extradition proceeding. Op. 37.  To credit Kim's statements, however, is to allow anything to come in.  Kim had no personal knowledge as to the legitimacy of the Onnara trademark agreement; he admitted that his information was a "guess"; and he could not identify a source for his "knowledge" other than "members of the congregation around me."  That Magistrate Judge McCarthy stretched to credit Kim is revealed in this sentence in her opinion:  "as an auditor for . . . some . . . affiliates, it is conceivable that Kim Chun-gyun would have at least some knowledge of the Yoo family's business structure, and in turn, the way that it handles its finances."  Op. 37.  If what is "conceivable" counts towards probable cause, then judicial review is essentially meaningless.

Neither Park nor Kim provide reliable evidence that the Onnara trademark agreement was a sham.

---

[25]      Kim was asked this question and gave this answer:

Q:      You were in charge of the external audit of the Yoo Byung-Eon family group for a while.  Do you know about the family's corporate ownership structure?

A:      Actually, I have been dedicated to external audits for Trigon Korea Co., Ltd., Cheonghaejin Shipping Co., Ltd., and Dapanda, so I do not know the exact corporate structure, but I am also a member of the same sect.  Because there are many members of the congregation around me, I know a little about the bottom line.  For the investigation of this case, I will state the truth.

Id. at 5 (emphasis added).

4.     Semo Consulting Agreement

The Korean submissions allege that, in March 2010, Keith Yoo conspired with Semo's then CEO to embezzle money from Semo through a sham consulting contract between it and Key Solutions.   (Semo sells health care products and nutritional supplements, including squalene, a compound obtained from shark liver oil, which is said to have anti-aging properties.) More specifically, the submissions allege that Semo "did not require regular business consulting" and that Key Solutions "was neither capable of offering business consulting service nor did it actually provide practical business consulting." EX-YOO-00085-86.  Judge McCarthy found that the statements of five witnesses provided "sufficient evidence to indict Yoo based on a reasonable belief that he orchestrated the alleged Semo scheme."  Op. 44.

The interviews of two of the five witnesses -- Park Seung-il and Kim Chun-gyun -- have previously been discussed.  See supra 24-27, 31-32.  Park's comments, properly translated, are not incriminating, and Kim lacked personal knowledge of the Semo agreement. That leaves three witnesses.  Below we compare the "quotes" in the Korean submissions with what the witnesses actually said to show that their words do not provide probable cause.

a.     Kim Gyu-seok

The Korean submission dated June 24, 2014, quotes Kim Gyu-seok, the leader of Semo's Management Support Team, as telling Korean prosecutors, in an April 30, 2014 interview, that Keith Yoo was paid a large consulting fee every month "but he provided business consulting service[s] only once or twice a year" and those services "could have been easily found on the internet." EX-YOO-S1-00027.  A review of Kim Gyu-seok's April 30, 2014 interview shows that he did not say the statements attributed to him.

What Kim Gyu-seok actually said was this:

Q.      Paying monthly fees for these kind of work, especially, 25 million won per month to Key Solution, 5 million won per month to I-One-I Holdings Co., Ltd., 75 million won or 40 million won per month and 120 million for additional service expenses for design services to Moreal Design Co., Ltd., 3 million won for Haemato Centric Life Research Center, and 5 million won for Deo-Pyeonhan-Mom Clinic.  Were those consulting fees worth?

A.      You can check it out with each department.

Ex. A at 20.  Thus, Kim Gyu-seok told Korean prosecutors that he couldn't judge whether the fees paid to Key Solutions were excessive.  Nowhere did he say that the consulting services were available on the internet.[26]

>           b.      <u>Go Chang-hwan</u>

The Korean submissions also quote Go Chang-hwan, Semo's former CEO, whom Korean prosecutors interviewed on April 25, 2014, and May 6, 2014.  The quote from the April 25 interview is supposedly this:  "I and PARK Seung-il decided on [Key Solutions'] business consulting fee without having estimates from other companies compared and taking into account Key Solution's level of expertise, performance records, reliability, and the need for two-way consulting service, etc."  EX-YOO-00090.  The quote from the May 6, 2014 interview is supposedly this:  "Key Solution provided business consulting services once or twice a year in writing.  The consulting service did not deserve a large amount of consulting fees, and could have been obtained by outsourced services."  EX-YOO-S1-00027.

