UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HYUK KEE YOO,
    a/k/a "Keith Yoo,"

                    Petitioner,

    v.

UNITED STATES OF AMERICA,

                    Respondent.

21 Civ. 6184 (CS)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO HYUK KEE YOO'S PETITION FOR A WRIT OF HABEAS CORPUS**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Derek Wikstrom
Assistant United States Attorney
    *Of Counsel*

## Table of Contents

Preliminary Statement ................................................................................................ 1

Background ................................................................................................................. 1

    A.    Procedural History ............................................................................... 1

    B.    The Offense Conduct in the Republic of Korea ................................. 3

Discussion .................................................................................................................. 5

I.    Applicable Law ..................................................................................................... 5

II.    The Court Should Uphold Judge McCarthy's Ruling That the Lapse-of-Time Provision Does Not Preclude Certification of Yoo's Extraditability ................................. 7

    A.    The Lapse-of-Time Provision Is Discretionary, and Therefore Reserved to the Secretary of State ........................................................................... 7

        1.    Discretionary Decisions in a Treaty Are Reserved to the Secretary of State ............................................................................... 7

        2.    The Treaty's Lapse-of-Time Provision Is Discretionary ............................ 8

    B.    The Prosecution Is Not Time-Barred ................................................. 13

III.    The Evidence Established Probable Cause To Believe that Yoo Committed the Charged Offenses ................................................................................................ 16

    A.    The Statements of Seung-il Park Are Independently Sufficient to Establish Probable Cause for All Seven Counts ................................. 17

    B.    Other Evidence Corroborated Park's Statements and Established Probable Cause ................................................................................... 21

        1.    The Trademark Licensing Scheme ....................................... 22

        2.    The Consulting Scheme ......................................................... 24

        3.    The Photograph Scheme ........................................................ 28

Conclusion ............................................................................................................... 32

i

## Table of Authorities

**Cases**

*Abbott v. Abbott*,
    560 U.S. 1 (2010)............................................................................................................... 11

*Ahmad v. Wigen*,
    910 F.2d 1063 (2d Cir. 1990) ........................................................................................... 5

*Ahmad v. Wigen*,
    726 F. Supp. 389 (E.D.N.Y. 1989) .............................................................................. 5, 17

*Anderson v. Yungkau*,
    329 U.S. 482 (1947)........................................................................................................... 9

*Austin v. Healey*,
    5 F.3d 598 (2d Cir. 1993) ................................................................................................ 23

*Bisram v. United States*,
    777 F. App'x 563 (2d Cir. 2019) ................................................................................. 6, 17

*Brady v. Maryland*,
    373 U.S. 83 (1963)........................................................................................................... 26

*Brink's Ltd. v. S. African Airways*,
    93 F.3d 1022 (2d. Cir. 1996) ............................................................................................ 8

*Chan v. Korean Air Lines, Ltd.*,
    490 U.S. 122 (1989)........................................................................................................... 8

*Collins v. Loisel*,
    259 U.S. 309 (1922)........................................................................................................... 5

*Farmers' & Merchs.' Bank of Monroe v. Fed. Reserve Bank of Richmond*,
    262 U.S. 649 (1923)......................................................................................................... 12

*Fernandez v. Phillips*,
    268 U.S. 311 (1925)..................................................................................................... 6, 17

*Grin v. Shine*,
    187 U.S. 181 (1902)......................................................................................................... 16

*Haynes v. United States*,
    891 F.2d 235 (9th Cir. 1989) .......................................................................................... 12

*In re Extradition of Atta*,
 706 F. Supp. 1032 (E.D.N.Y. 1989) ........................................................ 5

*In re Extradition of Han*,
 No. 11 Civ. 2059, 2012 WL 33201 (C.D. Cal. Jan. 6, 2012) ................... 15

*In re Extradition of Hyuk Kee Yoo*,
 No. 20 Mag. 2252 (JCM), 2021 WL 2784836 (S.D.N.Y. July 2, 2021) ................................. 2

*In re Extradition of Sindona*,
 450 F. Supp. 672 (S.D.N.Y. 1978) ......................................................... 26

*In re Extradition of Vukcevic*,
 No. 95 Crim. Misc. 1 p. 1, 1995 WL 675493 (S.D.N.Y. Nov. 14, 1995)................................. 17

*Jhirad v. Ferrandina (Jhirad I)*,
 486 F.2d 442 (2d Cir. 1973) ................................................................. 14

*Jhirad v. Ferrandina (Jhirad II)*,
 536 F.2d 478 (2d Cir. 1976) ................................................... 6, 14, 27

*Kapoor v. Dunne*,
 606 F. App'x 11 (2d Cir. 2015) ............................................................ 27

*Lopez v. Davis*,
 531 U.S. 230 (2001)............................................................................... 9

*Martinez v. United States*,
 828 F.3d 451 (6th Cir. 2016) ............................................................ 9, 15

*Marzook v. Christopher*,
 No. 96 Civ. 4107 (KMW), 1996 WL 583378 (S.D.N.Y. Oct. 10, 1996) ............................... 16

*Messina v. United States*,
 728 F.2d 77 (2d Cir. 1984) ............................................................... 5, 27

*Mirela v. United States*,
 416 F. Supp. 3d 98 (D. Conn. 2019)............................................. 9, 11, 16

*Murphy v. United States*,
 199 F.3d 599 (2d Cir. 1999) .................................................................. 7

*N.Y. Dept. of Env't Conservation v. Fed. Energy Regul. Comm'n*,
 991 F.3d 439 (2d Cir. 2021) .................................................................. 9

iii

*Patterson v. Wagner,*
   785 F.3d 1277 (9th Cir. 2015) ................................................................. 9, 10, 11

*Photopaint Techs., LLC v. Smartlens Corp.,*
   335 F.3d 152 (2d Cir. 2003) .................................................................... 12

*Pinkney v. Keane,*
   920 F.2d 1090 (2d Cir. 1990) .................................................................. 6

*Rastelli v. Warden, Metro. Corr. Ctr.,*
   782 F.2d 17 (2d Cir. 1986) ...................................................................... 9

*Sainez v. Venables,*
   588 F.3d 713 (9th Cir. 2009) ................................................................... 16

*Shapiro v. Ferrandina,*
   478 F.2d 894 (2d Cir. 1973) .............................................................. 6, 13, 26

*Skaftouros v. United States,*
   667 F.3d 144 (2d Cir. 2011) ........................................................ 5, 6, 16, 17

*Theron v. United States,*
   832 F.2d 492 (9th Cir. 1987) ................................................................... 13

*United States v. Atl. Rsch. Corp.,*
   551, U.S. 128 (2007) ............................................................................... 12

*United States v. Howard,*
   489 F.3d 484 (2d Cir. 2007) .................................................................... 17

*United States v. Porumb,*
   420 F. Supp. 3d 517 (W.D. La. 2019) .................................................. 9, 11

*United States v. Rogers,*
   461 U.S. 677 (1983) ............................................................................. 9, 12

*United States v. Weiss,*
   752 F.2d 777 (2d Cir. 1985) .................................................................... 21

*Vo v. Benov,*
   447 F.3d 1235 (9th Cir. 2006) ................................................................. 8, 9

## Statutes

18 U.S.C. § 3184 ...................................................................................... 1, 5

iv

18 U.S.C. § 3290 ............................................................................................................ 13

18 U.S.C. § 3582 ............................................................................................................ 13

N.Y. CPL § 30.10 ............................................................................................................ 13

## PRELIMINARY STATEMENT

Hyuk Kee Yoo is wanted in South Korea on seven counts of embezzlement. On July 2, 2021, pursuant to 18 U.S.C. § 3184 and the applicable extradition treaty between the United States and the Republic of Korea[1] (the "Treaty") and following an extradition hearing, Magistrate Judge Judith C. McCarthy certified that Yoo was extraditable on all seven counts.

Yoo has challenged that certification by petitioning for a writ of habeas corpus. He argues, first, that the charges against him are time-barred, and second, that probable cause was lacking. He raised and lost both of these arguments before Judge McCarthy, who concluded that Korea's extradition submissions established probable cause as to each of the seven embezzlement counts, and that the question of timeliness was a discretionary matter reserved to the United States Secretary of State. Because Judge McCarthy was correct on both scores, her order certifying Yoo's extraditability should be affirmed, and Yoo's petition should be denied.

