UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
HYUK KEE YOO, a/k/a "KEITH YOO,"        :
                                        :
          Petitioner,                   :
                                        :    Case No.  7:21-cv-06184-CS
     vs.                                :
                                        :
UNITED STATES OF AMERICA                :
                                        :
          Respondent.                   :
-----------------------------------------------------x


REPLY MEMORANDUM IN FURTHER SUPPORT OF THE PETITION OF
YOO HYUK KEE ("KEITH YOO") FOR A WRIT OF HABEAS CORPUS


Paul Shechtman
BRACEWELL LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020
212-508-6107
paul.shechtman@bracewell.com


Shawn Naunton
ZUCKERMAN SPAEDER LLP
485 Madison Avenue
10th Floor
New York, NY 10022
646-746-8655
snaunton@zuckerman.com

Attorneys for Defendant Keith Yoo

September 24, 2021

-i-

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................... ii

POINT ONE:   THE CHARGES AGAINST KEITH YOO ARE TIME-BARRED........................1

    A.    Mandatory or Discretionary ...............................................................................1

    B.    Tolling.................................................................................................................4

POINT TWO:  THERE IS NOT PROBABLE CAUSE THAT KEITH YOO
                    COMMITTED EMBEZZLEMENT CRIMES .......................................................6

    A.    Park Seung-il.......................................................................................................6

    B.    Corroborative Evidence ......................................................................................9

CONCLUSION............................................................................................................................14

## TABLE OF AUTHORITIES

PAGE

CASES

Austin v. Healey, 5 F.3d 598 (2d Cir. 1993)..................................................................10

In re Extradition of Atta, 706 F. Supp. 1032 (E.D.N.Y. 1989).......................................9

Jhirad v. Ferrandina, 486 F.2d 442 (2d Cir. 1973)(Jhirad I)..........................................4

Jhirad v. Ferrandina, 536 F.2d 478 (2d Cir. 1976)(Jhirad II) .......................................4

Kapoor v. Dunne, 606 F. App'x 11 (2d Cir. 2015)........................................................11

Martinez v. United States, 828 F.3d 451 (6th Cir. 2016)(en banc)..................................1

Mason v. Fearson, 50 U.S. 248 (1850) ...........................................................................1

Matter of Sindona, 450 F. Supp. 672 (S.D.N.Y. 1978) ................................................11

Mirela v. United States, 416 F. Supp. 3d 98 (D. Conn. 2019)........................................6

Patterson v. Wagner, 785 F.3d 1277 (9th Cir. 2015).....................................................2

Skaftouros v. United States, 667 F.3d 144 (2d Cir. 2011)..............................................6

United States v. Marion, 404 U.S. 307 (1971)...............................................................3

United States v. Rogers, 461 U.S. 677 (1983)................................................................1

OTHER AUTHORITIES

S. EXEC. REP. No. 106-13 (1999)..............................................................................2, 3

Richard Posner, Reflections on Judging (2013) ............................................................3

This reply memorandum is submitted in further support of Keith Yoo's application for a writ of habeas corpus.

POINT ONE

THE CHARGES AGAINST KEITH YOO ARE TIME-BARRED

Several points in the government's submission warrant a response.

A.   Mandatory or Discretionary

1.   We agree with the government that "[t]he word 'may' . . . usually implies some degree of discretion." G. Mem. 9, quoting United States v. Rogers, 461 U.S. 677, 706 (1983)(emphasis added). But "usually" is emphasized for a reason. As the Supreme Court has instructed, the principle that "may" confers discretion "is by no means invariable . . . and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." Id.; see also Mason v. Fearson, 50 U.S. 248, 259 (1850)("[w]here a statute directs the doing of a thing for the sake of justice or the public good, the word 'may' is the same as the word 'shall'"). Thus, the word "may" begins the analysis; it does not determine the outcome.[1]

2.   The government's treatment of the legislative history is cursory at best. The history shows that the drafters did not use the words "may" or "shall" consistently to identify issues that are for the court or the Executive to resolve. The use in Article 2(4) of the phrase "the executive authority of the Requested State may, in its discretion," is proof that the drafters recognized that "may," by itself, might not have decisive effect. More importantly, the

