UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
HYUK KEE YOO, a/k/a "KEITH YOO,"

                            Petitioner,

     - against -

UNITED STATES OF AMERICA,

                            Respondent.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 21-CV-6184 (CS)

Appearances:

Paul Shechtman
Bracewell LLP
New York, New York

Shawn Naunton
Zuckerman Spaeder LLP
New York, New York
*Counsel for Petitioner*

Derek Wikstrom
Assistant United States Attorney
Southern District of New York
White Plains, New York
*Counsel for Respondent*

Seibel, J.

       Before the Court is the petition of Yoo Hyuk Kee ("Yoo" or "Petitioner") for a writ of

*habeas corpus* under 28 U.S.C. § 2241.  Petitioner challenges Magistrate Judge Judith C.

McCarthy's July 2, 2021 Order, (Ext. Dkt. No. 39 (the "Extradition Order")),[1] certifying

Petitioner as extraditable pursuant to the Extradition Treaty Between the United States of

America (the "United States" or "Government") and the Republic of Korea ("Korea"), signed on

---

[1] Docket entries from the extradition proceedings held before Judge McCarthy, No. 20-MJ-2252 (the "Extradition Court"), are cited as "Ext. Dkt. No. __."

June 9, 1998 and entered into force on December 20, 1999.  Extradition Treaty Between the

Government of the United States of America and the Government of the Republic of Korea, K.-

U.S., June 9, 1998, T.I.A.S. No. 12,962 (the "Treaty").

I.      **BACKGROUND**

    A.      **Procedural History**

On May 8, 2014, after Petitioner was charged with seven counts of embezzlement, a

judge of the Incheon District Court in Korea issued a warrant for his arrest.  (Ext. Dkt. No. 2 ¶¶

4-5.)  Petitioner is located in the United States, and on May 28, 2014, the Korean government

sent its first diplomatic note seeking his extradition.  (Ext. Dkt. No. 2-1 ¶¶ 3, 6.)  Over the next

several years the Korean government made a number of supplemental submissions.  (*Id.*)  The

Government filed a complaint on February 27, 2020, seeking a warrant for Petitioner's arrest

under 18 U.S.C. § 3184 (the "Extradition Statute") and the Treaty.  (Ext. Dkt. No. 2); *see In re

Extradition of Hyuk Kee Yoo*, No. 20-MJ-2252, 2021 WL 2784836, at *1 (S.D.N.Y. July 2,

2021).[2]  The Extradition Court issued the arrest warrant on July 22, 2020, and ordered Petitioner

detained without bail.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *1.  Petitioner's

counsel moved to dismiss the Government's complaint on October 5, 2020; the Government

filed a brief in support of extradition on December 8, 2020; and Petitioner filed his reply on

December 21, 2020.  *Id.*  On January 7, 2021, the Government made a supplemental submission,

to which Petitioner replied on January 25, 2021.  *Id.*

The Extradition Court held an evidentiary hearing on March 3, 2021.  *Id.* at *1-2.  At the

hearing, the Extradition Court admitted four exhibits submitted by the Government, without

---

[2] Citations to Judge McCarthy's July 2, 2021 Extradition Order are to the Westlaw version.

objection from Petitioner, and admitted nine of his proffered seventy-one exhibits, reserving

decision on whether to admit the remaining sixty-two.  (Ext. Dkt. No. 38.)  Petitioner's exhibits

to which the Government did not object were English translations of excerpts of transcripts of

witness interviews conducted by Korean prosecutors.  (*Id.*); *see In re Extradition of Hyuk Kee*

*Yoo*, 2021 WL 2784836, at *2.[3]  The Korean government had submitted English summaries of

these interviews but had not included direct translations of the transcripts.  *In re Extradition of*

*Hyuk Kee Yoo*, 2021 WL 2784836 at *11 n.16.

On July 2, 2021, the Extradition Court issued the eighty-page Extradition Order, ruling

on the admissibility of all outstanding evidence and certifying Petitioner as extraditable pursuant

to the Treaty.  *Id.* at *1.

### B.  The Republic of Korea's Allegations

Petitioner is the son of a prominent religious and business leader in Korea, Yoo Byeong-

eun.  *Id.* at *2.  Petitioner took over his father's church as *de facto* leader in 2010 and is also

involved in the family businesses.  *Id.*  Petitioner's family controls I-One-I Holdings ("I-One-I"),

which holds a controlling interest in a number of affiliated corporate entities (the "Affiliated

Entities").  *Id.*  The charges against Petitioner stem from three categories of alleged schemes to

embezzle money from several of these entities:  "(1) pretextual and fraudulent trademark

licensing agreements with the Companies; (2) pretextual and fraudulent agreements for business

consulting services with the Companies; and (3) a scheme to cause the Companies to make

advance payments in support of a photography exhibition by Yoo's father at inflated values."  *Id.*

Korea alleges that, at Petitioner's direction, certain co-conspirator Chief Executive Officers

---

[3] Petitioner also submitted these translated transcript excerpts to the Court as part of the instant *habeas* application.  (*See* ECF No. 8 ("Petitioner's Br.") at 25 n.20.)  Materials from this submission are cited as "Korean Interviews Binder Tab __."

("CEOs") of the Affiliated Entities entered into contracts and arranged for payments from the Affiliated Entities to Petitioner or his private company Key Solutions. *Id.*

### 1.     Trademark Schemes

Petitioner allegedly embezzled funds from three Affiliated Entities – Chonhaiji Co., Ltd. ("Chonhaiji"), Ahae Co. Ltd. ("Ahae"), and Onnara Shopping Co., Ltd. ("Onnara Shopping") – through schemes in which he registered trademarks used by the entities and then conspired with the CEOs to sign licensing agreements so he would be paid for the marks' use at above-market rates. *Id.* at *3.  Payments were made to Petitioner under these agreements from January 2008 until June 2010 (Chonhaiji), January 2009 until December 2013 (Ahae), and January 2009 until December 2011 (Onnara Shopping). *Id.*

### 2.     Consulting Schemes

Korea also alleges that Petitioner embezzled funds from three of the Affiliated Entities – Semo Co., Ltd. ("Semo"), Moreal Design Inc. ("Moreal"), and Chonhaiji – through sham consulting agreements. *Id.* at *3-4.  Petitioner allegedly conspired with the CEOs to cause these entities to enter into consulting contracts with Petitioner's private company, Key Solutions, by which Key Solutions was paid monthly consulting fees but either did not provide the services or provided only limited services. *Id.*  Payments were made to Key Solutions or to Petitioner directly by Semo from March 2010 until March 2014, by Moreal from April 2010 until December 2013, and by Chonhaiji from February 2011 until November 2011. *Id.*

### 3.     Photography Scheme

Finally, in or around 2013, Petitioner allegedly coerced Chonhaiji to provide its own money, and money transferred to it by several other Affiliated Entities, ostensibly as advance payments for investment in unspecified photographs taken by Petitioner's father, but the

payments allegedly greatly exceeded the value of any such photographs and much of the money was in fact used to fund an exhibition of his father's work at the Palace of Versailles.  *Id.* at *4, 30.