The quoted words do not appear in Go Chang-hwan's actual interviews.  What does appear is this statement:  Key Solutions provided "advice through documents related to HACCP

---

[26]      In Korea's January 30, 2018 submission, the phrase "could have been easily found on the internet" was eliminated from the summary of Kim Gyu-seok's statement.  <u>See</u> EX-YOO-S4-00006.

(Hazard Analysis Critical Control Point) [and] data related to the US FDA." Ex. B at 16.  And

this:

> Q.   In conclusion based on the above, it seems like excessive consulting fees were paid without any justifiable reasons.  What do you think about that?

> A.   <u>That is absolutely not the case</u>.

Id. at 17 (emphasis added).  Korea's failure to disclose Go Chang-hwan's exculpatory statements

is shocking.[27]

> Go was also asked these questions and gave these answers:

> Q:   What does Yoo Hyeok-Ki have to do with Dapanda [a company related to Semo]?

> A:   I mean Yoo Hyuk-Ki gives lectures and talks about health.  I thought he was quite influential . . . .  I received advice through documents related to HACCP (Hazard Analysis Critical Control Point) or data related to the US FDA.  We received data to maintain GMP (Health Supplement Management Certification System run by Food and Drug Administration) certification and received advice on HACCP (food certification) . . . .

> Q:   The above data doesn't seem like something that requires consultation with regular consulting fees, but seems like something that can be provided by a one-time outsourcing service.

> A:   That's right.  But I can't be too sure.

> Q:   However, why did you receive advice that can be provided by one-time outsourcing service as above while continuously paying a large amount of 25,000,000 won per month?

> A:   As I said before, though consulting itself matters, they also can provide us with influential power on sales and so on.  So the consulting contract was signed and we paid for it.

---

[27]     Magistrate Judge McCarthy concluded that Korea was not required to disclose Go's exculpatory statement because "there are no <u>Brady</u> obligations in an extradition proceeding." Op. 48.  That may be generally correct, but seems wrong here.  Should a court credit a purported summary of a witness' testimony that is contradicted by the witness' actual (and undisclosed) words?  Moreover, Korea did not "ultimately cooperat[e] with Yoo's requests for information" by disclosing the full interviews, as Magistrate Judge McCarthy wrote.  Op. 48-49.  Keith Yoo's associates found the interviews in court files and provided them to us.

Id. at 16-17.  In her opinion, Magistrate Judge McCarthy cited this colloquy and wrote that Go "admitted, in sum and substance, that the Semo consulting arrangement was not worth regular consulting fees, and could have been 'outsource[d]' on a 'one-time' basis." Op. 46-47.  That gives far too much weight to an "I can't be too sure" answer.

c.   <u>Jo Seon-ae</u>.

The Korean submissions include a quote from Jo Seon-ae, identified simply as a Semo employee.  On May 1, 2014, Jo Seon-ae supposedly told Korean prosecutors (i) that Semo's liabilities were higher than its equity and yet, at the direction of Keith Yoo, it was paying Key Solutions a consulting service fee, "which was excessive" and (ii) that Semo's performance did not get any better despite the high-priced consulting services and yet it did not replace Key Solutions, which was "far from normal."  EX-YOO-00090; EX-YOO-S1-00027-28.[28]

Once again what is quoted was not said.  In her interview with Korean prosecutors, Jo Seon-ae, who identified herself as an "office worker," said this:  that she had "no idea" why Semo had entered into a consulting contract with Key Solutions; that she didn't know what kind of consulting services were provided; and that the fee might have been "a little too much," but she "did not think about it seriously."  Ex. C at 1, 7-9.  And this:

---

[28]     Jo Seon-ae's statement was modified in Korea's January 30, 2018 submission, in which Jo's name is spelled "Cho":

> Statement made by CHO Seon-ae, an employee of Semo, at the Incheon District Prosecutors' Office on May 1, 2014:  'While Semo's debt exceeded its capital on its financial statement and its operating profits were on the decline, Semo provided KRW 300,000,000 to Key Solution every year, which amounted to a whopping KRW 1,150,000,000 in total over a period of four years, on the pretext of paying management consulting fees.  It was unusual that Semo didn't change the consulting company even when Semo's business performance barely improved with such expensive consulting service.'

EX-YOO-S4-00006-7.

Q.   In the case of contract of a normal company with a general consulting firm, it is not only rare to pay for such a high-priced consulting as above, and if the company's management performance does not improve even after paying such fees as above, it is better to replace the consulting firm or get a refund.  Isn't it normal?