## BACKGROUND[2]

### A.    Procedural History

On May 8, 2014, a judge of the Incheon District Court in the Republic of Korea issued a warrant for Hyuk Kee Yoo's arrest. Korea had charged Yoo with seven counts of embezzlement, in violation of Article 355(1) of the Criminal Act and Article 3(1)(1) and 3(1)(2) of the Act on the Aggravated Punishment, Etc. of Specific Economic Crimes. On May 28, 2014, Korea submitted a diplomatic note formally requesting Yoo's extradition from the United States. Thereafter, between

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, U.S.-S. Korea, signed on June 9, 1998 and entered into force December 20, 1999, S. TREATY DOC. No. 106-2 (1999).

[2] "Ex. Dkt." refers to entries on the extradition docket, 20 Mag. 2252 (JCM). "Ex. Order" refers to Judge McCarthy's opinion and order certifying Yoo's extraditability. "Pet. Br." refers to Yoo's opening brief in support of his petition for the writ of habeas corpus, filed on August 16, 2021.

2014 and 2019, Korea submitted a series of diplomatic notes providing additional information and supplementing the extradition request. (Korea submitted further supplemental exhibits during the pendency of the extradition case.) On February 27, 2020, the United States Government filed the Complaint commencing this action, and a warrant was issued for Yoo's arrest in the United States.

On July 22, 2020, the United States Marshals Service arrested Yoo in Westchester County, New York. That same day, Yoo was presented before a magistrate judge, who ordered Yoo detained pending extradition. Yoo has been in custody since his arrest.

On March 3, 2021, after receiving briefing from the parties, Judge McCarthy held an extradition hearing. On July 2, 2021, Judge McCarthy issued a Certification of Extraditability and Order of Commitment (Ex. Dkt. 39, the "Extradition Order" or "Ex. Order").[3] After admitting the exhibits offered without objection by the Government, consisting of Korea's various submissions in support of extradition, and admitting a subset of the numerous exhibits Yoo offered at the hearing, Judge McCarthy found that Korea's extradition request satisfied the requirements of the Treaty and federal law, and established probable cause as to each of the seven counts on which Korea sought Yoo's extradition. Judge McCarthy also rejected Yoo's argument that extradition was barred by a statute of limitations, concluding that the Court lacked authority to decide that discretionary issue, which is reserved to the Secretary of State.

Yoo filed this habeas petition challenging the Extradition Order on July 20, 2021. On August 16, 2021, he filed an opening memorandum of law in support of the petition.

---

[3] Throughout this brief, citations to pages in the Extradition Order refer to the version posted on the extradition docket. The Extradition Order is also available on Westlaw, see *In re Extradition of Hyuk Kee Yoo*, No. 20 Mag. 2252 (JCM), 2021 WL 2784836 (S.D.N.Y. July 2, 2021). Courtesy copies of the Extradition Order, the Government's Complaint, and the Government Exhibits admitted at the extradition hearing will be sent to the Court in hard copy.

B.      **The Offense Conduct in the Republic of Korea**

The crux of the Korean government's allegations is that Yoo leveraged his power as a business and religious leader in Korea to steal money from various affiliated companies (the "Victim Companies"). Yoo's father Byeong-eun Yoo was the prominent founder and former leader of the Evangelical Baptist Church in Korea (the "Church"). Beginning in 2010, Yoo served as the de facto leader of the Church. In addition to leading this religious organization, the Yoo family collectively owned a holding company called I-One-I Holdings, which in turn owned a stake in various commercial entities including the Victim Companies. *See* Ex. Order at 3.

Yoo conspired with executives at the Victim Companies to enter into sham contracts, through which Yoo embezzled millions of dollars from the companies, to the detriment of their shareholders. A recurring theme in Korea's submissions was that these executives were overpowered by Yoo, and believed that they could not refuse his demands. There were two reasons for this dynamic. First, a number of the executives, officers, and employees of the Victim Companies were members of the Church, and revered Yoo's father. Second, Yoo's and his family's control over I-One-I Holdings provided effective control of the other entities in its corporate structure—including the Victim Companies—because the holding company and the various other entities had overlapping directors and officers, many of whom had gotten their jobs from the Yoo family. For instance, Yoo's personal assistant and one of his principal co-conspirators, Seung-il Park, worked for a private company called Key Solutions that Yoo created and owned, but was also a Director of both I-One-I Holdings and one of the Victim Companies, Chonhaiji, and served as an auditor of another one of the Victim Companies, Ahae. *See id.* at 3-4.

Yoo's schemes took three forms, *see id.* at 4-7:

First, Yoo and his co-conspirators embezzled money from three Victim Companies, Chonhaiji Co., Ltd., Ahae Co., Ltd., and Onnara Shopping Co., Ltd., using fraudulent trademark

3

licensing agreements. In these trademark licensing schemes, Yoo would register Victim Companies' names as trademarks, and then conspire with the companies' executives to sign contracts licensing their names back to them. In exchange, the Victim Companies paid licensing fees directly to Yoo, or to his private company, Key Solutions.

Second, Yoo and his-co-conspirators caused three Victim Companies—Chonhaiji (which was also a victim of the trademark licensing scheme), Semo Co. Ltd., and Moreal Design, Inc.—to make payments to Yoo or Key Solutions under fraudulent agreements for business consulting services. In these schemes, the Victim Companies signed consulting contracts, pursuant to which they paid large monthly fees, nominally for business advice from Key Solutions; the actual business advice Key Solutions provided in return was minimal, if any was provided at all.

Third, Yoo and his co-conspirators caused Victim Companies, including some of the companies discussed above and some others, to fund the exhibition of photographs taken by Yoo's father Byeong-eun Yoo. On instructions from Yoo, the Victim Companies made disguised payments, characterized on their books as capital increases or stock subscriptions, to a single Victim Company, Chonhaiji, which in turn used the payments nominally to buy Byeong-eun Yoo's photographs at inflated values. Much of the money collected from the Victim Companies was actually used to fund exhibitions of the photographs at prominent cultural institutions, in a failed attempt to pump up their value.

In each of these three categories of schemes, Korea alleged that the Victim Companies received little or nothing of value in return for their payments to Yoo. And in each instance, Yoo conspired with leading executives of the Victim Companies, causing the executives to breach their fiduciary duties and causing the Victim Companies to make millions of dollars in payments to or for the benefit of Yoo. Many of the executives with whom Yoo conspired were interviewed by

Korean authorities, and described being cowed by Yoo, and having no choice but to comply with his demands that they help him embezzle funds. Indeed, each count—three corresponding to the three victims of the trademark scheme, three corresponding to the three victims of the consulting scheme, and one relating to the photograph scheme—was supported, in the materials submitted by Korea and received in evidence at the extradition hearing, by statements made to Korean officials by Yoo's co-conspirators. Many of Yoo's own exhibits received at the hearing corroborated these statements. All told, the Korean Government alleged that Yoo embezzled the equivalent of approximately $25 million, to the detriment of the Victim Companies and their shareholders.

## DISCUSSION

### I. Applicable Law

Judge McCarthy's task at the extradition hearing in this case was a limited one: she had to determine whether the requesting country had submitted evidence "sufficient to sustain the charge," *i.e.*, whether there was probable cause. 18 U.S.C. § 3184. In conducting this analysis, Korea's evidence was to be "deemed truthful." *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) (citing *Collins v. Loisel*, 259 U.S. 309, 315-16 (1922)), *pet. for habeas corpus dismissed sub nom. Ahmad v. Wigen*, 726 F. Supp. 389 (E.D.N.Y. 1989), *aff'd* 910 F.2d 1063 (2d Cir. 1990). And because of the limited nature of extradition proceedings, Yoo's rights at the extradition hearing were strictly circumscribed.[4]

---

[4] "[F]ugitives do not benefit from many of the protections that are traditionally accorded to defendants in the criminal context." *Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011). Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply. Hearsay is admissible, unsworn statements of absent witnesses can be considered, and there is no right to confrontation or cross-examination. *Id.* (collecting cases). The fugitive has no right at an extradition hearing to "introduce evidence to rebut that of the prosecutor," and while the extradition court has discretion to permit "explanatory testimony," the accused "may not offer proof which contradicts that of the demanding country." *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984). It is thus proper for the Court to exclude, among other things, evidence that would be considered *Giglio* or *Brady* material in the criminal context: the Second Circuit has, for