---

[1]   The government cites Martinez v. United States, 828 F.3d 451, 460-61 (6th Cir. 2016)(en banc), as a case "interpreting Article 6 of the Treaty as permissive." G. Mem. 9. But Martinez does not discuss the mandatory/discretionary issue. The question there was whether a "lapse of time" provision in the United States-Mexico Treaty incorporated the Sixth Amendment's speedy-trial protections.

government does not discuss that, in summarizing the Treaty's provisions, the Foreign Relations Committee wrote that Article 6 "<u>precludes</u> extradition of offenses barred by an applicable statute of limitations."  S. EXEC. REP. No. 106-13 at 5 (1999)(emphasis added).  Nor does it even mention that the Technical Analysis section of the Report, prepared by the Office of International Affairs, notes that "Korea <u>insisted</u> on [Article 6] because Korean law <u>demands</u> that extradition be denied if the statute of limitations would have expired in either Korea or in the Requesting State."  <u>Id.</u> at 14 (emphasis added).  As we noted in our opening brief, "precludes," "insisted" and "demands" bespeak lack of discretion.  The point is a powerful one, which may explain why the government does not address it.[2]

       3.       What the government does address is the colloquy during the Senate hearing between Senator Grams and Mr. Harris, the Acting Director of the Office of International Affairs.  G. Mem. 10-11.  Borrowing from the Ninth Circuit's opinion in <u>Patterson</u>, the government describes the dialogue as one in which Senator Grams "may have been speaking imprecisely" in saying that the "proposed treaty bars extradition" if the statute of limitations has run, but in which he was "persuaded and corrected" by the answer he received.  G. Mem. 11, <u>quoting</u> <u>Patterson v. Wagner</u>, 785 F.3d 1277, 1283 (9th Cir. 2015).  Fairly read, however, the colloquy does not permit that interpretation.  Senator Grams spoke unambiguously:  he understood the Treaty to bar extradition if the limitations period had run.  (His concern was that a fugitive could flee to Korea

---

[2]    The government cites Magistrate Judge McCarthy's conclusion that "the Report's 'Technical Analysis' 'supports a finding that consideration of the statute of limitations is not mandatory under the treaty.'"  G. Mem. 10, <u>citing</u> Op. 75-76.  As Magistrate Judge McCarthy saw it, "if the relevant authority of the requested State chooses to apply [limitations] considerations, it must also take into account any tolling by fugitivity and any other tolling rules from either State."  Op. 75.  That construction suggests that the Executive is obliged to make a nuanced limitations calculation, giving effect to the tolling provisions of both States, but then is free to ignore the calculation if other policy considers favor extradition.  It is hard to believe the parties chose such a peculiar approach.

and run out the clock.)  And Mr. Harris' answer did <u>nothing</u> to "correct" that understanding.  He did not utter the words "discretion" or "permissive" or "Executive Authority" or any other words that might signal that the running of the statute was other than a mandatory bar.  Instead, he emphasized that, as drafted, the tolling provisions of both States (the requesting and requested) would apply, so that Senator Grams' concern about a fugitive fleeing to Korea to run out the clock had been met.  <u>See</u> S. EXEC. REP. No. 106-13 at 37.  Anyone who reads this colloquy and concludes that Article 6 is not mandatory is engaged in wishful reading.[3]

        4.      It bears re-emphasis that statutes of limitations are important for the protection of defendants' rights.  They "provide predictability by specifying a limit beyond which there is an irrebutable presumption that a defendant's right to a fair trial would be prejudiced."  <u>United States v. Marion</u>, 404 U.S. 307, 322 (1971).  As we observed in our opening brief, if Article 6 were a discretionary provision, then a person could be sent abroad for trial on even the stalest of charges if the Executive determined that the foreign policy interests of our country favored that course.  Parties to a treaty could negotiate for that unfortunate outcome, but the history here strongly indicates that neither party did.[4]

---

[3]    The Ninth Circuit's reading of the colloquy between Senator Grams and Mr. Harris, on which the government relies, reflects what has been called "motivational reading" -- "the credulous acceptance of evidence that supports a preconception and the peremptory rejection of evidence that contradicts it."  Richard Posner, <u>Reflections on Judging</u> 218 (2013).