## II.    STANDARD OF REVIEW

An extradition court has the limited task of determining whether there is sufficient evidence "to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184.  If the court finds that the request falls within the treaty and satisfies the Extradition Statute, it must issue a certificate of extraditability to the Secretary of State, who makes the ultimate decision whether to extradite the individual.  *Id.*

> At an extradition hearing, the judicial officer's inquiry is confined to the following:  whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof.  An extradition hearing is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, and is not the occasion for an adjudication of guilt or innocence.  Rather, it is essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation.

*Skaftouros v. United States*, 667 F.3d 144, 154-55 (2d Cir. 2011) (cleaned up).  Assuming that there is a valid treaty and the crimes charged fall within that treaty, the role of the extradition court is "in line with [a magistrate judge's] accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense."  *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (cleaned up).

Review of a magistrate's determination that a person is extraditable is even more circumscribed.  "Because extradition orders are regarded as preliminary determinations . . . they may only be reviewed by a petition for a writ of habeas corpus under 28 U.S.C. § 2241." *Skaftouros*, 667 F.3d at 157.  *Habeas* review of an extradition order is confined to (1) "'whether

the magistrate had jurisdiction,'" (2) "'whether the offense charged is within the treaty'" and, (3)

"'whether there was any evidence warranting the finding that there was reasonable ground to

believe the accused guilty.'"  *Id.* (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

"Ultimately, 'in order to merit habeas relief in a proceeding seeking collateral review of an

extradition order, the petitioner must prove by a preponderance of the evidence that he is in

custody in violation' of the statute authorizing extradition or the applicable extradition treaty."

*Bisram v. United States*, 777 F. App'x 563, 565 (2d Cir. 2019) (summary order) (quoting

*Skaftouros*, 667 F.3d at 158).  Thus, "collateral review of an international extradition order

should begin with the presumption that both the order and the related custody of the fugitive are

lawful."  *Skaftouros*, 667 F.3d at 158.

## III.   **DISCUSSION**

Petitioner does not challenge Magistrate Judge McCarthy's jurisdiction under 18 U.S.C.

§ 3184 and Local Criminal Rule 59.1(b), nor does he dispute that the Treaty between the United

States and Korea is in force.  *See In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *5.

The Extradition Court also concluded that the embezzlement crimes satisfy the "dual criminality

requirements" of the Treaty, *id.* at *6, and Petitioner does not contend otherwise.  But Petitioner

argues that he is being held in violation of the Treaty and the Extradition Statute because the

statute of limitations has run on the charges against him and, even if not time-barred, the charges

are not supported by probable cause.

### A.   **Statute of Limitations**

The Extradition Court did not assess whether the charges against Petitioner are time-

barred because it concluded that that the Treaty permits only the Secretary of State to make that

determination.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *35.  Petitioner argues that this was in error.

While judicial officers are empowered to determine whether the legal requirements for extradition are met – that is, whether extradition is barred by the extradition statute or the applicable treaty – the executive branch is the final decision-maker and retains discretion to deny extradition.  *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000).  Thus, under an extradition treaty "'discretionary' determinations are reserved for the Secretary of State, and 'mandatory' determinations must be addressed by the extraditing court."  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *35 (citing *Patterson v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015)); *see Vo v. Benov*, 447 F.3d 1235, 1247 (9th Cir. 2006) ("[T]he statutorily imposed judicial functions encompass the entirety of a court's obligations in the extradition process, . . . the magistrate judge has no discretionary decision to make.  Because discretionary decisions are within the province of the Secretary of State and not the extradition magistrate, . . . it is for the Secretary to decide what evidence might have a bearing upon a discretionary decision.") (cleaned up); *cf. Murphy v. United States*, 199 F.3d 599, 601-02 (2d Cir. 1999) ("The function of habeas review in this context is to test only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the executive branch to decide.") (cleaned up). Accordingly, this Court may analyze whether the charges against Petitioner are timely only if consideration of the statute of limitations is a mandatory prerequisite to extradition under the Treaty.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas,* 552 U.S. 491, 506 (2008).  A court must also look to other sources to ensure that its reading "give[s] the specific words of the treaty a meaning consistent with the shared

expectations of the contracting parties." *Air Fr. v. Saks,* 470 U.S. 392, 399 (1985).  "[C]ourts –

including our Supreme Court – look to the executive branch's interpretation of the issue, the

views of other contracting states, and the treaty's negotiation and drafting history in order to

ensure that their interpretation of the text is not contradicted by other evidence of intent."

*Patterson,* 785 F.3d at 1281-82 (citing *Abbott v. Abbott*, 560 U.S. 1, 15-20 (2010); *Medellin*, 552

U.S. at 508-13; *Vo*, 447 F.3d at 1246 n.13).

### 1.      Text of the Treaty

Article 6 of the Treaty states:

> Extradition may be denied under this Treaty when the prosecution or the
> execution of punishment of the offense for which extradition is requested would
> have been barred because of the statute of limitations of the Requested State had
> the same offense been committed in the Requested State.  The period during
> which a person for whom extradition is sought fled from justice does not count
> towards the running of the statute of limitations.  Acts or circumstances that
> would suspend the expiration of the statute of limitations of either State shall be
> given effect by the Requested State, and in this regard the Requesting State shall
> provide a written statement of the relevant provisions of its statute of limitations,
> which shall be conclusive.

Treaty, art. 6.

The Extradition Court correctly noted that the natural reading of the first sentence is that

it is permissive rather than mandatory.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at

*31.  This reading is consistent with the Ninth Circuit's decision in *Patterson v. Wagner*, which

analyzed the same Treaty and addressed the same issue.  *See id.* at *32.  The *Patterson* court

explained:

> The normal reading of "may" is permissive, not mandatory.  The most natural
> reading of Article 6, therefore, is that untimeliness is a discretionary factor for the
> Secretary of State to consider in deciding whether to grant extradition.  That is,
> the Secretary "may" decline to extradite someone whose prosecution would be
> time-barred in the United States, but he or she is not required to do so.  Under this
> reading, there is no mandatory duty that a court may enforce.

*Patterson*, 785 F.3d at 1281.  As the Extradition Court also observed, district court cases –
including one from this Circuit – that have analyzed "extradition treaties with identical language
in lapse of time provisions" have also concluded that consideration of the statute of limitations is
permissive rather than mandatory.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *32
(citing *Mirela v. United States*, 416 F. Supp. 3d 98, 110-11 (D. Conn. 2019), *appeal dismissed*,
No. 19-3366, 2020 WL 1873386 (2d Cir. Feb. 25, 2020); *United States v. Porumb*, 420 F. Supp.
3d 517, 527-28 (W.D. La. 2019)).