A.   Yes.  However, it was decided by my superiors, so I just did what I had to do.  At first, I thought it was a little weird, and then as I continued doing my job, I did it without giving a thought.

Id. at 9.  To go from this quote to a claim that the fee was "excessive," "whopping" and "far from normal" is to substitute the prosecutor's words for those of a witness who knew nothing.

In sum, the actual statements of the three additional witnesses -- Kim Gyu-seok, Go Chang-hwan, and Jo Seon-ae -- do not amount to probable cause.

*   *   *

Before Magistrate Judge McCarthy, we submitted affidavits from two other people -- Hwang Ho-eun and Ryu Geun-ha -- who are not mentioned in the Korean submissions.  Hwang Ho-eun has been in charge of production at Semo since 2003.  In his affidavit, he reports on his numerous consultations with Keith Yoo and on Keith Yoo's pivotal role in improving Semo's production facilities, and, in particular, its processes for distilling squalene.  Keith Yoo's suggestions, Hwang Ho-eun avers, led to an increased squalene yield of 11 percent and a significant increase in Semo's profitability.  Hwang Ho-eun also writes that Ryu Geun-ha, of Key Solutions, was instrumental in Semo's obtaining FDA and HACCP certifications.  Ryu Geun-ha became a member of Semo's Task Force team on obtaining the certifications and regularly attended team meetings.

In his affidavit, Ryu Geun-ha confirms that he prepared consulting reports for Semo and met regularly with the company.  Ryu Geun-ha was born in Seoul but attended college at the University of Missouri, where he stayed on to obtain a master's degree in economics.  He joined Key Solutions in January 2012.  To the extent we have been able to locate them, Ryu Geun-ha's

reports are provided in the "Semo Documents" binder.[29]  They include a 96-page report entitled Business Trategies [sic].  The report seeks to "predict the upcoming market changes and help establish [Semo's] management strategies accordingly" -- specifically to analyze "the trend of the health functional food market" so as to "set[] the direction in which [Semo] should go."  Also included is (i) a lengthy 2012 consulting report entitled US-FDA On-Site Inspection of Semo Facilities and (ii) an equally long 2013 report on the HACCP certification process.  The Semo Documents binder also includes notes of 18 meetings that Key Solutions employees attended with Semo executives to discuss (i) topics of general interest (e.g., the "spread of new bacteria"); (ii) the FDA inspection; and (iii) the HACCP certification process.

Magistrate Judge McCarthy found that the two affidavits and the documents were not "admissible because they constitute either impermissible contradictory evidence or evidence that is not legally sufficient to rebut probable cause."  Op. 44.  But can that really be so?  The thrust of the Korean submissions is that Key Solutions "was neither capable of offering business consulting service nor did it actually provide practical business consulting."  EX-YOO-00085-86.  The affidavits and documentation provide clear cut evidence that the allegation is untrue.  An extradition proceeding is not a trial, but a person should not be sent abroad on the basis of so little when so much undermines it.[30]

---

[29]    The reports have been translated into English; the original Korean-language reports are available upon request.

[30]    Consider this hypothetical.  A country seeks the extradition of "X" based on a claim that he lied to investors that he was a graduate of the Wharton School and a senior investment banker at Goldman Sachs.  (Assume a witness testified that those representations were false.)  In response, X submits an authenticated transcript from the Wharton School showing that he graduated with distinction and an affidavit from the head of Goldman Sachs extolling his work there as a senior investment banker.  Surely, an extradition court would not reject that evidence on the ground that it is merely contradictory.

5.     Moreal Consulting Agreement

Moreal has two separate divisions:  a medical division and a graphic design division.  The former manufactures medical devices, including a colonic irrigation system patented by Yoo Byeong-eun, which cleanses the colon.  The design team, which has 10 to 15 employees, does graphic design work -- corporate logos, brochures, advertisements and the like -- for other companies.  The Korean extradition submissions allege that, in April 2010, Keith Yoo conspired with the former CEO of Moreal Design to execute a sham consulting contract, pursuant to which Moreal Design transferred money to Keith Yoo.  According to the submissions, Moreal Design "did not require regular business consulting for risk management, etc. and Key Solution managed by [Keith Yoo] was neither capable of offering business consulting nor did it actually provide business consulting to 'Moreal Design.'"  EX-YOO-00086.  In her decision, Magistrate Judge McCarthy found that "the totality of the circumstances create[d] a reasonable belief that Yoo utilized his relationship with his older sister, Moreal's co-CEO, to embezzle Moreal's funds through a fraudulent [agreement]."  Op. 57.