This Court's task in reviewing Judge McCarthy's Extradition Order is even more limited. Extradition orders are not directly appealable. "Rather, if review is to be had at all it must be pursued by a writ of habeas corpus." *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976) ("*Jhirad II*") (citing *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973)). This is a "procedural idiosyncrasy," but it has "important substantive consequences," *id.*: a habeas court can only "inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and, by a somewhat liberal extension, whether there was *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty." *Id.* (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925), emphasis added); *accord, e.g.*, *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011). The Second Circuit has described this "any evidence" standard as a "minimal threshold." *Bisram v. United States*, 777 F. App'x 563, 567 (2d Cir. 2019) (summary order). Habeas challenges in the extradition context are asymmetrical proceedings "in which a prisoner seeks to overturn a presumptively valid judgment." *Skaftouros*, 667 F.3d at 158 (quoting *Pinkney v. Keane*, 920 F.2d 1090, 1094 (2d Cir. 1990)). Given that the Extradition Order is presumptively lawful, Yoo bears the burden of proving by a preponderance of the evidence that he is in custody in violation of the extradition treaty. *Id.*

Here, Yoo concedes that Judge McCarthy had jurisdiction and that the offenses charged by Korea are covered by the Treaty. He challenges Judge McCarthy's rejection of his argument that a statute of limitations bars his extradition, and contests her probable cause finding. Those challenges are addressed in turn.

---

instance, affirmed exclusion of evidence that the declarant of an inculpatory statement might be biased against the accused, and evidence that certain fraudulent statements attributed by the requesting country to the accused had not, in fact, been made. *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973).

II.     **The Court Should Uphold Judge McCarthy's Ruling That the Lapse-of-Time Provision Does Not Preclude Certification of Yoo's Extraditability**

Article 6 of the Treaty, entitled "Lapse of Time," states:

> Extradition may be denied under this Treaty when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State. The period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations. Acts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested State, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive.

Yoo argues, as he did below, that this provision precludes his extradition. *See* Pet. Br. at 5-21. But he is wrong. Judge McCarthy correctly held that Article 6 of the Treaty is discretionary, and therefore that the determination of this issue was reserved to the Secretary of State. Ex. Order at 68. She thus did not reach the merits of the question whether the charges against Yoo were time-barred. As explained below, first, Judge McCarthy's conclusion that this was an issue for the Secretary of State was correct, but second, even if the Court disagrees, Article 6 does not bar Yoo's extradition here.

A.     **The Lapse-of-Time Provision Is Discretionary, and Therefore Reserved to the Secretary of State**

1.     **Discretionary Decisions in a Treaty Are Reserved to the Secretary of State**

As Judge McCarthy explained, the statutory role of an extradition court is to "determine whether the legal requirements for extraditability are established," while the executive branch exercises discretion in making the ultimate determination whether to extradite. Ex. Order at 70-71 (collecting authorities); *see also, e.g.*, *Murphy v. United States*, 199 F.3d 599, 601-02 (2d Cir. 1999) (the function of the courts is "to test only the legality of the extradition proceedings; the

question of the wisdom of extradition remains for the executive branch to decide" (citation omitted)). By virtue of this procedure, "mandatory" provisions of extradition treaties are determined by the extraditing court, whereas "discretionary" determinations are reserved to the Secretary of State. Ex. Order at 71. Yoo appears to agree with this part of the analysis. *See* Pet Br. at 7 (quoting *Vo v. Benov*, 447 F.3d 1235, 1247 (9th Cir. 2006) for the proposition that "discretionary decisions are within the province of the Secretary of State and not the extradition magistrate").

### 2.    The Treaty's Lapse-of-Time Provision Is Discretionary

Where Yoo disagrees with Judge McCarthy is on the question whether the Treaty's provision that "[e]xtradition may be denied" is mandatory or discretionary. Yoo argues, effectively, that the word "may" in Article 6 of the Treaty actually means "shall." This argument, that the Treaty does not mean what it says, flies in the face of the rules of treaty interpretation and has been rejected by every court that has considered it.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text, and where the language of a treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Georges v. United Nations*, 834 F.3d 88, 92 (2d Cir. 2016) (cleaned up, citations omitted). Where, as here, the relevant language of the treaty is not ambiguous, the analysis should be over. Courts "may apply secondary tools of interpretation only when the treaty text is ambiguous." *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1027 (2d. Cir. 1996) (citing *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989)).

As Judge McCarthy recognized, the Treaty's use of the word "may," in the phrase "extradition may be denied," "connot[es] discretion and possibility, whereas 'shall' connotes a mandate or command." Ex. Order at 70 (citing dictionary definitions of "may" and "shall"). That is the standard interpretation of the word "may"—it is ordinarily read as permissive and

discretionary. *See, e.g.*, *United States v. Rogers*, 461 U.S. 677, 706 (1983) ("The word 'may'…usually implies some degree of discretion."); *N.Y. Dept. of Env't Conservation v. Fed. Energy Regul. Comm'n*, 991 F.3d 439, 446 (2d Cir. 2021) ("The use of 'may,' instead of 'shall' or 'must,' indicates to us that the clause is permissive rather than mandatory."); *Vo*, 447 F.3d at 1246 n.13 ("The use of 'may' language in a treaty indicates a provision constitutes a discretionary exception."); *Rastelli v. Warden, Metro. Corr. Ctr.*, 782 F.2d 17, 23 (2d Cir. 1986) ("The use of a permissive verb—'may review' instead of 'shall review'—suggests a discretionary rather than mandatory review process."). The standard permissive interpretation of "may" in Article 6 of the Treaty is bolstered by the use of the word "shall" elsewhere in the Treaty, including later in Article 6 itself (which, as discussed in more detail below, states that information about tolling provided by the Requesting State "shall be given conclusive effect"). *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory 'shall' in the very same section."); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("[W]hen the same Rule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory.").

Against this backdrop, every court that has considered this Treaty provision or a similar one has reached the same conclusion Judge McCarthy did. *See Patterson v. Wagner*, 785 F.3d 1277, 1281-83 (9th Cir. 2015); *Mirela v. United States*, 416 F. Supp. 3d 98, 110-11 (D. Conn. 2019); *United States v. Porumb*, 420 F. Supp. 3d 517, 527-28 (W.D. La. 2019). *See also Martinez v. United States*, 828 F.3d 451, 460-61 (6th Cir. 2016) (en banc) (interpreting Article 6 of the Treaty as permissive, in contrast to similar provisions in other treaties; the Court explained that the Korea Treaty "*permits* the parties to deny extradition" based on a statute of limitations, while our extradition treaty with, *e.g.*, France, "*forbids* extradition" on the same basis (emphasis added)).

In *Patterson*, the Ninth Circuit interpreted the same provision of the same Treaty, and rejected the same arguments Yoo makes here, concluding that Article 6 was discretionary, and therefore reserved to the Secretary of State. Yoo complains that for the *Patterson* court, the use of the permissive "may" was "talismanic." (Pet. Br. at 9.) The Ninth Circuit would hardly deserve criticism for viewing a treaty's plain language as a talisman. But contrary to Yoo's criticism, the court's analysis did not end with its recognition that "[t]he most natural reading of Article 6…is that untimeliness is a discretionary factor for the Secretary of State to consider in deciding whether to grant extradition." *Patterson*, 785 F.3d at 1281. Instead, the *Patterson* court carefully analyzed the legislative history of the Treaty, concluding that this history reinforced the ordinary meaning of Article 6. The court rejected the arguments—both also advanced by Yoo, *see* Pet. Br. at 11-14—that the Senate Report accompanying the Treaty and a single exchange during the Senate hearing on the Treaty showed that the Senate understood Article 6 to be mandatory.

With respect to the Senate Report, the court noted that while an introductory summary described the lapse-of-time provision using mandatory language ("precludes"), the Report's technical analysis "calls that reading into question," by "describ[ing] Article 6 in permissive terms." *Id.* at 1282 (discussing S. Exec. Rep. No. 106-13, at 5, 14 (1999)); *see also* Ex. Order at 75-76 (discussing the same sections of the Senate Report, and concluding that the Report's "Technical Analysis" "supports a finding that consideration of the statute of limitations is not mandatory under the treaty"). The *Patterson* court also addressed a colloquy from the Senate hearing on which Yoo also relies: Yoo claims that one senator, Senator Grams, "plainly…believed that Article 6 was a mandatory provision." *See* Pet. Br. at 13. In rejecting that argument, the Ninth Circuit noted that Senator Grams received a nuanced answer from a State Department official about how heavily and carefully negotiated the treaty had been, and concluded that Senator Grams

10

"may have been speaking imprecisely," or may have been "persuaded and corrected" by the answer

he received at the hearing, but in any event "was not speaking for the full Senate." *Patterson*, 785

F.3d at 1283.