[4]    The government argues that interpreting Article 6 as a mandatory provision would lead to "absurd results."  G. Mem. 12.  But our argument is not that "may" always signals a mandatory matter, but rather that it can do so in some circumstances.  To take only one example, no one would argue (and nothing in the legislative history would suggest) that the decision whether to extradite a fugitive who could be punished by death is other than a discretionary decision for the Executive.  <u>See</u> Treaty Art. 7(1).

B.     Tolling

        1.     On the merits, the government first argues that "Yoo's absence from [Korea] toll[s] the statute of limitations in this country." G. Mem. 13. It cites Jhirad v. Ferrandina, 536 F.2d 478 (2d Cir. 1976)(Jhirad II), for that proposition, but the case is readily distinguished. Jhirad was the administrator of the Naval Prize Fund in India with authority to withdraw monies, and on several occasions in 1961, he embezzled money from the fund. When India sought his extradition in 1972, he was living in America. Id. at 481.

        After a hearing, the District Court found these facts: in July 1966, knowing that he was under investigation for embezzlement, Jhirad, accompanied by his wife, left India purportedly to attend a conference in Brussels, which he had attended in previous years but from which he had always returned promptly. Before he left, he sold his law books and other personal possessions. When the conference was over, he travelled to Switzerland, Israel and then the United States, arriving here in 1971. Not surprisingly, on this record, the District Court concluded (and the Second Circuit affirmed) that Jhirad's intent in leaving India was to avoid prosecution. Id. at 484 ("Jhirad formed a definite intent not to return to India [at least] in early September of [1966], by which time he had already been out of the country for a longer period than on any of his previous similar trips"). Thus, whether labelled "actual" or "constructive" flight, there is no doubt that Jhirad "le[ft] the place of his alleged offense to avoid prosecution or arrest" -- i.e., that he fled from justice. Jhirad v. Ferrandina, 486 F.2d 442, 445 (2d Cir. 1973)(Jhirad I).[5]

---

[5] The Restatement (Third) of Foreign Relations Law puts it this way: In Jhirad II, "the Court of Appeals upheld a finding that an intent not to return, formed during a trip abroad undertaken for other reasons, was equivalent to an attempt to flee for purposes of tolling the statute of limitations." Section 476 (1987) Rpt. Note 3 (emphasis added).

The difference between Jhirad and Keith Yoo is obvious. As we noted in our opening brief, Keith Yoo came to America in 1989 to attend school, and America has been his home ever since. Since 2007, he has lived in Pound Ridge with his wife and children. Although he has travelled to Korea for business and religious worship, he was home in Pound Ridge when the ferry sank and the criminal investigation began. Under the United States standard, which applies here, his staying away from Korea is <u>not</u> fleeing from it, and therefore the fugitivity toll does not apply.

2. We have also argued (i) that the Korean arrest warrant issued for Keith Yoo in May 2014 does not toll the statute of limitations and (ii) that Korea's accomplice toll (Article 253(2) of Korea's Criminal Procedure Act) applies, but that it suspends the limitations period only for the specific crime for which the accomplice has been prosecuted. Both propositions are supported by affidavits from Professor Sang Hoon Han, a leading Korean-law authority. The government has not countered those affidavits and indeed tells the Court to ignore them. G. Mem. 14-16.

In the government's view, Article 6 makes Korea's written statement of the relevant provisions of its statute of limitations "conclusive." <u>Id.</u> at 15. But citation to the Treaty will not do. As for the arrest warrant, all Korea has told us is that "<u>according to the Korean practice on investigation and indictment</u>, a prosecutor does not indict a suspect without his custody," and therefore Keith Yoo has not been indicted. EX-YOO-00081 (emphasis added). Korea has never said that an arrest warrant, without an indictment, tolls the running of the statute under Korean law. Simply stated, Korean "practice" is <u>not</u> a provision of Korean law to which this Court must defer.