     Petitioner asserts that the Ninth Circuit and the Extradition Court misread the first
sentence of Article 6 and that there "may" is mandatory language that should be read as "must"
or "shall" in light of the structure of the Treaty and its legislative history.  (Petitioner's Br. at 5-
15.)  Petitioner cites several cases for the proposition that legislative intent and inferences drawn
from the structure and purpose of a treaty can rebut the usual presumption that the word "may" is
permissive rather than mandatory.  (*Id.* at 8.)  A close reading of the Treaty as whole, according
to Petitioner, reveals that "may" is mandatory in this case:  he contrasts Article 6, in which the
word "may" stands alone, with Article 2(4), which says "the executive authority of the
Requested State may, in its discretion," grant extradition in certain circumstances, and Article
4(4), which says "the executive authority of the Requested States may refuse extradition" in
certain other circumstances.  (Petitioner's Br. at 9.)  Petitioner contends that if "may" standing
alone is read as permissive, then the words "discretion" and "executive authority" in these other
provisions would be surplusage.  (*Id.*)  Petitioner also points to Article 3(1)'s use of "shall" to
connote discretion (the Requested State "shall have the power to extradite such person if, in its
discretion, it be deemed proper to do so") to bolster his argument that the Court must look
beyond the mere use of "may" or "shall."  (*Id.* at 10.)  Finally, Petitioner points to Article 10(4) –

which uses the word "may" but, he argues, "seems directed to the court, and . . . is likely mandatory"[4] – to highlight the lack of "semantic precision" in the Treaty.  (Petitioner's Br. at 9-10.)

I am not persuaded.  In addition to the ordinary meaning of "may," the Extradition Court correctly noted that the words "may" and "shall" appear alongside one another within Article 6, reinforcing the conclusion that "may" should be read as discretionary and "shall" as mandatory, absent context which would alter these natural meanings.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *31; *see Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) (connotation of "may" as discretionary is "is particularly apt where, as here, 'may' is used in contraposition to the word 'shall'"); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("[W]hen the same Rule uses both 'may' and 'shall', the normal inference is that each is used in its usual sense – the one act being permissive, the other mandatory.").

Looking to other provisions of the Treaty, just because the drafters may in certain provisions have used words that were not strictly necessary ("may, in its discretion") does not mean that the Treaty does not mean what it says in the provision at issue here ("may").  Further, while certain provisions using "may" contain additional permissive language, several other provisions use the word "may" standing alone – as it is used in Article 6.  *See* Treaty, art 2(7) ("extradition may be denied" where less than four months remain on a sentence of confinement in the Requesting State); *id.* art. 7(1) ("Requested State may refuse extradition" under certain circumstances where the crime is punishable by death in the Requesting State); *id.* art. 12(1) (if

---

[4] Article 10(4) provides: "A person who is provisionally arrested may be discharged from custody upon the expiration of two months from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the supporting documents required in Article 8."  Petitioner does not explain why this provision is "likely mandatory."

the person subject to extradition is serving a sentence in the Requested State for a different crime

than that for which extradition is sought, "the Requested State may temporarily surrender the

person sought to the Requesting State for the purpose of prosecution"); *id.* art. 17(1) ("Either

Contracting State may authorize transportation through its territory of a person surrendered to the

other State by a third State.").  As the Extradition Court noted, the Technical Analysis section of

the Senate Report on the Treaty – prepared by a U.S. Department of Justice official[5] –

specifically explains that several of these provisions are discretionary.  *In re Extradition of Hyuk*

*Kee Yoo*, 2021 WL 2784836, at *33; *see* S. Rep. No. 106-13 at 15, 18, 20 (1999).  Thus, in these

provisions, the drafters of the Treaty used "may" to signal discretion without additional verbiage.

Petitioner attempts to refute this point, arguing that the Court need not read the word

"may" as mandatory in all instances where the word stands alone – but should read "may" as

mandatory in one such instance, in Article 6.  (*See* Petitioner's Br. at 10.)  But he provides no

principled basis on which the Court could decide when "may" means "may" and when it means

"must."  His proposed reading would not only require the Court to ignore the plain text and

ordinary meaning of the word "may," but also to grant it a different meaning in Article 6 than it

has in other provisions of the Treaty.  The drafters of the Treaty knew how to make provisions

mandatory, *see Patterson*, 785 F.3d at 1282, and chose not to do so in Article 6.[6]

---

[5] The Technical Analysis section was "prepared by the Office of International Affairs, United States Department of Justice, and the Office of the Legal Adviser, United States Department of State, and is based on notes from the negotiations."  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *33 n.46 (citing S. Rep. No. 106-13, at 8 (1999)).  "While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."  *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961).

[6] For example, the provision immediately preceding Article 6 states "Extradition *shall not be granted* when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested."  Treaty, art. 5 (emphasis added).

Thus, nothing in the plain text of Article 6 or in the structure or language of the Treaty as a whole allows the Court to draw an "obvious inference[]" to defeat the natural, "common-sense" reading of "may" as indicative of discretion.  *See United States v. Rogers*, 461 U.S. 677, 706 (1983).

### 2.   Legislative History

The legislative history likewise does not reflect any clear intent from which the Court can conclude that the Treaty mandates judicial consideration of the statute of limitations.

As Petitioner notes, the Summary of the Treaty in the Senate Report states that Article 6 "precludes extradition of offenses barred by an applicable statute of limitations," which supports Petitioner's reading.  S. Rep. No. 106-13, at 5.  But this mandatory language contrasts with the enacted language, as discussed above, and only appears in the Summary section.

The Technical Analysis section, in contrast, uses the term "may" to describe the authority granted to each state.  S. Rep. No. 106-13, at 14-15.  As the Ninth Circuit noted:  "The more detailed technical analysis of the treaty, contained in the body of the Report, describes Article 6 in permissive terms, stating that extradition 'may be denied' and explaining that the Korean and U.S. statutes of limitations operate so differently that 'this provision could be very difficult to implement.'"  *Patterson*, 785 F.3d at 1282; *see In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *34 ("As with the other provisions noted above, the Technical Analysis section connects the word 'may' in the original text of Article 6 with discretionary authority through a detailed explanation of the provision's negotiating history.").

Petitioner pushes back against this reading, quoting other language in the portion of the Technical Analysis discussing Article 6:  "'Korea *insisted* on this provision [Article 6] because Korean law *demands* the extradition be denied if the statute of limitations would have expired in

either Korea or in the Requesting State.'"  (Petitioner's Br. at 11 (quoting S. Rep. No. 106-13, at

8, 14) (emphasis in Petitioner's Br.)).  He also points out that the Korean law footnoted in the

Technical Analysis section provides that "[n]o criminal shall be extradited . . . [w]here the

prescription of indictment or sentence against an extraditable crime is completed under the Acts

of the Republic of Korea or the requesting state."  (*Id.* at 11-12.)  Petitioner then incorrectly

asserts that the Extradition Court failed to address how this language can be squared with the

common-sense reading that "may" is permissive.  In fact, the Extradition Court did address this

argument:

> Crucially, although Korea "insisted" that the first sentence comport with Korean
> law, the section explains that because "the delegations were sensitive" to the
> differences between Korean and United States statutes of limitations, "the Treaty
> provides that a request *may* be denied if it would be timebarred in the Requested
> State, *but* that acts or circumstances that would toll the statute of limitation in
> either state *would be applied* by the Requested State."  Contrary to Yoo's
> assertions, this passage does not communicate that the provision adopts Korean
> law's "demand that extradition be denied if the statute of limitations would have
> expired in either Korea or in the Requesting State." . . . .  Rather, through a
> combination of permissive and mandatory language mirroring Article 6 itself, the
> passage reflects a compromise between the delegations, allowing Korea to apply
> its own statute of limitations law when it is the requested State – as it wanted –
> and requiring consideration of the tolling rules of either State whenever statute of
> limitations is in play.