The supposed statements of two new witnesses -- Ha Myeong-hwa and Park Hwa-sun -- are proffered in support of this embezzlement allegation.[31]  As shown below, the allegation does not withstand scrutiny.

a.     Ha Myeong-hwa

The Korean submissions include this purported quotation from Ha Myeong-hwa in a May 14, 2014 interview with Korean prosecutors:  "[Keith Yoo] was paid KRW 20,000,000

---

[31]     The Korean submissions also identify Park Seung-il and Kim Chun-gyun as witnesses to the alleged Moreal embezzlement; their statements have previously been discussed.  See supra at 24-27, 31-32.

every month [but] there is no official record showing that the company received consulting services."  EX-YOO-S1-00028-29.  In her May 14 interview, Ha Myeong-hwa actually said this:

> Q. Was there anything that Key Solution actually gave you as management advice?
>
> A. When our designers went abroad for training, it seems that Key Solution provided expenses for their stay, but I'm not sure about the details.
>
> Q. Do you have any documents to prove that?
>
> A. I looked it up, but there are no official documents, I only guess.
>
> Q. What do you think such thing has to do with management consulting?
>
> A. I remember that they said they would provide a design training program, but in fact, I wasn't in charge of design, so I'm not really sure what it was.

Ex. F at 14-15 (emphasis added).  Ha Myeong-hwa, a doctor trained in the United States, was in charge of Moreal's medical division.  The answer "I'm not sure" from a person who did not oversee the relevant division is not proof of wrongdoing.

To find probable cause, Magistrate Judge McCarthy relied, in part, upon Ha's testimony about the "unusual formation" of the Moreal agreement.  Op. 57.  What Ha testified to is that "Park Seung-il asked [her] to sign [the contract]," telling her that "Key Solution would provide [Moreal] with a number of solutions such as a design training program" and that she then "consulted with Yoo Sum-Na on whether to sign and maintain the contract, and as it was a decision by Yoo Sum-Na, [Ha] just followed it."  Ex. F at 14-15.  None of this gets Korea very far.  Ha, the head of the Medical Division, signed the contract after consulting with the head of the Design Division, whose employees would benefit from the services.  That scenario does not suggest that an embezzlement scheme was afoot.

b.      Park Hwa-sun

Korea's submissions quote Park Hwa-sun, a Moreal employee in charge of accounting, as telling Korean prosecutors:  "[Keith Yoo] signed a consulting service contract with [Moreal].    But  I  do  not  know  whether  Key  Solution  provided  consulting  services." EX-YOO-S1-00029.  Park Hwa-sun's actual words were these:

Q.      Why do you think Moreal signed a management consulting contract with [Keith Yoo]?

A.      I do not know.

Q.      Was there anything that Key Solution actually gave as management advice?

A.      I do not know.

Ex. G at 13 (emphasis added).  All that Park Hwa-sun said was that, working in accounting, she had no knowledge of the consulting services that Key Solutions provided.  That does not support probable cause.

*      *      *

Before Magistrate Judge McCarthy, we submitted an affidavit from Han Yeun Ju, the leader of Moreal's Graphic Design team, who is not mentioned in the Korean submissions. Han Yeun Ju explains that Keith Yoo developed Moreal's Abroad Internship program, which took designers overseas to broaden their knowledge.  Key Solutions, she avers, "provided the materials necessary for the program:  training dates, air tickets, accommodations, and guides."   The designers "profited greatly" from their experiences.  In addition, we submitted a 93-page Key Solutions consulting report for Moreal entitled "Business Strategies."  Its introduction states this:

Customers now want differentiation provided by purchasing products rather than purchasing products based on their functions, and they pay premium prices for such differentiated products.    A  good  example  would  be  superior  sales  volume  of Apple's  products . . . .   Companies  [have]  started  to  realize  the  importance  of designs in order to create such differentiation, and this has led to the development of "design management" whereby designs are integrated with the overall company

> management.  As a result, our country's design market has continued to grow after
> 2008.  Therefore, it is important for Moreal Design Co., Ltd. to carry out "design
> management" in order to become a specialized design company that will lead the
> growing design industry.  This report will present guidelines about Moreal Design
> Co., Ltd.'s "Design management" as well the direction that Moreal Design Co.,
> Ltd. should take through "Design management."