Nor, as the Ninth Circuit seemed to recognize, could Senator Grams have been speaking

for the entire United States Government; the Executive Branch's interpretation has consistently

been that "Article 6 was permissive rather than mandatory."[5] *Id.*; *see also* Ex. Order at 77-78

(discussing the executive branch's interpretation of Article 6 as permissive). The Ninth Circuit

relied heavily on that executive branch interpretation, ultimately concluding that "untimeliness is

a discretionary factor for the Secretary of State to consider in deciding whether to grant

extradition," but "there is no mandatory duty that a court may enforce." *Patterson*, 785 F.3d at

1281.

Two district courts, both interpreting the U.S.-Romania extradition treaty, have reached the

same conclusion. Like the Treaty at issue here, our extradition treaty with Romania contains a

similarly worded, and facially discretionary, time-lapse provision. The courts that have interpreted

the treaty have concluded, just as Judge McCarthy did here and the Ninth Circuit did in Patterson,

that a treaty stating that extradition "may" be denied based on the lapse of time allows the Secretary

of State, not the courts, to decline to extradite. *See Mirela*, 416 F. Supp. 3d at 110-11; *Porumb*,

420 F. Supp. 3d at 528.

Yoo has identified no directly contrary authority. Instead, he has cited a number of non-

extradition cases that have noted the *possibility* that context, or secondary interpretive tools like

---

[5] The United States' interpretation—and Korea's, for that matter—that Article 6 is discretionary
is entitled to substantial weight. *See, e.g., Abbott v. Abbott*, 560 U.S. 1, 15-16 (2010) (noting that
the Executive Branch's interpretation of a treaty is entitled to "great weight," as are the opinions
of other contracting states).

legislative history, can indicate that a particular statutory "may" is not permissive. (Pet. Br. at 8-9.) Many of those cases nevertheless interpreted the word "may" permissively.[6] But more to the point, no matter what justification may exist to read the word "may" as obligatory in certain unrelated statutes, Yoo has not identified a basis in the Treaty to do so here. His sole argument based on the Treaty's language and structure is that the word "may" is sometimes coupled with other words which similarly indicate discretion—such as in Article 4(4), which provides that the "executive authority of the Requested State may refuse extradition" for certain military offenses. Yoo argues that the language "executive authority of the Requested State" is surplusage if the word "may" inherently confers discretion on the executive. But as Judge McCarthy noted below, this minor surplusage is worth tolerating to avoid the absurd results that would follow from Yoo's proposed mandatory gloss on the word "may." *See* Ex. Order at 73-74 (quoting *United States v. Atl. Rsch. Corp.*, 551, U.S. 128, 137 (2007), for the proposition that "[i]t is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction"). If the word "may," when used in the Treaty without additional language connoting discretion, is mandatory, then it would strip the contracting governments of discretion in multiple important respects, such as in deciding whether or not to extradite most fugitives who could be punished by death in the

---

[6] *See, e.g.*, *Rogers*, 461 U.S. at 706-09 (concluding that the word "may" conferred a degree of discretion, but noting that the standard permissive implication of the word "can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute"); *Farmers' & Merchs.' Bank of Monroe v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662-63 (1923) ("It is true that in statutes the word 'may' is sometimes construed as 'shall.' But that is where the context, or the subject-matter, compels such construction. Here it does not." (citation omitted)); *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 157-58 (2d Cir. 2003) (although not "affording decisive effect to the ordinary permissive meaning of 'may,' interpreting "the word 'may'…as permissive"); *Haynes v. United States*, 891 F.2d 235, 239-40 (9th Cir. 1989) (deferring to Secretary of the Interior's interpretation of the word "may" in a statute as permissive "[g]iven the ambiguous legislative history and the plain meaning of the word 'may'").

Requesting Country (*see* Treaty Art. 7(1)) and whether or not to permit transit through their borders in service of extradition from a third country (*see id.* Art. 17(1)). *See* Ex. Order at 74 (citing Treaty Arts. 7(1), 12(1), and 17(1)). Yoo's only response to these potential absurd results is to suggest that the Court *selectively* interpret the word "may," so that it is mandatory in the lapse-of-time provision but discretionary elsewhere in the treaty. *See* Pet. Br. at 10. The Court should decline this invitation to create inconsistencies in the Treaty by reading "may" as mandatory where it helps Yoo, but nowhere else in the document. Judge McCarthy properly left the question of timeliness to the discretion of the Secretary of State, and the Court should uphold her decision.

**B.    The Prosecution Is Not Time-Barred**

Even if this were an issue for the Court to decide, the Lapse-of-Time provision would not bar Yoo's extradition. As Yoo agrees, Pet. Br. at 15, the applicable statute of limitations is five years, under both federal and state law.[7] *See* 18 U.S.C. § 3582; N.Y. CPL § 30.10(2)(b). Yoo argues that this limitations period has expired as both a matter of United States and Korean law, but he is wrong on the first point and the Treaty forecloses his argument as to the second.

First, Yoo's absence from the jurisdiction would—contrary to his argument—toll the statute of limitations in this country. Under New York Criminal Procedure Law 30.10(4)(a), the limitations period excludes any period up to five years during which "the defendant was continuously outside this state." And under 18 U.S.C. § 3290, the statute of limitations is tolled

---

[7] Yoo argues that federal law applies, because the United States is the contracting party to the Treaty, relying on an out-of-circuit decision. *See* Pet. Br. at 15 (citing *Theron v. United States*, 832 F.2d 492, 499 (9th Cir. 1987)). The Second Circuit has apparently left this an open question: it applied New York's statute of limitations for larceny in an extradition case, but noted that "it *might* be proper to look to federal, rather than state law, under which the limiting period is one of five years." *Shapiro*, 478 F.2d at 913 (emphasis added). The Court need not resolve this question here, because in the circumstances of this case, Yoo's absence from Korea extends the statute of limitations either way.

during periods of fugitivity. Yoo asserts that he has lived in Pound Ridge, New York since 2007, and that therefore he was not a fugitive from Korea. He argues that this tolling requires "more than absence or staying away," relying on *Jhirad v. Ferrandina*, 486 F.2d 442, 445 (2d Cir. 1973) ("*Jhirad I*"). *See* Pet. Br. at 18. But that argument ignores the Second Circuit's subsequent decision in *Jhirad II*. There, the Second Circuit agreed with a lower court that Section 3290 covered not only actual flight, but also "constructive flight." The court found no "meaningful distinction…between those who leave their native country and those who, already outside, decline to return." *Jhirad II*, 536 F.2d at 483. The *Jhirad II* court affirmed the application of Section 3290 to a fugitive in an extradition proceeding who had left the country seeking his extradition, India, for a reason other than to flee prosecution, but who then declined to return once he learned he was under criminal investigation. Korea has presented similar facts here: its extradition submission indicates that Korean officials conducting the criminal investigation into Yoo and his co-conspirators requested meetings with Yoo three separate times in 2014, but that he failed to appear in Korea. Ex. Dkt. 2-3 at EX-YOO-00084. Korea also noted that, whereas Yoo traveled to Korea regularly during the decade before the investigation began—multiple times each year, in some years averaging almost once per month—beginning in 2014 he ceased traveling to Korea altogether. Ex. Dkt. 31-1 at 10.

Second, Yoo asks the Court to reject Korea's claims that there are multiple circumstances that toll the statute under Korean law, and that must therefore be applied here. Korea has identified three candidates, stating that as a matter of Korean law: (1) the limitations period is tolled between "the institution of the public prosecution" and "when a judgment rejecting a public prosecution or a judgment indicating a violation of jurisdiction becomes final and conclusive," Ex. Dkt. 31-1 at 5-6; *see also* Ex. Dkt. 2-3 at EX-YOO-00081 (explaining that "according to the Korean practice

14

on investigation and indictment, a prosecutor does not indict a suspect without his custody");
(2) when "a public prosecution is instituted against one of several accomplices," the limitations
period is tolled as to the other accomplices, Ex. Dkt. 31-1 at 10-11; and (3) the limitations period
is tolled "during the period[] for which an offender stays abroad for the purpose of escaping
criminal punishment," Ex. Dkt. 31-1 at 6-10; *see also* Ex. Dkt. 27-2.