Nor must the Court defer to Korea's feeble attempt, raised for the first time in January 2021 in its ninth submission, to use its accomplice tolling provision to keep this prosecution alive. The Court must apply the accomplice tolling provision, but it need not conclude, without some supporting authority, that a person is an accomplice under Korean law for crimes in which he or she had no role -- e.g., that Byeon Gi-chun, the former CEO of Chonhaiji, was an accomplice to the alleged embezzlement from Moreal Design with which he was uninvolved. If an American court is bound by such nonsense, then it should abandon the field. The judicial function requires more independence than that. See Skaftouros v. United States, 667 F.3d 144, 156 (2d Cir. 2011)("district court judges . . . should not engage in an analysis of the demanding country's law and procedure, except to the limited extent necessary to ensure that . . . the applicable extradition treaty ha[s] been satisfied")(emphasis added).[6]

In sum, the limitations issue is for this Court to decide, and time has run on all counts.

POINT TWO

THERE IS NOT PROBABLE CAUSE THAT KEITH YOO
COMMITTED EMBEZZLEMENT CRIMES

Here, too, the government's memorandum calls for a response.

A.   Park Seung-il

The government hangs its hat principally on the statements of Park Seung-il, arguing that his statements are "independently sufficient to establish probable cause for all seven counts." G. Mem. 17. We strongly disagree. First, the government relies on Park's statement to

---

[6]   Mirela v. United States, 416 F. Supp. 3d 98, 110-12 (D. Conn. 2019), on which the government relies, is not to the contrary. G. Mem. 16. There, Judge Haight found that the U.S.-Romania extradition treaty gave the limitations issue to the Executive, and not the court, and thus he abstained from opining on Romanian law.

Korean authorities that he "didn't think that [he] was collecting money illegally" at the time, but now thinks he "collected those funds illegally." Ex. E at 9. Whatever else may be true, that response does not provide probable cause. As we noted in our opening brief, Park was Keith Yoo's right-hand man for more than 2 1/2 years. Thus, the question here is this: Could Keith Yoo have orchestrated a massive embezzlement scheme and Park come to realize it only post hoc when questioned while in custody? No judge would grant a search warrant application on so little.

<u>Second</u>, the government claims that Park repeatedly described the trademark and consulting payments as "pretextual." On this point, the government correctly notes that "under the pretext" was our initial translation of the Korean word 명목으로 in Park's interview. G. Mem. 20. Only when a Korean-speaking lawyer pointed out that the word was ambiguous did we dig deeper. Now, both parties acknowledge that 명목으로 has two possible meanings: (i) "for" or "as" or (ii) "under the pretext," and that the proper meaning depends entirely on context. In the context of Park's interview, "for" or "as" is the far better translation. <u>See</u> Yoo Mem. 25-26. We urge the Court to consider enlisting a court-certified interpreter to speak to the issue.

In the end, the government writes that "regardless of whether Park [or his questioners] used the word 'pretext,' he described payments that were paradigmatically pretextual: the payments were called one thing . . . but were actually . . . a means for the Yoo family to 'take the funds' from the Victim Companies' coffers." G. Mem. 21. But that is pure question-begging. Asserting that the payments were "paradigmatically pretextual" does not make them so, and Park's testimony adds nothing to the mix if 명목으로 means "as" or "for," as we believe it does.

<u>Third</u>, the government quotes from Magistrate Judge McCarthy's opinion to suggest that Park made "extensive and incriminating statements to Korean authorities . . . on each of the seven counts." G. Mem. 18. But, more often than not, Magistrate Judge McCarthy relied

-7-

on Korea's summaries as opposed to what Park actually said. Take this example: Magistrate Judge McCarthy wrote that Park "asserted that such [trademark] royalties were 'unnecessary' and a mechanism to take affiliates' funds to benefit the Yoo family's own wealth." Op. 36. But what actually occurred in the interview was this:

> Q. As for the financial status of major affiliates such as Ahae Co., Ltd., for the past 6 years, financial conditions were getting worse such as debts were increasing up to multi billion won, net profit was declining and so on. Even in that situation, it was not the case the brand of an existing recognizable company or product was used for a royalty-type fee, but a trademark was used that only worth about the cost of a trademark registration . . . . It does not seem necessary to have the trademark registered with the Korean Intellectual Property Office and to have trademark fee of ultra-high 0.5 to 1% of sales paid. All together, it seems that it was actually a way for the Yoo Byung-Eon family to take the funds of affiliates. What do you think?
>
> At this time, the prosecutor shows the investigation report compiled in Record No. 137Jung (financial status of major affiliates that cannot afford to spend trademark fees) and continues.
>
> A. Yes, it seems so.