*In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *34 (cleaned up).  The Court agrees

with this reasoning.  The mandatory language to which Petitioner points – when read in context –

comports with the conclusion that each state has discretion whether to consider the timeliness of

charges.  The phrases that Petitioner quotes refer to requirements of Korean law, and Article 6

accounts for those requirements by allowing Korea to follow those mandates when it is the

Requested State.  In other words, that Korea insisted on the first sentence of Article 6 does not

suggest that the application of the Requested State's statute of limitations is mandatory; that on

which Korea "insisted," and which the Treaty provides, was that it have the discretion to apply

the "demands" of its law when it was the Requested State, while not requiring the United States to do the same.

Petitioner also argues that an exchange between Senator Rod Grams and John Harris, the Acting Director of the Office of International Affairs at the Department of Justice, during the Senate hearing, reflects both Senator Grams's and Mr. Harris's understanding that the statute-of-limitations bar was mandatory under the treaty.  (Petitioner's Br. at 12-13.)  The exchange is as follows:

> SENATOR GRAMS:  Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out.
> . . .
> So the question is are you confident that this article of the treaty adequately insures that fugitives cannot simply run out the clock by fleeing to Korea?
>
> MR. HARRIS:  Senator, this article of the treaty was the subject of considerable negotiation.  As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language.  Many of our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.  We have a few in which it was not possible to reach that resolution. In this case, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply.  But, as you have indicated, the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.  So when the United States is making a request to Korea, there should be the ability to prevent a miscarriage of justice by the statute of limitations of Korea having expired before extradition can be accomplished.

S. Rep. No. 106-13, at 37.  The Ninth Circuit addressed this same exchange and noted that it only "weakly supports [the] contention that the Senate understood the provision to be mandatory" because Senator Grams – even if he believed the provision was mandatory and did not have this assumption corrected by Mr. Harris's response – was not speaking for the whole Senate.  *Patterson*, 785 F.3d at 1282-83.  The Court agrees.  Further, the colloquy does not directly address Mr. Harris's understanding of the mandatory/permissive nature of the requirement.  The focus of the exchange was the effect of Article 6 when the United States

requests extradition of a fugitive from Korea, not the other way around.  Mr. Harris was assuring

the Senator that because Korea would have to respect U.S. tolling rules, a fugitive from U.S.

justice could not "run out the clock" even if Korea applied its own statute of limitations when the

United States was the Requesting State.  He was not addressing whether the United States would

be required to apply Korea's statute of limitations when the United States was the Requested

State.  Thus, it is not particularly helpful in answering the question here, and certainly is not so

conclusively persuasive as to warrant a departure from the natural reading of the enacted

language.

　　　　Finally, Petitioner addresses the State Department's official submittal letter to President

Clinton, which states that "Article 6 permits extradition to be denied when the prosecution or the

execution of punishment of the offense for which extradition is requested would have been

barred because of the statute of limitations of the Requested State had the same offense been

committed in the Requested State."  S. Treaty Doc. No. 1062, at v (1999).  Petitioner contends

that "permits" here is best read as "authorizes," meaning that the Treaty authorizes "a court to

consider whether a prosecution is time-barred," in contrast to treaties that bar consideration of

timeliness.  (Petitioner's Br. at 14.)  But nothing in the text of the letter indicates that the State

Department is purporting to explain to the President the scope of potential judicial review under

the treaty:  the much more natural reading is that the executive branch is speaking about what

issues may permissively be considered.  As the Ninth Circuit noted, if consideration of the

statute of limitations were mandatory, the letter would use the word "requires."  *Patterson*, 785

F.3d at 1283.  Moreover, this reading is consistent with both the enacted text and the beliefs of

the executive branch in the wake of treaty negotiations, as reflected in the Technical Summary.

The Court agrees with the Extradition Court that this letter reinforces the conclusion that the

statute-of-limitations issue is for the Secretary of State, not the courts, and "is entitled to great

weight, as it was drafted by Strobe Talbot of the Department of State, an office that played a key

role in the Treaty's negotiation." *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *35

(citing *Lozano v. Alvarez*, 697 F.3d 41, 50 (2d Cir. 2012)).[7]

In sum, the Court agrees that, under the Treaty, consideration of the statute of limitations

is a discretionary task assigned to the executive branch.  Thus, this Court will not analyze the

issue of whether the charges are time-barred.

### B.   Probable Cause

Petitioner challenges the Extradition Court's probable cause finding on each of the seven

embezzlement counts with which he is charged.  Petitioner also asks this Court to consider

certain evidence that was excluded by the Extradition Court.

This Court's *habeas* review of the Extradition Order "is limited and should not be

converted into a *de novo* review of the evidence."  *Melia v. United States*, 667 F.2d 300, 302 (2d

Cir. 1981); *see Fernandez*, 268 U.S. at 312 ("[*Habeas* review of an extradition order] is not a

means for rehearing what the magistrate already has decided.  The alleged fugitive from justice

has had his hearing . . . ."); *Suyanoff v. Terrell*, No. 12-CV-5115, 2014 WL 6783678, at *2

(E.D.N.Y. Dec. 2, 2014) ("The parameters of habeas review of an extradition order are highly

circumscribed.") (cleaned up).  While the Court is not "expected to wield a rubber stamp" and

---

[7] In addition, the Government takes the position that "may" means "may," not "must," in
Article 6.  *See Mora v. New York*, 524 F.3d 183, 204 (2d Cir. 2008) ("We place great weight on
the interpretation of a treaty by the Executive of our federal government.") (cleaned up).  The
Government represents that this is Korea's interpretation as well, (*see* ECF No. 9 at 11 n.5), in
which case this Court's deference is even greater, *see Sumitomo Shoji Am., Inc. v. Avagliano*,
457 U.S. 176, 184-85 (1982) ("When the parties to a treaty both agree as to the meaning of a
treaty provision, and that interpretation follows from clear treaty language, [the court] must,
absent extraordinarily strong contrary evidence, defer to that interpretation.").

must ensure compliance with the treaty provisions and Extradition Statute, the Extradition Order is afforded a "presumption of validity." *Skaftouros*, 667 F.3d at 158; *see Spatola v. United States,* 741 F. Supp. 362, 373 (E.D.N.Y.1990) ("A magistrate's finding that there is probable cause will not be overturned so long as there is *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty.") (emphasis in original), *aff'd,* 925 F.2d 615 (2d Cir. 1991). Further, "[t]he credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extraditing magistrate." *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993).