Also submitted were annual reports (2010 to 2013) that Key Solutions provided Moreal about the

Abroad Internship Program, which it had conceived and planned.

Here, too, Magistrate Judge McCarthy rejected this evidence because it was

"impermissible contradictory evidence."  Op. 53.  We repeat what was said before:  Korea alleged

that Key Solutions, Keith Yoo's company, "was neither capable of offering business consulting

nor did it actually provide business consulting to Moreal Design."  That allegation is demonstrably

false.  Surely, its falsity should matter to a court.

6.    Chonhaiji Consulting Agreement

The Korean submissions allege that Keith Yoo conspired with the CEO of

Chonhaiji to execute a sham advisory contract, "even though he did not play any special role

concerning the management of [Chonhaiji]."  EX-YOO-00088.  The payments were made between

February 2011 and November 2011.[32]  In her decision, Magistrate Judge McCarthy found that the

testimony of Park Seung-il and Byeon Gi-chun "plus the corroborative bank records," supported

probable cause for this charge.  Op. 61; see also id. at 60 ("[a]lthough Yoo may succeed at trial

with regard to this charge, his arguments are insufficient to defeat the minimal showing required

for probable cause").[33]

---

[32]    Keith Yoo became a director of Chonhaiji in late 2011, and the consulting payments
stopped.

[33]    At several places in her opinion, Magistrate Judge McCarthy refers to corroborative bank
records.  Op. 30, 35, 47, 53, 61.  But the bank records (actually excel spreadsheets) show only that
money was transferred to Keith Yoo from the companies.  They shed no light on the legitimacy
(or illegitimacy) of the underlying transactions.

We have previously discussed Park's interview statements and need say no more here.  See supra at 24-27.  As for Byeon Gi-Chun, Magistrate Judge McCarthy ignored his answers to these questions put to him in his interview:

> Q.    Have you received any advice from [Keith Yoo]?
>
> A.    Cheonhaeji Co., Ltd., planned to build a yacht manufacturing plant in Gyeongsangnam-do, and [Keith Yoo] had data on technical alliances with US yacht schools, design, and design technology, so he instructed the company about the future yacht business policy.
>
> Q.    Was the yacht business planned after you took office as CEO of Cheonhaeji Co., Ltd.?
>
> A.    No.  Prior to 2007, it was already reported to the Gyeongsangnam-do or Goseong-gun that it had entered the yacht business, and was known to the media.  As part of that, we built the Han River water taxi.  All of this was part of [Keith Yoo's] business plan.

Ex. H at 36 (emphasis added).  Byeon Gi-Chun's answers -- that Keith Yoo "instructed the company about the future yacht business" and that "[a]ll of this was part of [Keith Yoo's] business plan" -- eviscerate Korea's contention that Keith Yoo "did not play any special role [in Chonhaiji's] management."[34]

*   *   *

Before Magistrate Judge McCarthy, we submitted an affidavit from Sung Min Park that described in detail Keith Yoo's role in advising Chonhaiji and developing its business plan. Sung Min Park met Keith Yoo in August 2007 at a meeting with Chonhaiji's executives in South Korea.  At the time, Chonhaiji was building parts for ships, but had stopped building ships.  At the meeting, the participants discussed building yachts and constructing a shipyard in the Philippines

---

[34]    Magistrate Judge McCarthy placed considerable weight on Korea's claim that the Chonhaiji consulting agreement "replac[ed]" the trademark agreement when Korean tax authorities concluded that trademark fees were not deductible expenses.  Op. 58, 60-61.  But whatever its origin, the consulting agreement was not a sham if it compensated Keith Yoo for his significant work, which it did.

for that purpose.  Keith Yoo recommended that Sung Min Park, then a young Chonhaiji employee, serve an internship at Chonhaiji's shipyard in South Korea to begin learning the skills needed for the venture.  When Sung Min Park finished the internship, he met again with Keith Yoo, this time in New York, to discuss the next steps in his education.  After their meeting, Keith Yoo arranged for Sung Min Park to visit ship building companies in Vancouver, which specialize in aluminum boats.  After the trip to Vancouver, Sung Min Park met with Keith Yoo, who recommended another internship, this time with a German boat company that specializes in boat assembly systems.