Yoo has contested the first two of these three bases for tolling under Korean law by offering
affidavits from a proposed expert in Korean law arguing that the issuance of an arrest warrant does
not toll the statute of limitations in Korea, and that Korea has incorrectly calculated accomplice
tolling, as the tolling must be calculated on a count-by-count basis. *See* Pet Br. at 16-18, 19-21.
With respect to the argument that the arrest warrant does not toll, Yoo notes the existence of one
U.S. case, *In re Extradition of Han*, No. 11 Civ. 2059, 2012 WL 33201 at *12 (C.D. Cal. Jan. 6,
2012), that held to the contrary.[8]

The Court need not, and should not, attempt to resolve these disputes of Korean law. The
Treaty provides that "Acts or circumstances that would suspend the expiration of the statute of
limitations of either State shall be given effect by the Requested State, and in this regard the
Requesting State shall provide a written statement of the relevant provisions of its statute of
limitations, which *shall be conclusive*." Treaty Art. 6 (emphasis added). Korea has provided
written statements about tolling provisions that it says apply here; under the Treaty, those
statements are "conclusive." That provision effectuates a judgment that has longstanding support

---

[8] Other authority is also to the contrary. *See, e.g.*, *Martinez*, 828 F.3d at 456 ("'For purposes of applying statutes of limitation to requests for extradition'…courts generally calculate the limitations period 'from the time of the alleged commission of the offense to the time of the warrant, arrest, indictment, or similar step in the requesting state, or of the filing of the request for extradition, whichever occurs first.'" (quoting Restatement (Third) of the Foreign Relations Law of the United States § 476 cmt. e (1987))).

in case law: each country is the best interpreter of its own laws. One district court in the Second Circuit recently explained at length why it had concluded that a question of foreign law regarding a statute of limitations was best decided in the first instance by the Secretary of State. *See Mirela*, 416 F. Supp. 3d at 110-12. In *Mirela*, Romania claimed that the statute of limitations had not run, while the fugitive whose extradition Romania sought claimed that it had. Judge Haight refused to decide which party was correct: "I do not think it would be appropriate for a habeas court to [decide this question]…the Secretary might not agree with the court's interpretation of Romanian law, and it is not clear that the Secretary would be bound to follow it." *Id.* at 112; *see also, e.g.*, *Grin v. Shine*, 187 U.S. 181, 190 (1902) (extradition court "can hardly be expected" to "become conversant with the criminal laws" of the requesting state); *Skaftouros*, 667 F.3d at 156 ("[I]t has long been recognized that an extradition judge should avoid making determinations regarding foreign law."); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty and because…the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles." (internal quotation marks and citation omitted)); *Marzook v. Christopher*, No. 96 Civ. 4107 (KMW), 1996 WL 583378, at *5 n.4 (S.D.N.Y. Oct. 10, 1996) ("In the context of extradition proceedings, it would be inappropriate for a court to review the demanding state's analysis of its own law."). Consistent with that law and the Treaty, the Court should not second-guess Korea's description of its tolling provisions or their application.

## III. The Evidence Established Probable Cause To Believe that Yoo Committed the Charged Offenses

Yoo next challenges Judge McCarthy's probable cause finding. Judge McCarthy found that Korea's submissions in this case established probable cause as to each of the seven counts. Judge

McCarthy's task was not to evaluate the weight of Korea's evidence, nor to compare it to Yoo's rebuttal evidence, nor to consider potential defenses, nor to decide which witnesses were credible and which were not. An extradition hearing is not a trial. The court's finding was not, and was not supposed to be, a determination that Yoo was guilty, or even that Korea had enough evidence to convict him. Instead, it represented only a finding that the evidence before the court was "sufficient to warrant a person of reasonable caution in the belief that an offense has been committed." Ex. Order at 14 (quoting *United States v. Howard*, 489 F.3d 484, 491 (2d Cir. 2007)). Probable cause is already a relatively "low threshold," *id.* at 30, and this Court's review of Judge McCarthy's finding is even less exacting—the Court should deny the petition if the probable cause finding meets the "minimal threshold" of having been supported by "any evidence." *Bisram*, 777 F. App'x at 567.

This case is "not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing." *Skaftouros*, 667 F.3d at 158 (quoting *Fernandez*, 268 U.S. at 312). Yet Yoo's challenge to probable cause is a straightforward attempt to obtain a rehearing. His brief repackages the arguments that he made, and that Judge McCarthy rejected, below. Those arguments are no more persuasive this time. They should be rejected, because the Extradition Order was supported by sufficient evidence to establish probable cause.

### A.    The Statements of Seung-il Park Are Independently Sufficient to Establish Probable Cause for All Seven Counts

As Judge McCarthy explained, it "is well-established that in extradition proceedings, a single 'accomplice's testimony, whether corroborated or not, is competent evidence to support a finding of probable cause.'" Ex. Order at 24 (brackets omitted, quoting *In re Extradition of Vukcevic*, No. 95 Crim. Misc. 1 p. 1, 1995 WL 675493, at *8 (S.D.N.Y. Nov. 14, 1995)); *see also Ahmad*, 726 F. Supp. at 400 ("As a matter of law, accomplice testimony is sufficient even without

corroboration to demonstrate probable cause to certify the accused for extradition"). Here, that rule is fatal to Yoo's habeas challenge, because a single accomplice, Seung-il Park, incriminated Yoo on all seven counts.

Park was Yoo's right-hand man, and a central figure in Korea's descriptions of Yoo's criminal schemes. Yoo readily admits that Park ran the day-to-day operations of Yoo's private company, Key Solutions. *See* Pet. Br. at 24; Ex. Order at 16 n.6. By virtue of his position at Key Solutions and his taking direction from Yoo, Park was a key player in all three schemes, and in all seven counts. Park gave statements to Korean officials implicating Yoo, and admitted to criminal charges in Korea for his participation in the embezzlement. *See* Ex. Order at 16.

Korea's submissions explained that Park admitted that he managed the Yoo family's funds and "collect[ed] funds from group affiliates in an illegal manner on the pretext of trademark fees, consulting fees, etc." Ex. Order at 16 (quoting Ex. Dkt. 27-1 at 59-60, 67). Judge McCarthy relied on Park's extensive and incriminating statements to Korean authorities (along with other corroborating evidence) on each of the seven counts:

- On the Chonhaiji trademark count, Park provided "serious incriminatory statements…affirming that the trademark fees were out of proportion to the value of the trademarks, and therefore, a mechanism to transfer funds from affiliates such as Chonhaiji for the Yoo family's personal use." Ex. Order at 19. Indeed, "[a]ccording to both parties' submissions, Park expressly admitted, in sum and substance, to 'illegally collecting money and managing funds from affiliated companies.'" *Id.* at 22-23 (citing both Korea's and Yoo's own exhibits).

- On the Ahae trademark count, in addition to the general statements noted above that the trademark fees were pretextual, Park "specifically told prosecutors that Yoo ordered him to carry out the subject trademark licensing agreement with Ahae and that the fee was not based on market pricing." Ex. Order at 30 (citing Ex. Dkts. 2-4 at 29-30, 2-7 at 8-9).

- On the Onnara Shopping trademark count, Park's "accomplice statements," corroborated by another witness's testimony and records of Onnara's payments to Yoo, "provide[d] just enough detail and objective evidence to support a reasonable belief that Yoo used his family's stature to cause Onnara Shopping to pay him spurious trademark fees that were not in the company's financial interest." Ex. Order at 35. Specifically, "by both parties' accounts," Park "named Onnara Shopping as one of the affiliates from whom Yoo received money 'in the name of

trademark royalties,' and asserted that such royalties were 'unnecessary' and a mechanism to take affiliates' funds to benefit the Yoo family's own wealth. Park also confirmed that he received all of his instructions to facilitate such transactions from Yoo, and that looking back, the operation was illegal." *Id.* at 36 (citations and footnote omitted).