Ex. E at 21. As this colloquy shows, Park did not assert anything; he was asked a leading question and shown an investigatory report and answered "Yes, it seems so." That is hardly the stuff on which probable cause can be based.[7]

Having little else to go on, the government contends that "Korea's extradition submissions [must be] 'deemed truthful' for purposes of the probable cause analysis." G. Mem. 21,

---

[7] Other examples are to the same effect. Magistrate Judge McCarthy found that Park "affirm[ed] that the trademark fees were out of proportion to the value of the trademarks." Op. 19. Not so. What he said was that "[t]he patent team . . . worked on the trademark, so [he] did not know the value of the trademark at all." Ex. E at 19. Likewise, Magistrate Judge McCarthy found that Park said the services Keith Yoo's company provided were "mere translations of general information that could be obtained through the internet." Op. 39. Also not so. Park said only that the "data" used for a paper on FDA standards "was [a] translation of data available on the Internet into Korean." Ex. E at 17. And Magistrate Judge McCarthy quotes Park as saying that Keith Yoo was "behind all this," Op. 39, but those words do not appear in his interview.

quoting <u>In re Extradition of Atta</u>, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989).  But, given what happened here, that contention is risible.  As the government would be forced to concede, Korea's submissions often distorted the witnesses' actual statements and attributed statements to witnesses that were never said.  Exculpatory statements were omitted, and quotation marks were repeatedly misused.  Truthful is what Korea's submissions were not.

In sum, while one accomplice witness can provide probable cause by his incriminating statements, Park Seung-il is not such a witness.

B.        <u>Corroborative Evidence</u>

1.        <u>Chonhaiji Trademark</u>.  The government argues that Byeon Gi-chun "confirmed to Korean officials that [Chonhaiji] had used the Chonhaiji mark before Yoo registered it." G. Mem. 22.  But Byeon gave no such testimony.  He said that "when [he] joined the company in 2007, they were using the trademark and logo of Cheonhaeji [sic], and [he knew] that it had been used from before, but [he did] not know whether it was used from the beginning."  Ex. H at 30.  It is undisputed that Keith Yoo's brother applied for the trademark in May 2005 and that it was registered in April 2007.  <u>Id.</u>  Simply stated, nothing in that timing corroborates the existence of an embezzlement scheme.

2.        <u>Ahae Trademark</u>.  The government argues that the statements of Lee Seong-hwan and Lee Gang-se, two former CEO's, reveal that the trademarks were a way to divert money to the Yoo family.  G. Mem. 22.  We quoted those statements in our original brief, and they do not say what the government claims.  <u>See</u> Yoo Mem. 29-30.  Lee Gang-se's statement is indicative: he told Korean authorities that Ahae "<u>did actually use [Keith Yoo's] trademarks</u>," although he believed that it paid too much for them.  Ex. I at KY-07.  Overpaying is not an embezzlement crime.  The government also contends that Lee Seong-hwan told prosecutors that Keith Yoo had issued "a directive" "so we couldn't help but pay the fees."  G. Mem. 22, <u>quoting</u> EX-YOO-S4-

-9-

00009.  But as Magistrate Judge McCarthy observed, Lee Seong-hwan's interview "is devoid of any indication that [he] told prosecutors that the licensing transaction was prompted by pressure to obey Yoo's family."  Op. 31.

    3.  Onnara Shopping Trademark.  The government relies on the interview of Kim Chun-gyun.  It argues that this Court must credit Kim's statements because Magistrate Judge McCarthy did so.  G. Mem. 23.  That cannot be the law.  As we observed in our opening brief, it is abundantly clear that Kim had no knowledge as to the legitimacy of the Onnara trademark; that he admitted he was "guess"[ing]; and that he identified the source for his information as "members of the congregation around me."  See Yoo Mem. 30-32.  Habeas review is "limited and should not be converted into a de novo review of the evidence," Austin v. Healey, 5 F.3d 598, 605 (2d Cir. 1993), but what Kim was peddling cannot possibly count.