### 1.    Statements of Park Seung-il

The Extradition Court cited statements made by Petitioner's alleged co-conspirator, Park Seung-il ("Park"), as support for a finding of probable cause on all seven charges brought by Korea. *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *8-30. Park ran the day-to-day operations of Key Solutions, Petitioner's private company that is at the center of many of the embezzlement charges, and was also employed by several companies affiliated with Petitioner's family's corporate empire, including as a director of I-One-I and Chonhaiji, and an auditor of Ahae. *Id.* at *2, *8 & n.6.

Because Park's testimony is relevant to all of the charged conduct, I address the arguments regarding his statements before addressing the other issues raised by Petitioner. Petitioner submits (as he did in the Extradition Court) his own translation of Park's statements to Korean prosecutors[8] and zeroes in on a few key passages that he argues render Park's statements innocuous.

---

[8] As noted above (*see* note 3 and accompanying text) the Korean government submitted summaries of witness interviews. *See In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at

First, Petitioner focuses on a colloquy in which Park – in response to a question whether he was "responsible for illegally collecting and managing funds from affiliated companies under the pretext of trademark fees, consulting fees, etc., as well as being responsible for the overall management of the Yu family's finances" – stated, "Yes, I admit to all of this. However, I didn't think that I was collecting money illegally." (Petitioner's Br. at 24.)  In response to a follow-up question, Park conceded that, "[L]ooking back on it now I think I collected those funds illegally." (*Id.*)  Petitioner argues that this exchange shows that Park believed he was acting legally at the time he was collecting trademark and consulting fees on Petitioner's behalf, (*id.* at 24-25), which undermines Korea's case because Park would have known he was doing something illegal at the time if the conduct constituted "the brazen embezzlement that Korea posits." (*Id.* at 27.)  But while Park's after-the-fact description of his state of mind at the time could be helpful to Petitioner at trial, it does not rob the statements of evidentiary value:  Park admits to collecting funds on behalf of Petitioner and his family, illegally, under the pretext of trademark and consulting fees.  (Korean Interviews Binder, Tab E at 9.)[9]

———————————

*11 n.16, *20-21.  Petitioner obtained – from associates who found them in Korean court files – what he asserts are the full transcripts of the witness interviews on which the summaries were based, (Petitioner's Br. at 23, 35 n.27), translations of which were admitted into evidence and considered by the Extradition Court, (Ext. Dkt. No. 38); *see In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *2.  The Extradition Court addressed the discrepancies between the summaries and the translations, including the summaries' improper use of quotation marks, but found that overall, "the summaries and excerpts of Park's interview provided by Korea sufficiently align with Yoo's version to support a finding of probable cause."  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *11 n.16.

[9] Indeed, even if Park had adhered to the view that his actions were not illegal, his admission to siphoning money from the Affiliated Entities for Petitioner's benefit via pretexts would be powerful evidence of embezzlement.  And, of course, any such belief on Park's part would be far from conclusive.  It is not uncommon that an accused white-collar criminal admits to transactions but maintains that they were legitimate, or that he believed them to be legitimate, and is nevertheless thereafter convicted.

Next, Petitioner reiterates an argument he belatedly made below, that a Korean word translated by the Korean Government as "under the pretext of" can also mean "for," and is properly translated as "for" in several places in Park's transcribed interview.  (*Id.* at 24-25.)[10] Both before the Extradition Court and here, Petitioner offers the affidavits of a former Korean judge and an experienced Korean/English translator in support of this translation.  (ECF No. 8-3.)  Petitioner argues that this distinction is key because it turns otherwise incriminating admissions – for example, that Park collected money "under the pretext" of trademark or consulting fees – into neutral, innocuous statements.  (Petitioner's Br. at 25-26.)

Although the Extradition Court admitted both of Petitioner's proffered affidavits, it expressed skepticism regarding Petitioner's translation of the Korean term in question, noting that there was "little reason to believe that the linguistic analysis presented by Yoo is any more accurate than that submitted by Korea" and that a Korean factfinder would be better equipped to assess the issue.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *11.  Regardless, the Extradition Court engaged with Petitioner's translation, finding that even if it accepted that translation, the substance of Park's statements still established probable cause:

> Furthermore, even taking into account any ambiguity in the word "명목" the rest of Park's statements to prosecutors are sufficient to establish probable cause because they convey that under Yoo's direction, Park facilitated a sham trademark agreement whose only purpose was to extract money from Chonhaiji for the Yoo family's benefit. . . .  According to both parties' submissions, Park expressly admitted, in sum and substance, to "illegally collecting money and managing funds from affiliated companies," (Korean Interviews Binder, Tab E at 9; *see also* [Ext. Dkt.] No. 27-1 at 59), and that the trademark fees were "unnecessarily" high and "actually a way for the Yoo . . . family to take the funds of affiliates," (Korean Interviews Binder, Tab E at 21; *see also* [Ext. Dkt.] No. 27-1 at 68-69). Park further admitted that he assumed "responsibility for the overall management

---

[10] Petitioner concedes that an earlier translation he submitted to the Extradition Court translated the word at issue as "under the pretext" rather than "for," but says this was a "mistake[]."  (Petitioner's Br. at 25 n.21.)

of the Yoo family's slush fund."  (Korean Interviews Binder, Tab E at 25; *see also* [Ext. Dkt.] No. 27-1 at 69-70).

*In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *11 (cleaned up).  The Court agrees with this assessment.  While some of the linguistic discrepancies Petitioner raises might make Park's statements less incriminating, his statements remain incriminating.[11]  They thus constitute evidence sufficient to support the Extradition Court's findings.  *See Skaftouros*, 667 F.3d at 157.[12]

In addition to Park's statements, which the Extradition Court noted are entitled to "significant weight" as statements of an alleged accomplice, *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *12 (cleaned up), the Extradition Court cited additional evidence supporting its probable cause findings as to each of the seven embezzlement charges.  Petitioner reiterates several arguments he made before the Extradition Court challenging these findings.  In addition, Petitioner objects to some (but not all) of the Extradition Court's evidentiary rulings.  Mindful of the procedural posture, this Court will not engage in *de novo* review of the evidence, but will address the arguments raised by Petitioner.  *See Melia*, 667 F.2d at 302.

2.    **Trademark Licensing Allegations**

a.    Chonhaiji

The Extradition Court found that Park's statements, along with statements made by former Chonhaiji CEO Byeon Gi-chun and financial records reflecting payments made from Chonhaiji to Key Solutions, "constitute sufficient evidence to support a finding of probable

---

[11] Further, as discussed below, Park's statements are not the only evidence that the payments were pretextual.