Keith Yoo's interest in developing Chonhaiji into a leading yacht building company did not wane.  He had Sung Min Park create a database collecting all his research materials.  See Sung Min Park Affidavit ("[t]his website was only accessible by Mr. Yoo, the president of Chonhaiji . . . and myself . . . and contains 400,000 files").  He also encouraged Sung Min Park to enroll in The Landing School in Kennebunk, Maine, one of the world's leading boat building and design schools.  Sung Min Park spent five years at the school, studying boat building and yacht design.  During those years, he continuously met with Keith Yoo on weekends in New York to discuss his progress and ideas.  Significantly, Sung Min Park's association with The Landing School led to a November 2012 partnership between the school and Chonhaiji.  The letter agreement, addressed to Keith Yoo, includes this paragraph:

> We also want to be a valuable partner and we are pleased to offer support, consulting and training as you seek to expand your ship building and marine related operations in the United States.  We graduate approximately 70 students each year and I would welcome a discussion about how we may help you achieve your business goals.

All of this, however, was cut short in April 2014, when the ferry accident occurred, and on-going projects stalled.

Magistrate Judge McCarthy deemed Sung Min Park's affidavit inadmissible because it did not "obliterate" probable cause.  Op. 60.  But if Sung Min Park's account of Keith

Yoo's ceaseless activities does not obliterate probable cause, one wonders what would. Indisputably, Keith Yoo devoted countless hours to developing Chonhaiji's yacht building business, so that the company's decision to pay him a consulting fee in 2011 was hardly unreasonable.

>        7.       Chonhaiji Photography Purchases

The Korean submissions allege that Keith Yoo conspired with Chonhaiji's CEO to embezzle money from the company by ordering it to purchase the photographs of his father, Yoo Byeong-eun, at inflated prices which "could not be priced accurately because [the photographs] had never been sold in the market before." EX-YOO-S4-00012. Specifically, the charge here is this:

> Around March 2013, at the office of 'Chonhaiji', YOO Hyuk Kee conspired with CEO BYEON Gi-chun of 'Chonhaiji' to have KRW 1,656,598,080 paid by the victim to a company in the US named Ahae Press Inc. represented by YOO Hyuk Kee as an advance payment for his father's photographs as if the victim had signed a contract to buy his photographs at a high price, even though his photographs were not proven to be priceless as they were never put up for sale in the auction market other than among followers of his church and affiliate companies. From then on to December 2013, YOO Hyuk Kee received and embezzled a total of KRW 19,862,077,987.

EX-YOO-00088.

That is the charge, but it is not what Magistrate Judge McCarthy analyzed. Instead, she wrote that "Korea's evidence is sufficient to support a reasonable belief that Yoo used his relationships with Park Seung-il and Byeon Gi-chun to extract monies from various affiliates to fund the Versailles exhibition in order to inflate the value of his father's photographs." Op. 65; see also id. at 67 ("any legitimate reasons behind Chonhaiji's actions do not negate Korea's evidence that other affiliates were unknowingly coerced into making inflated payments to fund an exhibition whose purpose was to increase the value of the photographs the affiliates thought they

were buying"). But what other companies did to support an exhibition at Versailles is <u>not</u> the issue here.

To address the merits of what was charged, we submitted substantial evidence to show that Chonhaiji was not cheated when it purchased Yoo Byeong-eun's photographs. Magistrate Judge McCarthy, however, rejected that evidence as "impermissib[ly] contradictory," although she acknowledged its force. Op. 66, 67 ("Yoo's evidence raises substantial fact issues that may exonerate him at trial"). We repeat the evidence here because, in our view, it undermines the core allegation that the photographs were essentially worthless.

The relevant facts here are these: Beginning in 2009, Yoo Byeong-eun, who used the pseudonym "Ahae" for his artistic endeavors, began photographing nature through the window of his studio. During the next five years, he produced more than three million images. The works were subsequently shown at exhibitions in six countries between 2011 and 2013: Vanderbilt Hall, Grand Central Terminal, New York; the Great Hall, National Gallery, Prague; Clarence House Gardens, London; Royal Botanic Gardens, London; Vremena Goda Center, Moscow; Alinari National Museum of Photography, Florence; Magazzini del Sale, Venice; Louvre Museum, Paris; and the Palace of Versailles.