- On the three counts comprising the business consulting scheme, involving Victim Companies Semo, Moreal, and Chonhaiji, Judge McCarthy relied on Park's statements that Key Solutions had few employees, none of whom had "any academic or professional background in business consulting," that the "services [Key Solutions] provided were 'mere translations of general information that could be obtained through the internet,'" that the "business consulting fee was merely a means to collect money illegally from Semo, Moreal Design, and Chonhaiji," and that Yoo was "behind all this." Ex. Order at 38-39 (citing Ex. Dkts. 2-4 at 26; 27-1 at 44 and 58); *see also id.* at 53 (relying in part on Park's statements for the Moreal count) & 61 (same for the Chonhaiji count). Judge McCarthy rejected Yoo's argument that the summaries of Park's statements offered by Korea were improper or inaccurate, concluding that "Yoo's own rendition of the interview [was] ultimately consistent with the summary to which he objects." *Id.* at 45-46.

- On the photography scheme count, Park told Korean authorities that Yoo "ordered the CEOs of [Victim Companies] to raise money in the form of paid-in capital increase[s]" for the sale of Yoo's father's photographs, and that those "CEOs had no other choice but to obey" given who Yoo's father was. Park also told Korea that he "prepared logistical stuff like invoices," while a Chonhaiji executive "led everything," and that Chonhaiji collected money from the other Victim Companies "under the pretext of rights offerings or cash deposits for new shares," which money was funneled to Yoo's and his father's companies "as advance payment for purchasing" the photographs. Ex. Order at 61-62; *see also id.* at 65-68 (relying on Park's statements, and noting they were corroborated by other evidence, in finding probable cause).

In his brief here, Yoo rehashes three objections to Park's statements that he raised below. Judge McCarthy rightly rejected all three, and this Court should as well.

First, Yoo suggests that probable cause for the trademark and consulting scheme counts was lacking because Park told Korean authorities that although he "collect[ed] and manag[ed] funds from affiliated companies under the pretext of trademark fees, consulting fees, etc.," "I didn't think that I was collecting money illegally." In his very next answer, Park confirmed that "looking back on it now I think I collected those funds illegally." Pet. Br. at 24. As Judge McCarthy rightly recognized, that exchange is inculpatory. *See* Ex. Order at 22-23 & n.15. It represents an admission by Yoo's personal assistant and the leader of his private company that when he collected pretextual fees from the victims on Yoo's behalf, he was violating the law. Yoo appears to think that this

19

colloquy establishes that Park *never* knew he was breaking the law until he met with Korean officials, Pet. Br. at 25, but that is merely wishful thinking given that Park pled guilty in Korea and made extensive admissions about his participation in wrongdoing, as discussed above.

Second, Yoo claims that Park's repeated description of the payments as "pretextual" was a mere translation error. Pet. Br. at 25-26. This is a position Yoo did not develop until his reply brief before Judge McCarthy. Yoo initially argued below, as he does here, *see* Pet. Br. at 23, that Korea's submissions "grossly distort[ed]" witnesses' statements, chief among them, Park's. But Yoo submitted excerpts of Korean interview transcripts, including Park's, that he had somehow obtained in Korea, and the transcripts largely corroborated Korea's accounts. *See* Ex. Order at 17 n.9, 22-23, 33 n.22, 46, 66 (noting various instances in which Yoo's exhibits were consistent with Korea's descriptions of the relevant witness interviews). Notably, Yoo's exhibits used the same "pretext" translation as Korea's submissions. When the Government pointed this out, and relied on Yoo's own translated interview excerpts in its brief in support of extradition, Ex. Dkt. 27 at 15-17, Yoo backtracked. Yoo's reply brief said "[o]n this issue, we have been our own worst enemy," and claimed that the Korean word that both the Korean Government and Yoo's translator rendered as "under the pretext" could also simply mean "for." Ex. Dkt. 30 at 8.

Judge McCarthy rejected this argument, because (1) ample evidence, including Yoo's own initial translation, supported the "pretext" translation, and (2) even without resolving the potential ambiguity, Park's other statements—including his admission of illegally collecting money from the victims, and his admission that although the payments were labeled, e.g., trademark royalties, they were "actually a way" for Yoo and his family "to take the funds of affiliates"—established probable cause. Ex. Order at 22-23. Judge McCarthy was correct on both scores. It was more than just reasonable to credit Korea's "pretext" translation, it was required. As noted above, Korea's

extradition submissions were "deemed truthful" for purposes of the probable cause analysis. *See supra* at 5 (citing *In re Extradition of Atta*, 706 F. Supp. at 1050-51). And in any event, regardless of whether Park used the word "pretext," he described payments that were paradigmatically pretextual: the payments were called one thing (trademark fees, consulting fees, etc.) but were actually another (a means for the Yoo family to "take the funds" from the Victim Companies' coffers).

Third, Yoo argues that Park's inculpatory admissions should be disregarded because they were given, in at least one instance, in response to leading questioning. Yoo claims that the witness answering yes "in response to a leading question does little to advance Korea's cause," and "would not get a prosecutor a search warrant." Pet. Br. at 27. This is nonsense. Yoo cites no authority for the audacious proposition that incriminating admissions don't count when elicited by leading questions, and there is none. To the contrary, the law is clear that probable cause can be established via the answers to leading questions. *See, e.g.*, *United States v. Weiss*, 752 F.2d 777, 786 (2d Cir. 1985) (Government can lead witnesses in the grand jury).

### B.    Other Evidence Corroborated Park's Statements and Established Probable Cause

As discussed above, the question before the Court is whether Judge McCarthy's probable-cause finding was supported by "any evidence." The answer—even considering just the statements of a single accomplice—is yes. But even though Park's statements are independently sufficient for probable cause, Korea's submissions offered significant additional evidence on each count. In the face of that evidence, which was detailed in Judge McCarthy's thorough opinion, Yoo can offer only previously rejected, renewed arguments going mostly to witness credibility or reliability, the exact kinds of arguments that are inappropriate in an extradition proceeding.

21

### 1.    The Trademark Licensing Scheme

Park's statements that he and Yoo extracted money from three Victim Companies, Chonhaiji, Ahae, and Onnara Shopping, via pretextual trademark licensing fees, were corroborated by statements from multiple witnesses, including by multiple leading executives of the relevant victims.

*Chonhaiji:* Gi-chun Byeon, a Chonhaiji director who later became CEO, confirmed to Korean officials that the company had used the Chonhaiji mark before Yoo registered it, that Chonhaiji paid fees in excess of the mark's actual value because Yoo demanded them, and that those fees were "actually a way" to enrich Yoo. Ex. Order at 25.

*Ahae:* Similarly, two former Ahae CEOs, Seong-hwan Lee and Gang-se Lee, gave statements corroborating Park's. Seong-hwan Lee told prosecutors that Yoo issued a "directive," through Park, "to pay trademark royalties," "so we couldn't help but pay the fees." Gang-se Lee confirmed that paying Yoo "that much in royalties was unnecessary." Ex. Order at 27; *see also id.* at 30.

*Onnara Shopping:* With respect to Onnara Shopping, Park's statement that the company made payments to Key Solutions "in the name of trademark royalty," which Park demanded on Yoo's instructions, was corroborated by statements of Chun-gyun Kim, an auditor who worked for affiliates of Onnara (but not Onnara itself) and who was a member of the Church. Kim told Korean officials that Onnara and other affiliates would, on orders from Yoo, "raise[] funds using many excuses," with the "slush funds" transferred to Yoo. Ex. Order at 32-33, *see also id.* at 35-37.

Yoo's attempts to overcome this evidence on habeas review fall flat. With respect to Byeon's statements about Chonhaiji, Yoo protests that Byeon was not yet Chonhaiji's CEO at the

time the company paid the trademark fees, and therefore had "no role in establishing the fees."[9] Pet. Br. at 27. But that attempt to impeach Byeon's statements was readily rejected by Judge McCarthy, who concluded that Byeon's pre-CEO role as a director of Chonhaiji was enough to establish that he had personal knowledge. Ex. Order at 20. That conclusion cannot be disturbed in this proceeding, because the "credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate," and "[h]abeas review in the district court is not an occasion to review such a determination." *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) (citations omitted). Yoo's argument that Chun-gyun Kim's statements lacked foundation and were hearsay, Pet. Br. at 31-32, fails for the same reason. Judge McCarthy rejected it, *see* Ex. Order at 36-37, and her assignment of weight to Kim's statements cannot be disturbed on habeas review.