    4.  Semo Consulting Agreement.  Relying on the Korean submissions, the government writes that Go Chang-hwan and Kim Gyu-seok, Semo executives, told Korean officials that the consulting services were unnecessary.  Neither executive said those words.  When asked if the consulting fees were "worth [it]," Kim answered, "[y]ou can check it out with each department."  Ex. A at 20.  And Go said this:

> Q. In conclusion based on the above, it seems like excessive consulting fees were paid without any justifiable reasons.  What do you think about that?
>
> A. That is absolutely not the case.

Ex. B at 17.  Go also made clear that, in addition to providing consulting reports, Keith Yoo and Key Solutions "also . . . provid[ed] us with influential power on sales and so on."  Id.  Go's statements are not incriminating.

    The government also writes that Magistrate Judge McCarthy was correct to exclude the "affidavits from Semo employees . . . assert[ing] that Yoo in fact provided consulting services."

G. Mem. 26. But those affidavits did more than "assert." They included lengthy reports that Key Solutions prepared on business strategies and on US-FDA inspections, as well as notes of 18 meetings that Key Solutions' employees attended to discuss topics of importance to Semo. The charge here is that Key Solutions "was neither capable of offering business consulting service nor did it actually provide practical business consulting." EX-YOO-00085-86. Can a country make such a charge and then have our government exclude clear-cut proof showing that it is false? See Matter of Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978)(the accused may submit "reasonably clear-cut proof . . . [with a] reasonable chance of negating [the government's] showing of probable cause").[8]

        5.      Moreal Consulting Agreement. The government relies on the statements of Dr. Ha Myeong-hwa and Park Hwa-sun to support Korea's allegation that Moreal Design did not need consulting services and that Key Solutions "was neither capable of offering business consulting nor did it actually provide business consulting to 'Moreal Design.'" EX-YOO-00086. But, fairly read, neither Dr. Ha nor Ms. Park have much to offer on the issue. Dr. Ha was in charge of Moreal's medical division, and the consulting services were provided to its design division, so her lack of knowledge is understandable. See Ex. F at 14-15 ("I wasn't in charge of design, so I'm not really sure what it was"). And Ms. Park was a back-room accountant, who, understandably, told Korean authorities that she didn't know whether Key Solutions provided management advice. Ex. G at 13 ("I do not know"). The statements of neither witness support probable cause.[9]

---

[8]     Compare Kapoor v. Dunne, 606 F. App'x 11, 13 (2d Cir. 2015)(Magistrate Judge properly declined to consider petitioner's handwriting report where requesting state had submitted its own handwriting report; "[t]his is precisely the type of credibility contest that the rule against contradictory evidence is intended to avoid"). The documents at issue here do not create a credibility contest; they go far to obliterate Korea's embezzlement claim.

[9]     The government writes that Park Seung-il described the Moreal consulting contract "as an embezzlement scheme." G. Mem. 27. If that were so, we would not be raising a challenge.

Here, too, the government argues that Magistrate Judge McCarthy was correct in excluding the "avowedly contradictory evidence" that we proffered. G. Mem. 28. That evidence includes a 93-page consulting report on business strategies and annual reports on the Moreal Internship Abroad Program, which Key Solutions conceived and planned.[10] This clear-cut documentary evidence negates Korea's allegation and therefore should be considered.

    6.  <u>Chonhaiji Consulting Agreement</u>. The government finds corroboration here in the supposed statement of Byeon Gi-chun that he agreed to the consulting fees because "as hired CEO[], [he] just followed instructions." G. Mem. 25. Byeon's words, however, were different. He told Korean authorities that the amount of the fee was "not up to [him] to decide because it was decided by I-One-I Holdings, the holding company," which sits above the affiliates. Ex. H at 34; <u>see also</u> <u>id.</u> at 36 ("[the] President of I-One-I Holdings . . . appointed [Keith Yoo] as an advisor and asked me to receive advice on the new business and important management decisions"). There is nothing incriminating in that statement.