[12] Because my decision here does not turn on the proper translation of the disputed term, I decline Petitioner's suggestion to engage a court-certified translator.  (*See* ECF No. 14 ("Petitioner's Reply") at 7.)

cause." *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *12. Petitioner attacks the probative value of Byeon Gi-chun's statements, citing the fact that he did not become CEO until after the alleged scheme had concluded. (Petitioner's Br. at 27.) But Petitioner concedes that Byeon Gi-chun joined Chonhaiji as a director in 2007, (*id.* at 24, 27), and the Extradition Court found the totality of his statements sufficiently demonstrated that he had personal knowledge of the trademark contract and the circumstances surrounding it, *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *12-13. Thus, while it is true that Byeon Gi-chun did not establish the contract at issue, it does not follow that he had no knowledge of the factors that caused the company at which he was a director to continue to pay the fee.

Petitioner also argues that Byeon Gi-chun's agreement with the prosecutor's statement that the trademark licensing fee was "actually a way for the Yoo Byung-Eon family to leak the funds of affiliates" should be disregarded as a response to a leading question that "adds little to the probable cause calculation." (Petitioner's Br. at 27.) This argument amounts to a dispute over the proper weight to give Byeon Gi-chun's statements, and it does not convince the Court that Judge McCarthy's determination was in error. *See Austin*, 5 F.3d at 605 (*habeas* review is not occasion for review of magistrate judge's findings regarding credibility or weight of evidence). Further, that the answer to a leading question may have less probative value than the answer to an open-ended question hardly means that its probative value cannot be significant. *See United States v. Thomas*, 282 F.2d 191, 195 (2d Cir. 1960) ("'Yes' and 'No' answers to leading questions may have less evidentiary weight but this is material for jury argument rather than appellate error.").

b.      Ahae

In finding probable cause for the Ahae trademark embezzlement charges, the Extradition

Court relied in part on statements made by Lee Seong-hwan, Ahae's former co-CEO, that the

price of the trademark licensing agreement was too high and had been set unilaterally by

Petitioner.  (Petitioner's Br. at 29-30.)  Park confirmed this statement.  (*Id.* at 29.)  While this

exchange, standing alone, might be insufficient for probable cause, the statement stands

alongside Park's other statements, including his admission that the trademark agreements were a

way for Petitioner's family to enrich itself.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL

2784836, at *15.  Lee Seong-hwan's statement supports that theory of the crime.  The same is

true of the statement of the other co-CEO, Lee Gang-se, that the licensing fee was unnecessarily

high, on which the Extradition Court also relied.  *Id.*  Petitioner's arguments, as above, largely go

to weight and do not convince me that there is a lack of evidence supporting the Extradition

Court's conclusion.[13]

c.      Onnara Shopping

With regard to Onnara Shopping, Petitioner dismisses Park's evidence as "frail[]" and

focuses his discussion on the Extradition Court's partial reliance, *see In re Extradition of Hyuk

Kee Yoo*, 2021 WL 2784836, at *17-18, on statements from Kim Chun-gyun, an auditor of I-

One-I and some of its affiliates (but not Onnara Shopping), (Petitioner's Br. at 31).  But, as

---

[13] I also do not agree that Petitioner's evidence – reflecting that the Korean government
was wrong about the date on which Petitioner sought to register the Ahae trademark – "tears the
heart from Korea's allegations."  (Petitioner's Br. at 28-29.)  As the Extradition Court explained,
the timing of the trademark's registration is not the only evidence going to probable cause.  *In re
Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *14 ("In light of the consistent evidence that
(1) the name "Ahae" was adopted in or about 1998, years before any trademark licensing
agreement with Yoo; (2) Yoo did not own or create the subject mark; and (3) the royalty
payments were disproportionate to the mark's value, Yoo's rebuttal evidence regarding the
specific timing of the subject licensing transaction is ineffective.").

discussed above, Park's evidence cannot be so easily discounted.  The Extradition Court held that Park's statements alone were sufficient to support probable cause as to Onnara Shopping because Park "named Onnara Shopping as one of the affiliates from whom Yoo received money" for trademark fees, "asserted that such royalties were 'unnecessary' and a mechanism to take affiliates' funds to benefit the Yoo family's own wealth," and "confirmed that he received all of his instructions to facilitate such transactions from Yoo" as part of a scheme that he considered illegal in retrospect.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *17.  This is sufficient for the minimal probable cause showing required at this stage.

Petitioner argues that Kim Chun-gyun's statements – to the effect that he was generally aware, through his knowledge of Yoo's family's corporate structure, that the Affiliated Entities generated funds for the family by fraudulent means, *see id.* – should be disregarded because Kim Chun-gyun lacked personal knowledge and his statements were hearsay, (Petitioner's Br. at 31-32).  But, as Petitioner acknowledges, the Federal Rules of Evidence do not apply in extradition proceedings and hearsay is admissible.  *Melia*, 667 F.2d at 302.  The Court thus defers to the Extradition Court's determinations of the proper weight to give these statements.

### 3.    Consulting Services Allegations

#### a.    Semo

In finding that there was probable cause that Petitioner was embezzling money from Semo through sham consulting agreements, the Extradition Court discussed the statements of five witnesses – Park, Kim Chun-gyun, Kim Gyu-seok (leader of Semo's Management Support Team), Go Chang-hwan (Semo's former CEO), and Jo Seon-ae (a Semo employee).  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *18-22.  Petitioner first incorporates his

arguments about Park and Kim Chun-gyun, (Petitioner's Br. at 33), which are unpersuasive, as discussed above.

Petitioner points to discrepancies between the Korean summaries of Kim Gyu-seok's statements and Petitioner's translation.  As explained by the Extradition Court, this discrepancy – regarding whether work product provided by Key Solutions was simply a Korean translation of information that was available on the internet – was an erroneous attribution of Park's statement to Kim Gyu-seok.[14]  Petitioner also suggests that Kim Gyu-seok did not say that Petitioner only provided consulting services once or twice per year in the years in which he was being paid a monthly fee.  (Petitioner's Br. at 33.)  But Petitioner's own translation includes that statement: "As a management advisory consulting firm, Key Solution provides us with 1-2 data per year." (*See* Korean Interviews Binder, Tab A at 20.)  Petitioner also points to Kim Gyu-seok's non-answer ("You can check it out with each department.") to a question whether the consulting fees paid by Semo to Petitioner were worth it.  (Petitioner's Br. at 34.)  But the fact that Kim punted on this question does not undermine his statements, confirmed in the transcript, that Key Solutions only provided services 1-2 times per year.  (*See* Korean Interviews Binder, Tab A at 20.)  Whether this is conclusive on its own is irrelevant in light of the other evidence on which the Extradition Court relied.

---

[14] According to the Extradition Court, during the proceedings below "Korea clarified that the 'internet' statement was misattributed, and was actually made by Park Seung-il," an assertion that Petitioner apparently did not question before the Extradition Court.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *18 n.27.  Petitioner's submission to this Court reflects that Park did not say the exact words Korea attributed to Kim Gyu-seok, but did concede that Key Solutions had inexperienced employees providing a translated version of data available on the website of the U.S. Food and Drug Administration ("FDA").  (Korean Interviews Binder, Tab E at 17.)