At each location, the works were acclaimed. Professor Milan Knizak, the former General Director of the National Gallery of Prague, wrote that Ahae's photographs "simultaneously testify to something lasting and eternal, something that flows beyond our lives." Dr. Joseph Backstein, Director of the Institute of Contemporary Art in Moscow, wrote that "Ahae's works unfold[] before our eyes [as] a sort of metaphor for man's ideal ecological environment." Anne-Marie Garcia, the Curator of Photography at the Ecole Nationale Superieure des Beaux-Arts in Paris, wrote that Ahae is "heir to the unstoppable photographers of the 19th century" and his

photographs are "stunning and alive, infused with . . . beauty and life."  And Henri Loyrette, then the Director of the Louvre Museum, wrote that Ahae's work "demonstrates the beauty and diversity of our world if only we take the time to stop and look."

In 2012, a plan was developed to merge the Hemato-Centric Life Institute, which then had the exclusive rights to sell Ahae's photographs in Korea, with Chonhaiji.  A report supporting the merger states that the plan was intended to "improve[] [the] overall . . . profits [of Chonhaiji] by incorporating high value-added industries [such as art sales] with the decline in net profit caused by the shipbuilding industry recession."  The report estimated that, by 2016, art sales would increase Chonhaiji's profits by KRW 1.5 billion a year (approximately $1.28 million).  The merger occurred in early 2013, and Chonhaiji purchased photographs from Ahae Press, which has the license to sell the images.

That is hardly a tale of embezzlement.  Purchasing photographs exhibited in major museums and hailed by leading critics and doing so after commissioning a report which concluded that the purchase was economically viable does not sound in crime.  Nor does the testimony of Byeon Gi-chun, on which Magistrate Judge McCarthy relied.  According to the Korean summary, Byeon Gi-chun supposedly said this:  Chonhaiji paid KRW 19,862,077,987 for the purchase of Yoo Byeong-eun's photographs, "[e]ven though . . . [it] had no idea about his works and didn't decide what works [it] would buy [because it] had no choice but to follow what [Keith Yoo] told [it] to do."  EX-YOO-S4-00012-13.  But the quoted words were not said.  Byeon Gi-Chun told Korean authorities that he was optimistic that Chonhaiji would sell the photographs "since there were many followers of [Yoo Byeong-eun] . . . [who] were excited about the fact that [his] works

were on display in the Louvre." Ex. H at 18.[35] The ferry accident, however, tarnished Yoo

Byeong-eun's name, and the art sale project never took off.

        In sum, the Korean submissions have turned a viable business plan into an

embezzlement by telling none of what actually occurred.

*   *   *

        We recognize that an extradition proceeding is not a trial.  But extradition is not for

the asking.  The judiciary has a critical role in ensuring that the requesting state has proffered

sufficient evidence to require the accused to stand trial far from home in what often is a hostile

jurisdiction.  Gill, 747 F. Supp. at 1038 (our extradition scheme is designed to "giv[e] to judges,

as members of relatively non-political departments, an important role in the avoidance of

threatened dangers to liberty").  Conceivable inferences, guesses, surmises ("it seems so"),

uncertainties ("I'm not sure") and false summaries are not enough.  That is what Korea has

provided.  Because the evidence here does not support probable cause, the certification of

extraditability should be set aside.

---

[35]    There was also this question and answer:

> Q.    While quality is a fairly subjective problem and is not easy to discuss, but the market price is implicitly formed in the market where the art world, galleries, and critics participate.  It is said that prices are only formed for works by a small number of artists and only when there is a consensus that the work is worthy of collection.  What do you think?

> A.    In general, I agree with what the experts say.  However, we thought that we could sell the photos to the followers of Yoo or to the people they introduced.

Ex. H at 21.

CONCLUSION

For the reasons stated above, Keith Yoo's petition for a writ of habeas corpus should be granted, and he should be freed from custody to go home.

Dated: New York, New York
       August 16, 2021

                                        Respectfully submitted,

                                        BRACEWELL LLP

                                        /s/ Paul Shechtman
                                        Paul Shechtman
                                        1251 Avenue of the Americas
                                        49th Floor
                                        New York, NY 10020
                                        212-508-6107
                                        paul.shechtman@bracewell.com


                                        ZUCKERMAN SPAEDER LLP
                                        Shawn Naunton
                                        485 Madison Avenue
                                        10th Floor
                                        New York, NY 10022
                                        646-746-8655
                                        snaunton@zuckerman.com

                                        Attorneys for Defendant Keith Yoo