As for the two Ahae CEOs, Yoo acknowledges that they told Korea that they caused Ahae to pay trademark royalties to Yoo, even though the royalties were "unnecessary" (Gang-se Lee), and that the company paid a fee that was unilaterally "decided by Yoo" and was "too much" for Ahae (Seong-hwan Lee). Pet Br. at 30. Rather than dispute these statements, Yoo claims that they are merely "opinions" that "provide[] little in the way of probable cause." *Id.* But that gives short shrift to the importance of the CEOs' admissions. These were not random Ahae employees expressing irrelevant "opinions," as Yoo suggests. They were the highest-ranking executives at Ahae and owed their company fiduciary duties. Yet they admitted to Korean prosecutors that they

---

[9] Yoo also renews his bizarre claim that leading questions cannot establish probable cause. Byeon was asked whether the "ultra-high" trademark fee paid by Chonhaiji was "actually a way for [Yoo's family] to leak the funds of affiliates," and answered in the affirmative. Although Yoo claims that this response to a leading question "adds little to the probable cause calculus," Pet. Br. at 28, that claim still cannot be reconciled with the clear law holding that witness testimony in response to leading questions can establish probable cause.

agreed to transfer money to Yoo simply because Yoo "decided" that they would, and even though it was "unnecessary" and "too much" for Ahae. Ex. Order at 30; *accord* Pet. Br. at 30 (quoting Yoo's own translations of the interviews). Even if that evidence is not independently sufficient to establish probable cause, it certainly corroborates Park's statements that "he helped Yoo use exorbitant trademark royalties to embezzle affiliate funds," and that "Yoo ordered him to carry out the subject trademark licensing agreement with Ahae and that the fee was not based on market pricing." Ex. Order at 30.

### 2.    The Consulting Scheme

Park's statements that the consulting agreements with Semo, Moreal, and Chonhaiji were pretexts, the actual purpose of which was to transfer money from those victims to Yoo, and that Key Solutions offered little in the way of actual consulting to those companies, were similarly corroborated by other evidence. Chief Executive Officers of all three victims, as well as other relevant witnesses, provided statements to Korea corroborating Park's testimony.

*Semo:* Chang-hwan Go, Semo's CEO, and Gyu-seok Kim, the leader of Semo's Management Support Team, told Korean officials that despite being paid a large monthly consulting fee, Yoo provided actual consulting only once or twice per year. Go confirmed that the fees were set without any bidding, any evaluation of Yoo's company's expertise or performance, or Semo's need for any consulting services. Ex. Order at 38-39, 46-47.

*Moreal:* Myeong-hwa Ha, Moreal's co-CEO told Korean prosecutors that Yoo and his sister, Chong Somena Yoo, who was Ha's Co-CEO at Moreal, signed a consulting contract and made monthly payments to Yoo, based on a demand received from Park, and without any analysis about whether Moreal needed the consulting. Ex. Order at 49-50. And Hwa-sun Park, a Moreal accounting employee, told Korean officials that she was aware of the contract but could not confirm whether Key Solutions provided consulting services. *Id.* at 49; *see also id.* at 53-57

(explaining the exclusion of an affidavit Yoo obtained from Ha purporting to recant her previous incriminating statements to Korean officials, and relying on Ha and Hwa-sun Park's testimony corroborating Seung-il Park's statements).

*Chonhaiji:* Gi-chun Byeon, the Chonhaiji executive discussed in the preceding section, explained that in 2010, Korean tax authorities concluded that the trademark licensing fees Chonhaiji was paying to Yoo were no longer tax deductible; as a result, Byeon said, they "turned to consulting fees," as an "alternative" to "replace" the payments to Yoo that were no longer deductible. Korean officials asked Byeon whether these consulting fees were "really necessary," and Byeon responded that "as hired CEOs, we just followed instructions." Ex. Order at 58, *see also id.* at 61.

Here, too, Yoo's habeas brief fails to overcome the evidence Judge McCarthy relied on. Yoo challenges some of Judge McCarthy's evidentiary rulings, contests her assignment of weight to particular evidence, and selectively and misleadingly quotes from excerpts of particular witness statements. But none of his arguments satisfy his burden of proving that Judge McCarthy's probable cause finding was erroneous.

With respect to Semo, Yoo has renewed the arguments he made below. He quotes a transcript excerpt reflecting that Semo CEO Chang-hwan Go agreed—albeit without total confidence ("That's right. But I can't be too sure.")—that the information Yoo provided did not "seem like something that requires consultation with regular consulting fees." Pet. Br. at 35. But Yoo fails to contest the other statements from Go on which Judge McCarthy relied, as discussed above, and Yoo's punch line is that Judge McCarthy assigned "far too much weight" to Go's testimony. *Id.* at 36. Yet again, Yoo's disagreement with the weight Judge McCarthy assigned to

particular evidence is not a cognizable basis for a habeas challenge.[10] Yoo also reiterates claims made below that Gyu-seok Kim did not actually tell Korean officials that (1) Key Solutions only provided consulting services once or twice per year, or that (2) the information Key Solutions provided was readily available on the internet. Pet. Br. at 33. On the first point, Yoo is simply wrong—Kim told Korea that Semo only received consulting reports once or twice per year. *See* Ex. Dkt. 27-1 at 43; *see also* Ex. Order at 39. As for the second point, Yoo's raising it as a basis to negate probable cause on habeas review is odd, because he well knows from the proceedings before Judge McCarthy that it was a misattribution. *See* Ex. Order at 39 n.27 (explaining that this statement was misattributed to Gyu-seok Kim—it was actually said by Seung-il Park—but that Yoo conceded before the extradition court that "what Kim said may be true," and did not dispute that Seung-il Park had made the relevant statement). Finally, Yoo challenges Judge McCarthy's exclusion of affidavits from Semo employees, which he offered to contradict Korea's evidence that Yoo's consulting arrangement with Semo was part of an embezzlement scheme. These affidavits, as his brief explains, asserted that Yoo in fact provided consulting services. *See* Pet. Br. at 37-38. Judge McCarthy interpreted them—as Yoo appears to—as evidence intended to contradict Korea's evidence, and she therefore excluded them. *See* Ex. Order at 44 (citing *Shapiro*, 478 F.2d at 905; *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978)). That was entirely consistent with applicable law, which allows the extradition judge, in her discretion, to permit "explanatory testimony," but which prohibits "proof which contradicts that of the

---

[10] Yoo also reiterates his "shock" that Korea's extradition submissions did not disclose that, at one point during Korea's interview, Go denied that the consulting fees paid to Yoo were excessive or unjustifiable. Pet. Br. at 35. Yet Yoo acknowledges that Judge McCarthy was "generally correct" that Korea was not required to disclose the statement. *Id.* at 35 n.27; *see also* Extradition Order at 47-49 (explaining that Korea's failure to disclose this statement was not a basis to deny extradition, and that *Brady v. Maryland*, 373 U.S. 83 (1963) did not apply to Korea's extradition submission given the limited nature and scope of extradition proceedings).

demanding country," to effectuate the "well-established rule that 'extradition proceedings are not to be converted into a dress rehearsal trial.'" *Kapoor v. Dunne*, 606 F. App'x 11, 12 (2d Cir. 2015) (quoting *Messina*, 728 F.2d at 80 and *Jhirad II*, 536 F.2d at 484). This exclusion was hardly an abuse of Judge McCarthy's discretion. *See id.* at 13 (affirming habeas court's finding that the extradition magistrate "acted within his discretion in excluding…evidence").

As for Moreal Design, Yoo attempts to undermine Judge McCarthy's probable cause finding by selectively and incompletely quoting from the interviews of two Moreal employees that the court relied on as corroboration for Park's statements. Yoo argues that the Moreal witnesses' statements to the Korean government that they were "not sure," or "did not know," what if any consulting services Key Solutions provided do not "get[] Korea very far." Pet. Br. at 39-41. But this ignores the import of their roles at Moreal: one of those two witnesses, Ha, was the co-CEO of Moreal. In that capacity, she signed a contract with Key Solutions to pay large monthly fees to Yoo in exchange for purported consulting services. Yet as Yoo's own excerpt reflects, there were "no official documents" reflecting the receipt of consulting services, and Ha could "only guess" whether such services were provided. Pet. Br. at 40. And the excerpt in Yoo's habeas brief strategically omits other inculpatory statements. The question and answer that *immediately* preceded the block quotation on page 40 of his brief was the following:

> Q:    Why did Moreal sign the consulting contract with YOO Hyuk Kee?
>
> A:    Around the time of signing the contract, PARK Seung-il told me that Key Solutions would provide us with various services…and requested the signing of the contract. So I concluded the contract at the amount PARK Seung-il demanded.