    What the government leaves out from the interview is this:

Q. Have you received any advice from President Yoo Hyuk-Ki?

A. Cheonhaeji Co., Ltd. planned to build a yacht manufacturing plant in Gyeongsangnam-do, and President Yoo Hyuk-Ki had data on technical alliances with US yacht schools, design, and design technology, so <u>he instructed the company about the future yacht business policy</u>.

Q. Was the yacht business planned after you took office as CEO of Cheonhaeji Co., Ltd.?

---

[10] The government writes that Dr. Ha testified "there were 'no official documents' reflecting the receipt of consulting services." G. Mem. 27. What she actually said was that she could locate no "official documents" showing that Key Solutions "provided expenses for [Moreal employees'] stay" abroad. Ex. F at 14-15. There is a broader point here: as noted above, there are numerous "official documents" reflecting Moreal's receipt of consulting services; it is just that the government seeks to exclude them.

> A. No. Prior to 2007, it was already reported to the Gyeongsangnam-do or Goseong-gun that it had entered the yacht business, and was known to the media. As part of that, we built the Han River water taxi. <u>All of this was part of President Yoo Huyk-Ki's business plan</u>.

<u>Id.</u> at 36 (emphasis added). Surely, a person who "instruct[s] [a ship building] company about the future yacht business policy" and develops the company's "business plan" is not embezzling from the company if he is paid for his services. <u>See also</u> Yoo Mem. 43-44 (discussing affidavit of Sung Min Park).

       7.      <u>Chonhaiji (Photographs)</u>. The government devotes the last four pages of its submission to arguing that Keith Yoo "extract[ed] monies from various affiliates to fund the Versailles exhibition in order to inflate the value of his father's photographs." G. Mem. 30, <u>quoting</u> Op. 65. What Korea has alleged, however, is that Keith Yoo embezzled money from Chonhaiji by conspiring with Byeon Gi-chun, its CEO, to have the company "buy [Yoo Byeong-eun's] photographs at a high price, even though his photographs were not proven to be priceless as they were never put up for sale in the auction market other than among followers of his church and affiliate companies"). EX-YOO-00088. That charge does not involve "Victim Companies" or the Versailles exhibition. One cannot be extradited for conduct not charged.

       As to the actual allegation, we rest on our opening submission. The photographs drew critical acclaim; Chonhaiji prepared a report concluding that purchasing Ahae's photographs from Ahae Press would be a profitable venture; and Byeon told Korean authorities that he was optimistic that Chonhaiji would sell the photographs successfully. Yoo Mem. 46-48. To repeat what we said before "[t]hat is hardly a tale of embezzlement." <u>Id.</u> at 47.

\* \* \*

       As noted in our opening submission, we believe that Keith Yoo cannot get a fair trial in Korea. The Yoo family has been blamed for the sinking of the Sewol, a national tragedy,

-13-

and the government views him as a rapacious cult leader.  See EX-YOO-S5-00003-4 (the Yoo "family's embezzlement . . . left the [ferry] company financially unsound [and] resulted in the loss of 304 innocent lives, including those of students"); EX-YOO-S1-00020 (Keith Yoo has "succeeded his father" as "the cult leader").  None of that is true, but achieving justice against that backdrop will be impossible.  That is why this extradition proceeding is so significant.  Because the limitation period has expired and probable cause is wanting, this Court should not send Keith Yoo abroad.

CONCLUSION

For these reasons and those in our opening submission, Keith Yoo's application for a writ of habeas corpus should be granted.

Dated: New York, New York
September 24, 2021

Respectfully submitted,

BRACEWELL LLP

/s/ Paul Shechtman
Paul Shechtman
1251 Avenue of the Americas
49th Floor
New York, NY 10020
212-508-6107
paul.shechtman@bracewell.com

ZUCKERMAN SPAEDER LLP
Shawn Naunton
485 Madison Avenue
10th Floor
New York, NY 10022
646-746-8655
snaunton@zuckerman.com

Attorneys for Defendant Keith Yoo