Petitioner contends that when Korean prosecutors asked Go Chang-hwan whether he thought the limited services Key Solutions provided could have been procured on a one-time outsourcing basis (as opposed to via the monthly fees Semo paid), his response was not unequivocal:  "That's right. But I can't be too sure."  (Petitioner's Br. at 35.)  But this is not the only inculpatory statement from Go Chang-hwan, as (based on Petitioner's translations) he also testified "I think so" in response to the question whether it was true that Petitioner only provided services one to two times per year.  (Korean Interviews Binder, Tab B at 17.)  These statements, though perhaps weak (or perhaps reflecting the reluctance of the witness), are consistent with the other evidence presented by Korea.

Petitioner also raises Korea's failure to disclose Go Chang-hwan's statements that it was "absolutely not the case" that Semo paid excessive consulting fees to Petitioner without any justifiable reason, and that Yoo provided talks on health and documents related to FDA and other certifications.  (Petitioner's Br. at 35.)  The Extradition Court concluded that Korea had no obligation to disclose this evidence, following other courts that have held that "there are no *Brady* obligations in an extradition proceeding precisely because, absent a full trial on the merits by the extraditing court, the extraditee has no rights that trigger *Brady*'s underlying purpose."  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *22 (citing *Montemayor Seguy v. United States*, 329 F. Supp. 2d 883, 888 (S.D. Tex. 2004); *In re Extradition of Singh*, 123 F.R.D. 108, 112 (D.N.J. 1987); *Merino v. U.S. Marshal*, 326 F.2d 5, 13 (9th Cir. 1963)).  I agree with the Extradition Court that, under the circumstances, the failure to disclose these statements does not negate probable cause.  The bottom line at this stage is that the statements were before the Extradition Court, even if through Petitioner's efforts rather than Korea's, and were considered by that court as part of the totality of the circumstances.  Korea's failure to disclose this

information does not alter the conclusion that there is evidence supporting the Extradition

Court's conclusion with regard to probable cause.

Petitioner's challenge to Jo Seon-ae's evidence – that Korea's summary of her statements

was misleading and that she could not have had any knowledge of the value of the consulting

provided by Petitioner – is immaterial because the Extradition Court determined that there was

sufficient probable cause for the Semo charge "regardless of the weight afforded to Jo Seon-ae's

statements." *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *22.

Finally, Petitioner challenges the Extradition Court's decision to exclude the affidavits of

Hwang Ho-eun (a Semo employee in charge of production) and Ryu Geun-ha (a Key Solutions

employee), as well as reports prepared by Ryu Geun-ha.  (Petitioner's Br. at 37-38.)  Petitioner

argues that the Extradition Court should have considered these materials because they negate

Korea's charge that Key Solutions failed to provide and was incapable of providing consulting

services.  (*Id.*)

While defendants in extradition proceedings are afforded "the opportunity to present

reasonably clear-cut proof which would be of limited scope and have some reasonable chance of

negating a showing of probable cause," *In re Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978),

contradictory evidence that merely "pose[s] a conflict of credibility" is inadmissible, *Shapiro v.

Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973).[15]  The "precise scope" of what is admissible is

"largely" within the extradition court's discretion.  *United States ex rel. Petrushansky v.

Marasco*, 325 F.2d 562, 567 (2d Cir. 1963).  The Extradition Court held that the documents in

---

[15] "Evidence submitted in support of an extradition request is deemed truthful and its
credibility generally may not be challenged at an extradition hearing. . . .  Thus, a defendant
challenging extradition is limited to evidence which explains or obliterates, rather than
contradicts, the government's proof."  *United States v. Hunte*, No. 04-M-0721, 2006 WL 20773,
at *6 (E.D.N.Y. Jan. 4, 2006).

question were inadmissible because they "simply offer[] an alternative set of facts that stand at odds with the heart of Park Seung-il's testimony." *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *22.  This conclusion is not in error.  Admission of this evidence would have put the Extradition Court in the position of evaluating the credibility of witnesses (not before it) with differing views on the value (or lack thereof) of Key Solutions's services, which would impermissibly expand the extradition hearing beyond its proper scope of determining if there is "any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976).

b.   Moreal

The Extradition Court relied on the testimony of Park, Kim Chun-gyu, and Ha Myeong-hwa (co-CEO of Moreal),[16] as well as contracts implicating Petitioner and bank records reflecting the alleged payments, *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *24, and concluded that "the totality of the circumstances create a reasonable belief that Yoo utilized his relationship with his older sister, Moreal's co-CEO, to embezzle Moreal's funds through a fraudulent business consulting contract." *Id.* at 26.  As he did before the Extradition Court, Petitioner argues that Ha Myeong-hwa would not have had relevant personal knowledge of Key Solutions's consulting work because she oversaw a different department.  But Ha Myeong-hwa was co-CEO of Moreal with Petitioner's sister and testified that she looked for and was unable to locate official documents reflecting training Key Solutions was supposed to have provided. (Petitioner's Br. at 39-40.)  The lack of official documentation may not be conclusive, but it is

---

[16] While the Extradition Court discussed the statements of Park Hwa-sun, a fourth witness whose statements Korea cited, and noted that Korea's summary of her testimony was consistent with the full transcript submitted by Petitioner, the Extradition Court did not explicitly rely on this testimony in its analysis.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *24-26.

not irrelevant to probable cause.  Nor is Petitioner correct that Ha Myeong-hwa's testimony that

she was directed to sign the contract first by Park and then by Petitioner's sister – and did so

without further investigation or consultation – clearly without any evidentiary value.  Again,

Petitioner's arguments go primarily to the weight of the evidence, an issue that is for the

Extradition Court to examine and, ultimately, a factfinder at trial to determine.  In sum, Ha

Myeong-hwa's statements provide some evidence supporting probable cause for this charge.

Petitioner also challenges the Extradition Court's refusal to admit an affidavit from the

leader of Moreal's Graphic Design team as well as a 93-page consulting report from Key

Solutions.  (Petitioner's Br. at 41-42.)  For the same reasons stated above with regard to the

Semo evidence, the Court does not agree that exclusion of this evidence was an error that negates

probable cause.

c.    <u>Chonhaiji</u>

While acknowledging that Petitioner may prevail at trial on the charge that the Chonhaiji

consulting agreement was an embezzlement scheme, the Extradition Court nonetheless found

that Korea had made the requisite "minimal showing" to establish probable cause.  The bases for

this conclusion were the statements of Park and Byeon Gi-chun.  The Extradition Court pointed

specifically to Byeon Gi-chun's statement that the consulting fees were an "alternative" to

"replace" the trademark fees after the Korean government determined that the trademark fees

were no longer tax deductible.  *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *27.

While the evidence going to probable cause is limited, this Court again cannot say the

Extradition Court's conclusion was baseless.