Ex. Dkt. 27-1 at 60-61. Ha told Korea that she agreed to make payments to Yoo not because Moreal needed consulting, but because Yoo's co-conspirator, Seung-il Park—who described this as an embezzlement scheme—*told her to*, and "demanded" the specific amount of money she would be

27

required to pay. Yoo's brief also omits important statements from later in the interview. Ha was asked whether, as CEO, she "had obligations to find out what kind of company Key Solutions is, whether Moreal was in need of business consulting, whether Key Solutions was a company capable of providing assistance for Moreal, whether the price was appropriate, whether the contract was being implemented as agreed, etc.?" Her answer was that she "just followed" instructions she received from Yoo's sister. *Id.* at 61-62.

Finally, with respect to both the Moreal and Chonhaiji consulting scheme counts, as with Semo, Yoo challenges Judge McCarthy's exclusion of avowedly contradictory evidence, which he argues directly conflicts with Korea's allegations. Pet. Br. at 41-45. But, again, the extradition hearing was not a trial. The role of our courts is not to weigh Korea's and Yoo's evidence and decide with is stronger, and Judge McCarthy's exclusion of Yoo's proffered contradictory evidence was both entirely proper and within her discretion.

### 3.     The Photograph Scheme

As for the final count, Judge McCarthy found that Park's statements were corroborated by Gi-chun Byeon (the Chonhaiji CEO), whose "detailed testimony explains the specific transactions undertaken by Chonhaiji and the other affiliates" to raise almost 20 billion KRW, which was transferred to companies controlled by Yoo and his father. Ex. Order at 65 (collecting support in both Korea's and Yoo's exhibits).

As before, Yoo challenges Judge McCarthy's probable cause finding using arguments that he previously made, and lost, below. His principal argument is that Judge McCarthy should not have excluded the "substantial evidence" that Yoo submitted, purportedly "to show that Chonhaiji was not cheated when it purchased" Yoo's fathers photographs.[11] Pet. Br. at 46. Judge McCarthy's

---

[11] Yoo's secondary claim, raised and rejected below, is that Yoo's translation of portions of Gi-chun Byeon's interview with Korean officials was inconsistent with the summaries of that

exclusion of contradictory evidence, and her refusal to weigh Korea's proof against Yoo's, was again entirely proper and an appropriate exercise of her discretion.

What's more, Yoo cannot defeat Judge McCarthy's probable cause finding on this count simply by supplying his own version of events. Yoo claims that Korea's submissions "turned a viable business plan into an embezzlement by telling none of what actually occurred." Pet. Br. at 48. In Yoo's telling, his father Byeong-eun Yoo was a prolific photographer whose work was critically acclaimed and was exhibited, among other places, at Grand Central Terminal in New York, London's Royal Botanic Gardens, and the Louvre in Paris. As a result of the elder Yoo's purported success, Yoo claims that a plan was developed for Chonhaiji to invest in the photographs by purchasing rights from a company called Ahae Press (a company not directly related to the Victim Company Ahae, but owned and operated by Yoo and his father), in the hope that Chonhaiji would earn profits from the photos. Yoo suggests that Chonhaiji failed to earn this profit only because a ferry accident tarnished Yoo's father's name, so "the art sale project never took off." Pet. Br. at 46-48.

But the only reason Yoo's version of events is "hardly a tale of embezzlement," *id.* at 47, is because it omits the extensive evidence that Korea submitted, and on which Judge McCarthy relied, establishing that this was a fraud scheme. As Judge McCarthy summarized, the testimony of Seung-il Park and Gi-chun Byeon established that Yoo ordered the CEOs of various Victim Companies to provide funds—disguised on their books as "capital increases" or "rights offerings" or "share subscriptions"—to Chonhaiji. Byeon, through Chonhaiji, then transferred these funds,

---

interview in Korea's submissions. *See* Pet. Br. at 47-48. Judge McCarthy rejected this argument in the extradition proceeding, concluding that while "specific words in the summary to which [Yoo] objects do not appear in [Yoo's] version of Byeon's transcript," the gist of the summary was consistent with Yoo's translations. Extradition Order at 66. Yoo has offered no basis to reject that reasoning.

plus some of Chonhaiji's own money, to Ahae Press and Ahae Press France, entities controlled by Yoo and his father. The Victim Companies' CEOs did not transfer these funds to Chonhaiji because they had decided to pivot to photography-investing—both Byeon and Park explained that they did so because Yoo instructed them to, and they had no choice because of who Yoo's father was. Byeon also told Korea that these CEOs did not even know what photographs were for sale, or what they were buying. Ex. Order at 61-63.

Byeon also confirmed that most of the money collected in this scheme was used to fund exhibition of the photographs, but that the Victim Companies were not told that their funds would be used in this way. *Id.* at 63. In other words, while Yoo's version of the story makes it seem as if Chonhaiji and the other Victim Companies decided to invest after these photographs had been exhibited at prestigious institutions in major cultural centers, the actual purpose of the purported "investment" was to *fund* those exhibitions. Yoo's own exhibit, admitted at the extradition hearing, reflects that Byeon told Korean officials that the Victim Companies were raising money to pay to have the elder Yoo's photographs exhibited at the Louvre and the Palace of Versailles (and, in the latter case, to fund site setup, a gala, and an appearance by the London Symphony Orchestra). Yoo Korean Interviews Binder, Tab H, at 12, 15, 18. In other words, the photographs weren't good investments because they had been exhibited at the Louvre on their merits; they were bad investments that the Yoo family sought to pump up, by causing the Victim Companies to pay millions of dollars so that the photographs *could* be exhibited at the Louvre, Versailles, and elsewhere, in the hopes of finding an audience. *Accord* Ex. Order at 65 ("Korea's evidence is sufficient to support a reasonable belief that Yoo used his relationships with Park Seung-il and Byeon Gi-chun to extract monies from various affiliates to fund the Versailles exhibition in order to inflate the value of his father's photographs.").

The victims of this scheme, incidentally, were not in the business of buying photographs, or in any related business. Semo, for instance, sold nutritional supplements. Ex. Dkt. 18 at 19. Ahae manufactured industrial paint. *Id.* at 29. Chonhaiji built parts for ships. *Id.* at 34. But the way these companies collected money to fund these photography exhibitions, while trying to hide it, eliminates any doubt as to the fraudulent nature of this scheme. The paint company, and the dietary supplement company, and the various other Victim Companies, all sent money through the ship-building company, nominally to buy rights to these now-worthless photographs. Even crediting Yoo's assertion that Chonhaiji ultimately exchanged the money for photographs it mistakenly hoped would have value, Pet. Br. at 47, it makes no sense for these other Victim Companies to have given away money so that Chonhaiji could invest. And if this were a legitimate investment, there would have been no reason for these Victim Companies to attempt to disguise it in their books—yet Byeon reported that along with the instruction to "invest" in the photographs came an instruction that the investment was to "recorded as various types of stock transactions, rather than transfers of cash." Ex. Order at 67 (citing Korea's and Yoo's exhibits). As Judge McCarthy recognized, the fact that these companies concealed the transfers on their books is strong circumstantial evidence corroborating that the payments, which Yoo ordered, "had a nefarious purpose." *Id.*

\*\*\*

In sum, the evidence contained in Korea's submissions and admitted at the extradition hearing was more than sufficient to establish probable cause. Yoo has not met and cannot meet his burden, on habeas review, of establishing that Judge McCarthy's probable-cause finding was not supported by "any evidence." His petition should be denied.

31

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Hyuk Kee Yoo's petition for habeas corpus.

Dated: White Plains, New York
        September 13, 2021

<div style="margin-left: 50%">

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York


By:    /s/ Derek Wikstrom
       Derek Wikstrom
       Assistant United States Attorney
       Tel.: (914) 993-1946

</div>

32