Petitioner objects that the Extradition Court should have admitted as evidence the

affidavit of Sung Min Park, a Chonhaiji employee.  (Petitioner's Br. at 43-45.)  Sung Min Park

was allegedly encouraged by Petitioner over several years to pursue internships and education related to yacht-building, a field into which Petitioner was interested in having Chonhaiji expand, and had Sung Min Park create a database of research materials. (*Id.*) Petitioner argues that this demonstration of Petitioner's interest and activities "obliterate[s] probable cause" for the Chonhaiji consulting charges. (*Id.* at 44-45.) But even though the Extradition Court did not admit this affidavit (or other associated documents), it considered the impact of the evidence:

> [I]rrespective of Yoo's advisory work for Chonhaiji between 2007 and 2012, the submissions do not demonstrate that he performed any specific projects during the ten-month period in 2011 when Korea alleges the embezzlement took place. (*See* [Ext. Dkt.] No. 2 ¶ 7g). According to Sung Min Park's affidavit, Yoo's only 'work' during this time comprised of meeting with Park Seung-il while he was at [a Maine-based boat-building and design school], and such meetings occurred throughout his enrollment between September 2009 and April 2014. Simply because Yoo performed valuable work for Chonhaiji before and after the time period when the fees were paid does not mean that these fees were legitimate.

*In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *27 (cleaned up). This Court agrees that the Extradition Court was not required to admit this evidence, and that even if admitted it would be insufficient to alter the conclusion here that probable cause exists for this charge. Neither this Court nor the Extradition Court is charged with adjudicating Petitioner's guilt or innocence of the charged conduct, and neither court is permitted to stand in place of a factfinder.

### 4.    Photography Exhibition Funding Allegation

The Extradition Court found that

> Korea's evidence is sufficient to support a reasonable belief that Yoo used his relationships with Park Seung-il and Byeon Gi-chun to extract monies from various affiliates to fund the Versailles exhibition in order to inflate the value of his father's photographs. Consistent with Park Seung-il's statements, Byeon Gi-chun's detailed testimony explains the specific transactions undertaken by Chonhaiji and the other affiliates to raise a total of KRW 19,862,077,987, which was transferred to Ahae Press and Ahae Press France, which Yoo and his father controlled. Byeon also admitted that the advance payment figures (1) were unilaterally set by Ahae Press, before the photographs had even been taken; (2) were used to cover substantial expenses associated with the exhibition; (3) and were not tied to any appraisal of the works in question. In addition, both of these

witnesses confirmed that the instructions for these arrangements all came from Yoo.

*Id.* at *29 (cleaned up).

Petitioner argues that the Extradition Court analyzed issues that are irrelevant to the charge, and suggests that, had the Extradition Court addressed only the merits of what was charged, Petitioner's evidence regarding the appraised value and artistic merit of the photographs would have properly been admitted to obliterate probable cause.  The charge as framed by Petitioner was that Petitioner "conspired with Chonhaiji's CEO to embezzle money from the company by ordering it to purchase the photographs of his father, Yoo Byeong-eun, at inflated prices which could not be priced accurately because the photographs had never been sold in the market before."  (Petitioner's Br. at 45 (cleaned up).)  Petitioner suggests that the Extradition Court should have disregarded that the Affiliated Entities funneled funds to Chonhaiji for the photos through the pretext that the payments were for stock offerings, (Petitioner's Reply at 13), and should have accepted evidence regarding the value of the photographs, (Petitioner's Br. at 46-47).

It is true that the paragraph quoted by Petitioner from the Korean "Statement of Confirmation," (Ext. Dkt. No. 2-3), only mentions Chonhaiji as the entity that paid Ahae Press and Ahae Press France for the photographs and does not name or mention other affiliates that contributed to the total KRW 19,862,077,987 that Petitioner is charged with embezzling.  (*Id.* at EX-YOO-00088.)  But this does not mean that Judge McCarthy erroneously considered the evidence pertaining to other affiliates, as the charge incorporates those entities by virtue of their having paid into the total funds Petitioner is alleged to have stolen.  (*Id.*)  Moreover, a later paragraph within the same section of the "Statement of Confirmation" refers to the collection of money from multiple Affiliated Entities for the photograph purchase.  (*Id.* at EX-YOO-00089 to

90.)  Further, even if Chonhaiji were the only "victim" from which Petitioner is charged with embezzling, evidence such as the fact that transfers were disguised as stock transactions still is some "circumstantial evidence that, regardless of Chonhaiji's own business plans, the advance payments had a nefarious purpose that needed to be disguised on the affiliates' books as legitimate stock purchases." *In re Extradition of Hyuk Kee Yoo*, 2021 WL 2784836, at *30.

       In short, the underhanded way Chonhaiji raised the money, as well as the circuitous routing of it (from the Affiliated Entities to Chonhaiji to the Ahae Press entities and then (largely) toward the exhibition costs rather than the photographs), support Park Seung-il's and Byeon Gi-chun's testimony that – regardless of what the photos might have eventually turned out to be worth – Chonhaiji collected the money and funneled it to the exhibition on Yoo's orders, without the company undertaking any consideration of what the photos might be worth or whether or not they were a good investment.  For probable cause to exist here, the photographs did not need to be, as Petitioner suggests, "essentially worthless," (Petitioner's Br. at 46), nor is that what the Korean government alleged.  Korea's allegation is that the prices were artificially inflated.  (*See* Ext. Dkt. No. 2-3 at EX-YOO-00088) (alleging that Chonhaiji bought the photographs "at a high price" despite the fact they had never been put up for sale other than to followers of the Yoo family's church and corporate affiliates).  That Petitioner's father was getting some positive attention from the art world for his photographs does not "obliterate" the charge that Petitioner's family used its position of influence to have the Affiliated Entities and Chonhaiji pay inflated prices for these photographs.  Nor does it negate evidence that many of the funds that were supposed to go to buying photographs – an asset the value of which could

conceivably appreciate – were actually sunk into an exhibition at Versailles designed to raise the profile of the photographer and the price of the photos.[17]

For these reasons, the Court concludes that some evidence supports the Extradition Court's probable cause finding for the charge related to the photography purchases, and that contradictory evidence regarding alleged business justifications for the purchase from Chonhaiji's perspective were properly excluded and would fail to obliterate probable cause.

IV.    **CONCLUSION**

For the foregoing reasons, the Court denies the petition for a writ of *habeas corpus*.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 1), and close the case.

**SO ORDERED.**

Dated:  November 1, 2021
        White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.

---

[17] In his reply, Petitioner argues that the conduct charged "does not involve . . . the Versailles exhibition."  (Petitioner's Reply at 13.)  But the first line of the Korean charge, omitted from Petitioner's reproduction in his opening brief, (Petitioner's Br. at 45), is "As suspect YOO Hyuk Kee needed a significant sum of money to exhibit photographs taken by his father YOO Byung Eyn at Chateau de Versailles, he decided to withdraw company funds from Chonhaiji."  (Ext. Dkt. No. 2-3 at EX-YOO-00088.)